# EXHIBIT A

VOLUME: I
PAGES: 1-164
EXHIBITS: 24

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 20-10020-PBS

CHRISTINE MARA ALEXANDER,
PLAINTIFF

V.

MASSACHUSETTS DEPARTMENT OF CORRECTION, CAROL MICI, IN HER OFFICIAL CAPACITY, NELSON ALVES, IN HIS OFFICIAL CAPACITY, AND WELLPATH, LLC,
DEFENDANTS

ZOOM videoconference deposition of CHRISTINE MARA ALEXANDER, taken on Behalf of the defendant, Massachusetts Department of Correction, pursuant to Rule 30 of the Federal Rules of Civil Procedure, before Paula E. Kelly, Court Reporter and Notary Public in and for the Commonwealth, on the 8th day of November, 2022, commencing at 10:00 a.m.

ALL-WRITE TRANSCRIPTION AND REPORTING SERVICES
389 WALPOLE STREET
NORWOOD, MASSACHUSETTS 02062

Q. And did you start when the program started in 1989 or a different time?
A. As a matter of fact, as soon as I came into prison, I started going to school.
Q. And when did you first come into prison?
A. 1989.
Q. And prior to your incarceration, what was your highest level of education?
A. High school. Graduated from high school.
Q. And where did you go to high school.
A. Abington. Abington High School.
Q. And what year did you graduate?
A. '87.
Q. And did you have any jobs prior to your current incarceration?
A. Yes, I had a lot of jobs.
Q. Let's start with the first one. What is the first job that you had?
A. So are we talking about the first job I ever had since I was a kid?
Q. Well, how old were you when you had your first job?
A. 13.
Q. 13. Okay. And what did you do for work then?

A. First degree, life.
Q. And when you say first degree, what do you mean?
A. Natural life.
Q. And is it a life sentence for murder in the first degree?
A. Yes.
Q. Are you parole eligible?
A. No.
Q. Where are you currently housed?
A. MCI Norfolk.
Q. And how long have you been at MCI Norfolk?
A. 30 years.
Q. And prior to MCI Norfolk, were you at any other Department of Correction facility?
A. I was in Walpole for six months, right after I got sentenced.
Q. And from Walpole, where were you classified to?
A. Norfolk. MCI Norfolk.
Q. And have you been at any other institution in the Department of Correction?
A. Yes. I went to Bay State for like six months, and I came back. I didn't like it.
Q. And when were you classified to Bay State?

American Spiritual Circle. There's some other DOC self-help programs that I know I did. I just can't remember. ADL, assisted daily living.

Q. What programs are you currently involved in?

A. Well, I am signed up for restorative justice. Okay, that's the one. I went to restorative justice retreat, restorative justice reading group currently, and I'm getting ready to facilitate another AVP, alternative to violence program. The other program is I have one-on-one counseling, too, with my mental health, if that's a program.

Q. And have you been employed while incarcerated?

A. Yes, miss.

Q. And what has been your most recent employment with the Department?

A. Mainline kitchen.

Q. And how long have you been employed at the mainline kitchen?

A. Since last February. Eight months, nine months.

Q. So February of 2022?

A. Yes.

Q. And what are your duties in the mainline kitchen?
A. I'm the clutch person. I float. They need me, I do it, pretty much, yep.
Q. So can you describe sort of what your daily job duties might be?
A. So I make the coffee, I put the cereal in the bins, I clean up the areas sometimes. I'll cut the roast beef, I'll stack the roast beef, I'll pan up all the burgers, I'll clean the fans, I'll clean the tunnels, I'll clean the office, I'll straighten out the supply room, I'll pick up supplies, things like that.
Q. And is this all occurring in the mainline kitchen?
A. Yes.
Q. And where is the mainline kitchen at MCI Norfolk?
A. It's down deep in the bowels of the institution. That's the only way I can describe it. It's the deepest level.
Q. And when you say the deepest level, is it like in a basement?
A. Yes.

Q. Okay. And is it in a particular building?
A. It's in the tunnel system.
Q. And when you say the tunnel system, can you describe what you mean by the tunnel system?
A. So the tunnel system is comprised of many tunnels that join together to all the units so we can feed them. That's how we send the food to them.
Q. Okay.
A. With the dumbwaiter system?
Q. With the what?
A. Dumbwaiter system.
Q. And can you describe what you mean by a dumbwaiter system?
A. So the carts go down the tunnels and the food gets placed on the dumbwaiters. And the housemen, the kitchen worker housemen in the units will pull the dumbwaiters up and feed the population from there.
Q. So is the food taken off the tray and put onto the dumbwaiter and then lifted up?
A. Yes.
Q. So is each housing unit fed in-unit?
A. Yes.

Q. So there isn't a large cafeteria?
A. No, miss.
Q. And do you travel in the tunnels?
A. Yes.
Q. Do you bring the food trays to the different housing units?
A. I don't personally, because they're way too heavy for me to push, but the other individuals do. When I go to the tunnels, when I'm cleaning them, or I will be -- they'll have a call-back. So something will be missing on one of the carts, and I'll bring the tray to the unit. They will yell out and say call-back.
Q. Okay. And the tunnels are underground?
A. Yes.
Q. Okay. And can you describe the tunnels?
A. Dreary. Very dreary. There's pipes all over the place. It's like a Freddy Kruger horror flick thing. That's what it looks like down there.
Q. And can you describe sort of, are there windows in the tunnels?
A. No, no windows.

Q. Okay. And how big are the tunnels?
A. They're huge. They're very big. The ceiling is, I want to say some areas is 20 feet, other areas it's ten.
Q. And what about the lighting?
A. The lighting is bright.
Q. So when you say that it's dreary like a Freddy Kruger, what do you mean?
A. So there's like dusty, there's marks all over the walls. The pipes have the insulation on them, but it's all falling off. There's leaks all over the place. There's water.
Q. And how far do you have to travel, if you know, from unit to unit in the tunnels?
A. Sometimes I can walk miles, a couple of miles in a day because there's so many call-backs. And the tunnels, they span through the whole institution. And this is a quarter-mile institution, square quarter mile. So sometimes I'll be walking to several units in the whole square, back to the kitchen to pick up more food, to do it again.
Q. And where is the kitchen located?
A. Down deep in the tunnel systems.

Q. Are you currently taking those medications?
A. No.
Q. So did you have any other treatment for GD, or gender dysphoria, prior to your incarceration?
A. No.
Q. And when were you first diagnosed with GD while incarcerated?
A. 2003, 2002.
Q. And who were you diagnosed by?
A. Fenway. Fenway Community Health Center. Randi Kaufman and Kevin Kapala. I believe those were the names.
Q. And do you currently hold a diagnosis of GD?
A. Yes.
Q. And what is your current treatment plan?
A. Hormone therapy and that's it.
Q. And you mentioned before, electrolysis?
A. Yes.
Q. Is that part of your treatment then for GD?
A. Yes, that's part of hormone treatment. The electrolysis, I forgot. I'm sorry.
Q. No, don't be sorry. And have you been -- strike that. Has there been a recommendation for any sort of gender affirmation surgery?

A. Yes.
Q. And what is that recommendation?
A. Testicle removal.
Q. Is that's also known as an orchiectomy.
A. Orchiectomy, yes.
Q. And when were you approved for an orchiectomy?
A. Just recently, as soon as this case started.
Q. Do you remember the year?
A. No.
Q. And have you had the orchiectomy?
A. No, miss.
Q. And who approved your orchiectomy?
A. I don't know. I'm assuming the GD Committee.
Q. And have you been approved for any other gender affirming surgery?
A. No.
Q. Have you ever had any other gender affirming surgery?
A. Just the electrolysis and laser hair removal.
Q. Do you have any medically-prescribed items to address your GD?
A. Well, I don't know if these are medically prescribed, but I'm allowed to get bras for -- and the medication.

Q. Do you have breast forms?
A. No.
Q. And what about a gaff?
A. I don't have one. I made them. I made gaffs. I have my own gaffs that were made.
Q. Have you ever been approved for a gaff?
A. Just recently.
Q. And when you say just recently, do you mean --
A. Like a month.
Q. And have you received that gaff?
A. No, not yet.
Q. Do you know if it's been ordered?
A. I do not know. My size was taken. They asked me for my size, and that's where I -- that's all I know.
Q. And can you describe what a gaff is?
A. It hides the penis. It pulls the penis up underneath the body, so when you wear pants, you can't see it.
Q. And you said that you currently engage in one-on-one counseling?
A. Yes.
Q. What is that counseling for?
A. For GD.

Q. Anything else?
A. Well, I'm allowed to put in slips when I'm stressed out or I'm having a problem dealing with something, and they'll call me, talk to me about it, help me deal with it, that's non -- not GD-related issues.
Q. And are you diagnosed with any non GD issues?
A. I'm diagnosed with claustrophobia.
Q. Okay. And when were you diagnosed with claustrophobia?
A. I can't remember. A few months ago, a year ago.
Q. Any other non GD diagnoses?
A. Not at the top of my head. I can't remember.
Q. And do you have one particular clinician that you meet with one-on-one?
A. Well, yeah. Yes, but they change them so frequently.
Q. Do you have scheduled one-on-one counseling with your clinician?
A. Yes.
Q. And how often do you meet with your clinician one-on-one?
A. Once a month.

Q. And then you said that you can submit sick slips if you need to be seen by mental health for any other reason?
A. Yes.
Q. And is there a particular clinician that you see when you submit those sick slips?
A. No.
Q. Is it sort of whoever is available at that time?
A. Yes.
Q. And in the last six months to a year, how often have you submitted sick slips for mental health counseling?
A. I would say about maybe ten, because I see them once a month anyways.
Q. Okay. And I'm just talking -- I know that you have once a month, one-on-one counseling with your one clinician, but in addition to that, you said that you can submit sick slips if you need some extra time, is that right?
A. Yes.
Q. Okay. And how often have you had to submit sick slips for extra time?
A. I'm using the number ten, but it's often. It's

Q. And under what circumstances, if you recall?
A. We drove to Florida for Disneyland or Disney World, whichever one that is, and we drove in a Cadillac. And a Cadillac has front-wheel drive. So my sister slept on the back seat, and I slept on the floor. My parents slept in the front seat, and they pushed the seat all the way back, to the back seat, and I was in this coffin.
Q. And that was when you were about five or six years old?
A. Yes.
Q. And prior to your incarceration, did you have any other times where you experienced claustrophobia or claustrophobic symptoms?
A. When I first got arrested, yeah. They had a hard time putting me in the cell that they had.
Q. What police department arrested you?
A. Brockton.
Q. And are you currently prescribed any medication for your claustrophobia?
A. Yes, ativan.
Q. And how often do you take ativan for your

was in there for a while. It was crazy.
Q. And that was around 2018, 2019?
A. Yeah.
Q. Thank you for clarifying that.
A. Yep.
Q. Ms. Alexander, do you see the screen share?
A. Yes.
Q. And do you see, it says Exhibit 1?
A. Yes.
Q. I'm going to scroll down to the second page. And do you recognize this first page?
A. No.
Q. It says it's a Massachusetts Department of Correction Policy. Do you see that?
A. Yes.
Q. And do you see where it says policy name, 103 DOC 652?
A. Yes.
Q. And it says, Identification, Treatment and Correctional Management of Inmates Diagnosed with Gender Dysphoria?
A. Yes.
Q. And you said that you have not seen this document before?

A. Yeah.
Q. Okay. And under that, it has subsection A that says Duties, and Number 1. Do you see that?
A. Uh-huh.
Q. Okay. And it says, The role of the Gender Dysphoria Treatment Committee is to review the individualized treatment plans developed for inmates diagnosed with gender dysphoria, to determine if the proposed treatment recommendations related to the management of gender dysphoria are clinically appropriate and medically necessary. Do you see that?
A. I do.
Q. Now I'm scrolling down to another section where it says, Treatment planning for inmates with gender dysphoria. Under subsection C, Essential Elements of the Treatment Plan for Gender Dysphoria Diagnosed Inmate.
A. Yes.
Q. Okay. And then it has another subsection, 2B. Do you see that?
A. Yes.
Q. Okay. Where it says, The treatment plan may contain recommendations regarding access to

cross-gender clothing and canteen cosmetic items approved for inmates, in accordance with 103 CMR 403 inmate property policy?

A. Yes.

Q. And continuing reading that, it says, Commensurate with the security level of the housing placement, gender dysphoria inmates housed in a male institution shall be permitted to purchase and retain clothing items and articles authorized for other male inmates housed in that institution, as well as those items authorized for females commensurate with their particular security level at the female institution. Do you see that?

A. Yes.

Q. Okay. And what do you understand what I read to you to mean?

MR. GUENTHER: Objection. You can answer.

THE WITNESS: Do I answer it?

MR. GUENTHER: You can answer, yeah.

THE WITNESS: Okay.

A. That the treatment, the GD Committee, they make

the determination on what I can have and what I can't have.

Q. And when it says that you shall be permitted to purchase and retain clothing items, as well as those items authorized for females commensurate with their particular security level at the female institution, what do you understand that to mean?

MR. GUENTHER: Objection. You can answer.

A. That whatever the girls can have at their prison, I can have.

Q. So whatever the other girls at MCI Framingham can have -- can order at MCI Framingham, you can also possess?

A. Yes.

Q. I'm going to stop share for a moment while I get the other exhibit ready. And I'm sharing another exhibit, marked Exhibit 2. Has that popped up on the screen for you yet?

A. Yes.

Q. Okay. And Exhibit 2 on the upper left-hand corner, it says 103 CMR 403.00, Inmate Property, is that right?

Q. I'm now sharing on the screen what's been marked as Exhibit 3. Do you see that?
A. Yes.
Q. Are you familiar with this document?
A. I'm very familiar with it.
Q. What is this document?
A. This is a Framingham canteen list, an old one.
Q. And if I was to suggest -- I don't think it's marked on here, but it is a 2011, it's marked on the -- really, really small writing on the bottom of the right-hand corner. It says revised September 20, '11.
A. Yep.
Q. And when you say that you're very familiar with this property list, what do you mean by that?
A. Well, I bought just about everything from it.
Q. And when did you start buying from the MCI Framingham list?
A. Earlier than this list. I want to say about 2007. I think 2007, we were allowed to order stuff off of the clothing part of the list.
Q. And looking at this document, is this the Framingham clothing list?
A. Yes, it was.

Q. Thank you for correcting me. It was the Framingham clothing list. And on the upper right-hand corner where it says Levi relaxed fit jeans, do you see that?
A. Yes.
Q. Okay. Did you order from this list?
A. I did.
Q. What did you order?
A. I ordered the size 6 jeans, and then I ordered the size 7 jeans, and I ordered the size 8 jeans.
Q. Of the Levi relaxed fit jeans?
A. Yes.
Q. And when you ordered them, I see that it says 6-short, 6-regular, 7-regular, 8-short, 8-regular?
A. Yeah.
Q. Which one did you order of each?
A. I ordered the 6-regular. I believe all regulars, 6, 7 and 8-regulars.
Q. And you said that was starting in 2007?
A. Yes. Well, I don't know the dates, Stephanie. I just can't remember those dates. I could be wrong.

Q. That's fair. But about 2007, you were permitted to order from the MCI Framingham property list?

A. I think so, yeah.

Q. Okay. And what else on this list were you able to order, if you recall, in 2011?

A. So I could order all these things in 2011. Right off of this particular list, I could order it.

Q. And can you tell me, you said that you ordered size 6-regular, size 7-regular and size 8-regular?

A. Yes.

Q. Okay. Can you tell me why you ordered three different sizes?

A. Well, it wasn't all at the same time. I was trying to get a pair of jeans that fit, and just the waist wasn't cutting it. I had to get the bigger size, and then they just weren't fitting, and I had to alter them in the leg to get them to fit, once I got the waist size right.

Q. And when you say that you had to alter them in the leg, can you describe what you mean?

A. I had to sew the seam in a bit, down the leg, a little down towards the knee.
Q. When you say that you had to sew the seam in towards the knee, what do you mean?
A. I would have to take, I don't know, about a half inch or an inch off and sew up underneath the crotch, down from the knee area, up underneath the crotch, down to the other knee area.
Q. Okay. So were you removing material in order to do so?
A. I was removing material, yes.
Q. So prior to removal of that material, how did it fit on your body?
A. Perfectly.
Q. Prior to the removal?
A. Oh, it wasn't -- very uncomfortable.
Q. And why was it uncomfortable?
A. Because there was too much material around the waist area -- not the -- hip area. There was way too much material in the hip area. I was picking my butt. They kept riding up into my butt, like bunching up. All that material was bunching up.

Q. Okay. And how did the material bunch up, if you can explain as best as you can?
A. The material in the crotch area would bunch up. Like when I walk, it was like, kind of like, it would be a whole bunch of material bunching up, wrinkling and bunching up in the crotch area, like walking around with poop in my pants.
Q. Okay. So this was in the rear of the pants?
A. Yeah, in the rear and in the crotch. In the crotch area. Let's just say in the crotch area.
Q. Okay. And where was the extra material coming from?
A. From the pants itself.
Q. Okay. But you said that the material was wrinkling and bunching up?
A. Yes.
Q. Okay. So how was the material doing that?
A. I don't know. It was bunching up. There was just more material there than my body has. My body is a male body, and it doesn't fit into the girl jeans. If I have a waist that fits, the crotch area and the hip area is too big.

If I have a crotch area and hip area that fits, the waist is too small, can't breathe.
Q. Okay. And so when you altered those jeans and removed material, where did you remove the material from?
A. The crotch area. Like I said, from the knee, up underneath the crotch, all the way down to the other knee.
Q. And how much material did you take off?
A. I don't know, half inch, an inch. There's like a big difference between the male body and the female body when it comes to the hip area.
Q. And so when you took off the half inch to an inch of material, did that make it more of, like a tighter fit?
A. Yes.
Q. And that was the goal of removing that material?
A. The goal was so they don't keep bunching up and make me feel like I've got poop in my pants, picking my butt while walking.
Q. So I previously showed you the 2011 property list. How many times did you alter jeans that you ordered from that list?

from the 2011 property list and altered?
A. Yes.
Q. And you told Ms. Lewis, the property sergeant, that you were having issues with those jeans?
A. Yes.
Q. Okay. And what were those issues with the jeans that you had altered?
A. Exactly what I just told you before, that they weren't fitting too good, that they were bunching up.
Q. But you had stated that that was prior to your removal of the material, correct?
A. Yes.
Q. Okay. And you had stated that after you removed that material, that it fit perfectly?
A. They fit perfect, yes, for my body at the time. What was going on is that -- because I gain weight and I lose weight, I gain weight and I lose weight. And I altered those other jeans, but the waist didn't go with my weight gain, so they became restrictive again, and it was just like buying a small pair. So I talked to Lieutenant Lewis -- Sergeant Lewis about it, and she told me to put in a slip. And then we

A. I do, but all these sneakers aren't on it. I don't remember the Quick Chase sneakers. I remember the Max Motion, but as you scroll down, there's things I didn't even recognize. They didn't have all that on there. They didn't have those jeans on there. The Kingdom High shoe, I don't remember all that, those words.

Q. And I'm going to keep scrolling up to where it says Levi relaxed black jeans and Levi relaxed fit blue.

A. Yep.

Q. And in the middle column, it says Levi's straight blue jeans. Do you see those?

A. Yes.

Q. Okay. And do you recognize these to be the women's jeans?

A. Yes.

Q. And in 2020, do you recall whether or not you had a list that included these women's jeans?

A. I can't remember. I think so. There was so many different lists, and they were always different. Every time they sent us a list, there was -- but I can't remember. But I do

recognize this list, the format of it.
Q. So from December 2016 to May of 2020, did you order any other women's jeans off of the MCI Framingham property list?
A. I did. I ordered one pair of blue jeans.
Q. Do you know when that was?
A. I do not remember. But they were the exact same type that the treasurer had found on the internet for me. They were the blue 512s.
Q. Okay. And they were on --
A. Yeah, the DOC somehow started selling them and -- because he told me that they started selling them so I bought a pair, and then they stopped selling them.
Q. And that was sometime between December of 2016 and May of 2020?
A. I do not remember the -- I don't remember. Let's say yes. Between '16 and '20, I would say, yes.
Q. Okay. Was it before you filled out the specialty order form or after?
A. It was after. Now that we're talking about this, it's about '18, maybe, 2018, maybe even 2017, but -- so I didn't have to put in a

Q. Okay. And what do you recognize this document to be?
A. This is the Framingham commissary list.
Q. And is that different than the Framingham property list?
A. Yes, it is.
Q. And how is it different?
A. It has food items and stuff on it and cosmetic miscellaneous things, paper, pencils, things like that.
Q. And you had testified before the break that you had been able to order off of the MCI Framingham property list, is that right?
A. Yes.
Q. Okay. And you were able to order jeans and other clothing items, is that right?
A. Yes.
Q. And have you been able to order off of this MCI Framingham commissary list?
A. I have.
Q. What have you ordered off of the MCI Framingham commissary list?
A. Eyeliner, lipstick. This current one?
Q. Yes.

A. This one right here?
Q. Yes.
A. The eyeliner, the lipstick, hairspray, the brush. That's all there is.
Q. And when you say that that's all there is, what do you mean by that?
A. It's thinned out from what it used to be.
Q. But this is the MCI Framingham commissary list that is available to all female inmates, correct?
A. Yes. Well, I don't know what they give the Framingham people, I just know what they're giving me. That's it.
Q. All right. And on this list, do you see -- I know it's small print, but do you see any eye shadow, mascara, press-on nails?
A. Nothing.
Q. And I'll keep scrolling to give you an opportunity to just look. I know that you said that you're familiar with this particular list, but.
A. It doesn't look like there's any on there, no.
Q. And for the lipstick, I believe on page one, there's a lipstick, black orchid.

A. Yes.
Q. Do you see that listed as item number 5314?
A. I see it.
Q. Do you see any other different color lipstick on this list?
A. I don't.
Q. And I'm showing you what's marked as Exhibit Number 9. Has that popped up on your screen?
A. Yes.
Q. And I'm going to scroll down. Do you recognize this document?
A. I do.
Q. And what is this document?
A. It's a canteen receipt.
Q. And where it says name, is that your name and inmate ID?
A. Yes, it is.
Q. And it looks like it's printed, order date 6/6/2019, is that correct?
A. Yes.
Q. Okay. And on that it says the order details, emery board, vented hairbrush, and lipstick, black orchid, is that correct?
A. Yes.

don't have them.
Q. I'm showing another document that says Exhibit 11. Has that popped up on your screen?
A. It has.
Q. And do you recognize this document?
A. Yes, I can see it.
Q. And what do you recognize this document to be?
A. The State -- Framingham Clothing Request Form.
Q. And is that your name and commitment number on the form?
A. It is.
Q. And what was the date on this form?
A. 1/10/16.
Q. And can you tell me what you ordered?
A. I ordered 42C bras, large sweatshirt, size 11 women sneakers, and a state jacket.
Q. And to the best of your knowledge, did you receive all of these items?
A. I don't think I got the coat, and I got the sneakers, I got the sweatshirt, and I definitely got the bras.
Q. Can you tell me what your current property list entails? What do you currently own as far as property is concerned for clothing and

commissary items?
A. That I own, that I have?
Q. That you have, correct.
A. I have jeans, T-shirts, sweatpants, sweatshirts, sweaters, polo shirts, dress shirts, sneakers, shoes. I have lipsticks, eyeliner, hairbrushes, hair spray, emery boards, socks, of course, underwear, coats. I have jackets. I have hats, a couple of hats, shorts. I have shorts. That's pretty much it.
Q. And how much of that property was ordered off the MCI Framingham property or commissary list?
A. So the shorts, the T-shirts. Of course, the jeans weren't on the list. The underwear, the bras, of course, a sweatshirt. One sweatshirt -- two sweatshirts, I should say. A lot of my stuff, I've had for a long time, when they used to sell the colored sweats and the colored sweatshirts, and stuff like that, so I really don't know how to answer this question, but I'm trying my best not to muddy up the waters on you.

Q. Yes. No, I appreciate that. And so the lipsticks, the eyeliner, the hair sprays, the hair brushes, the emery boards, those are all from the MCI Framingham commissary lists?

A. Yes.

Q. And you said that you have ordered women's underwear from the property list?

A. Yes, the state. I got the state underwear.

Q. And can you tell me what the difference is?

A. Well, the underwear that they sell in Framingham, they're a better quality and they're expensive. The state ones aren't as good as quality and they're free.

Q. So you ordered it from the state?

A. Yes, state clothing form. I haven't done that in a long time.

Q. Was it the state clothing form for MCI Framingham that you ordered from?

A. Yes.

Q. Have you ever ordered the underwear that's listed on the MCI Framingham property list?

A. Honest, Stephanie, I can't remember if I bought them. I just know that I got some pairs from other girls in the camp who gave them to me,

and I just turned them into gaffs.
Q. How did you turn them into gaffs?
A. I would cut them. I would slice them and sew them and form them.
Q. When you say that you turn them into gaffs by cutting them and slicing them, why did you do that?
A. So I could have the gaff, because they didn't -- we couldn't have gaffs. I asked for a gaff a long time ago, and they said -- because from what I understood what a gaff was, it was like a silicone object that goes over the male genitals, and it's shaped like the outside of a female's private area. So I was like, I don't know if I want that because that might -- start sweating and get wet and smell and stuff. I didn't -- so I just stuck with the -- I was glad that they didn't let me have that type of apparatus anyways.
Q. So you have either female underwear that other girls on the campus had given you or that you had ordered through the state form?
A. Yes.
Q. Okay. And why was it that you altered those

pair that's almost gone, worn out, and I have one pair that I still have to fix because the leg part, I made it too close to the front part. So the rubber band that goes around the leg is too far forward. So it's still too tight on my leg, so I have to move it back a little bit. And I haven't gotten to it. I've been so busy. But most of the time, I wear my gaffs anyhow.

Q. And when you say that you wear your gaffs, are these the gaffs that you made?

A. Yes.

Q. And can you describe them for me?

A. So they look like a thong. They don't go around the leg or up on the butt cheeks or anything. It's just a thong, and it hides everything perfectly, and there won't be any visual of the male part.

Q. So what products did you start with in order to make the gaff?

A. I don't understand that question.

Q. Sure. So you said that you sort of made the gaff by making, was it a pair of underwear that you had got from a state order form?

A. Okay, yes. As I said previously, I would turn these underwear either into gaffs or I would make them fit right, as regular underwear and gaffs. It depended upon the size. Sometimes some of the girls, you know, they buy a pair of underwear that was either too big for them or too small, and -- You want some underwear? I was like, I'll take them. And depending upon what size they were, determined whether or not they were going to be regular underwear or a gaff.
Q. So if the underwear were too small, would those underwear be made into a gaff?
A. No, those underwear would be made into regular underwear.
Q. And how did you do that?
A. It was the leg. So what I consider too small, it's the leg, because if the waist is too small, the leg's definitely too small. So it was usually the leg. So the small ones usually made the perfect underwear because the waist fit. The large ones were so freaking big -- I'm sorry. They were so big that they were perfect to make the gaff, because there

Q. And what color is the bra from the state clothing form?
A. White.
Q. And that is the MCI Framingham state order form, correct?
A. Yes.
Q. So that is a form that is provided to the inmates at MCI Framingham?
A. I just know that's the one they give me.
Q. So again, I'm going out of order, and I apologize for any confusion, but I'm showing you something that's Exhibit 20. Do you see that? Has that popped up on your screen?
A. It has.
Q. Do you recognize this document?
A. No.
Q. It states that it's the MCI Framingham Inmate Handbook. Do you see where it says that?
A. No.
Q. Do you see that?
A. I do. Inmate Handbook.
Q. And to your knowledge, does each institution have an inmate handbook?
A. Yes. I know this one does.

T-shirts only as an undergarment?
A. Yes.
(Off the record.)
Q. I want to talk a little bit more about transportation. When was your last trip outside of MCI Norfolk?
A. I think 2013.
Q. 2013?
A. Yes.
Q. And do you remember if that was for a medical appointment, a court appearance, or something else?
A. It wasn't a court appearance. I went to see Judi for laser hair removal.
Q. Laser hair removal. And do you remember where that was? Was that at a DOC institution, a hospital, or something else?
A. That was at her place. I don't know where it was. It was like a half hour away.
Q. And when you say her, you're referring to Judi?
A. Judi, yes. I'm sorry. Yes.
Q. Okay. So was it a residence or was it a medical facility?
A. I think it was a place of business.

Q. And do you remember how you were transported?
A. I was transported by a car.
Q. And was that a Department of Correction state vehicle?
A. Yes.
Q. And when you say a car, was that a sedan?
A. Yes.
Q. Do you remember what the make or model was?
A. No, but it was big.
Q. So it was a four-door sedan?
A. Yes.
Q. And do you recall if it was MCI Norfolk that transported you, or was it a central transportation unit, or CTU?
A. That I don't know. I believe it was these people.
Q. You believe it was who?
A. The institution.
Q. And you said that it was about a half hour away?
A. Something like that.
Q. And did you have laser hair removal done on that day in 2013?
A. Yes.

Q. And then you were transported back to the institution?
A. Yes.
Q. Okay. And were you transported back in the same four-door sedan?
A. Yes.
Q. And how many officers were with you in that vehicle?
A. Two.
Q. Where did they sit?
A. They sat in their front seat.
Q. And was there any sort of petition or divide between the front seat and the back seat?
A. Yes.
Q. And were you in the back seat?
A. I was in the back seat.
Q. And what kind of partition was separating the front from the back seat?
A. Plexiglass.
Q. Was there any metal cage or anything else on the Plexiglass?
A. No.
Q. And what about the doors in the back where you were sitting? Were there windows on those

doors?
A. Yes.
Q. And was there anything covering those windows?
A. Nothing. It was all like, just regular -- there was no tint or anything. They were just regular windows?
Q. No Plexiglass, no caging?
A. None.
Q. Were there any other inmates in the vehicle?
A. No.
Q. In 2013, when you were transported for laser hair removal, did you have a ride-alone medical restriction at that time?
A. I did.
Q. How about prior to 2013, did you have a ride-alone medical restriction?
A. I believe I did. I haven't -- I don't know, but I believe so.
Q. Have you ever been transported in any other vehicle other than the four-door sedan?
A. Yeah, the old vans.
Q. What old vans?
A. They were the old Ford Econoline, the panel vans, big panel vans.

A. I don't.
Q. It states that it is Commonwealth of Massachusetts, Department of Correction, MCI Norfolk Incident Report.
A. Yes.
Q. And in the description, it states, On May 24, 2021, at approximately 7:50, Inmate Alexander, Christine, W51335, did leave the booking department with state transportation and go on trip. Inmate returned due to having medical issues with the vehicle type. State transportation and gatehouse notified of this issue. Did I read that correctly?
A. Yes.
Q. Okay. Do you recall on May 24, 2021, what type of vehicle that was?
A. No. It was either the van or the SUV.
Q. And when you say the van, what do you mean?
A. The new vans, the new state trans vans, and the institutional vans, I guess, that they have.
Q. So the state trans, is that CTU, central transportation unit?
A. Yeah, I guess so.
Q. Okay. So does CTU have different vans in the

institution?
A. Yes.
Q. And it states, Inmate returned due to having medical issues with the vehicle type. Can you tell me more about that?
A. It depends upon what we're talking about, the SUV or the van.
Q. And you don't recall which one it was on this May 24, 2021 date?
A. If you ask me specifically about the SUV, I can tell you. If you ask me specifically about the first van trip, I can tell you, the second one. But I don't know what these are referring to, because he doesn't say whether it was a car or what. He just said it was a medical issue.
Q. So I'm showing you another exhibit that's been marked Exhibit 15. I'll scroll down. Do you recognize this document?
A. No.
Q. Do you recognize this to be an incident report from MCI Norfolk?
A. Yes.
Q. And in the description it states, On July 19,

2021, inmate Alexander Christine, W51335, did refuse her trip to LSH. Inmate signed the refusal form, and the gatehouse and state transportation notified of the refusal. Did I read that correctly?
A. Yes.
Q. Okay. And do you recall on July 19, 2021, what type of vehicle this was?
A. No.
Q. And I'm pulling up what's been marked as Exhibit Number 16. Has that popped up?
A. Yes.
Q. Do you recognize this document?
A. No.
Q. Do you see that it is a Department of Correction MCI Norfolk incident report?
A. I do.
Q. And it's dated August 12, 2021?
A. Yes.
Q. And in the description, it states, On Thursday, August 12, 2021, at approximately 7:30, I, CO Morrison, while assigned to booking, was notified by inmate Alexander Christine, (W51335), that she was refusing her trip.

Inmate was then sent to medical to sign refusal, EOR. Did I read that correctly?
A. Yes.
Q. And do you recall on this date, August 12, 2021, what type of vehicle that was?
A. No.
Q. And do you recall why you refused your trip on this date?
A. It's definitely the claustrophobia issue, because I would never refuse a trip. I noticed that the first one, Dragonne, he said it was a medical issue, and then the rest, everybody's saying that it's refused.
Q. And do you recall refusing to be transported on August 12, 2021?
A. With this one, here?
Q. Yes.
A. No, but I can only say that I don't think they're going to lie about the date and the fact that I didn't go.
Q. And you're saying that it was due to claustrophobia?
A. Oh, yeah.
Q. And can you describe for me what you mean by

that?

A. By what? What do you mean?

Q. Well, so what happens?

A. What happens when I get in the van, you're saying?

Q. Yes.

A. It's terrifying. It's a claustrophobe's (phonetic) nightmare. Those things are insane. They're dark, they're dingy. I mean, everything is like right there in your face. The ceiling's almost hitting your head. I mean, they're the smallest things I've ever seen. I mean, the cars are better than those. It's insane.

This thing with claustrophobia is an ambiguous thing and it's the hardest thing to even describe, even describe to my lawyers, the words that I need to let you people know how terrifying it is. I'm going to die in that thing. I mean, I'm not going to survive it. There's no way I'm going to survive the trip. It ain't happening. I just know it.

Q. And are you referring to the CTU van?

A. All of it. Every vehicle that they showed up

since that SUV, that SUV was the worst thing. I mean, that was just as bad as that Cadillac back in, you know, the '70s. Everything's -- it's just the way it is. It's insane.

Q. So you're saying that the first vehicle was the SUV, and that was the worst vehicle that they attempted to transport you in?

A. Yep.

Q. And then the next vehicle that they attempted to transport, what was that type of vehicle? Was that the CTU van?

A. Yes, state trans -- they came to pick me up in a state van, and I went in it. I sat in it. There was another person with me, another inmate, and he was a friend of mine, really nice guy. And he tried to talk to me into going with him. He said he was going to soothe me and stuff. I couldn't stay in it. I couldn't do it. I tried. I tried. I tried hard. I did my best to overcome that feeling. And there's a bodily feeling that even comes with the mental feat, like the sweat, everything.

Q. And I know that you had previously described

that the vans now have a PC section, so it separates the first row from the last two rows, is that right?

A. Yes.

Q. Okay. And so when you tried for the first time to get into the CTU van, did you go into the front section or the back section?

A. Back. The back.

Q. The back section. So the other inmate that was in the van, you described as your friend, where was he seated?

A. So behind that PC seat is one seat and then there's the back seat. So, like I said, there's three seats, but one of them is cut off from the rest of the population in the van. So he sat in that one seat behind the PC section, I sat in the back.

Q. And how long did you sit in the back for?

A. It seemed like forever. I didn't time it. I can't tell you that. I was so stressed out. I don't even remember really. I do remember, but I don't remember all the time stuff. I don't even know if it was daylight or nighttime. It was so dark in there.

marked as Exhibit Number 13, page two. Do you recognize this document?

A. Can you scroll it further up because I can't see the whole thing. I only can see the top. Okay. Yep, I've seen that one.

Q. And it states here, do you recognize this to be a medical restriction form?

A. Yes.

Q. And it states here, under transportation restrictions, Large van without PC section. Did I read that correctly?

A. Yes.

Q. It's dated November 23, 2021 to November 23, 2022, correct?

A. Yes.

Q. And it looks like this was submitted, reviewed, and received by the deputy superintendent on November 30, 2021, correct?

A. No, that's the HSU, health services administrator. Oh, the deputy superintendent's down on the bottom of it, okay. Yes. I'm sorry.

Q. That's okay. And then up on the top-left corner, it says DOC designate?

A. Yeah. Sherry Elliott.
Q. So you recognize that signature to be Sherry Elliott?
A. Yes.
Q. And who is Sherry Elliot?
A. She was the deputy here.
Q. The deputy superintendent?
A. Yes.
Q. Scrolling to page three of this document.
A. Yeah.
Q. Do you recognize this form?
A. I do. It's like the first one.
Q. A medical restriction form?
A. Yes.
Q. And this one states, Large van without PC section, old Econoline van or similar, preferably without tinted windows.
A. Yes.
Q. And it states November or 11/11/21 to 11/11/22?
A. Yeah. It was denied.
Q. And it appears that it was submitted by Herbert Berger-Hershkowitz, MD?
A. Berger-Hershkowitz, yes.
Q. And do you recall discussing this with Dr.

Berger-Hershkowitz.
A. Well, I've had many discussions with him over this claustrophobia issue, and I definitely, because he put that in, so it's definitely -- yes. Several times we talked about it.
Q. And the request in this medical restriction was for an old Econoline van or similar, preferably without tinted windows?
A. Yeah.
Q. And then I'm scrolling down to the last page, page four. Do you recognize this medical restriction form?
A. I recognize the form, yes.
Q. And it looks like this one, he has a medical restriction where it's requesting a wheelchair van 6/23/22 to 6/23/23, is that correct?
A. Yes. What happened to the February one --
MR. GUENTHER: Christine, just answer her questions, okay?
THE WITNESS: I'm sorry. I apologize.
Q. And I know that there's been a lot of documents that have been introduced in this case by way of discovery. Not all of them are going to be used in the deposition, okay?

A. Okay. I apologize.
Q. That's okay. Do you recognize this medical restriction?
A. I do.
Q. And this is dated 6/23/2022 to 6/23/2023, correct?
A. Yeah.
Q. So I'm showing you a document that's labeled Exhibit 18. Do you see that on your screen?
A. I see it.
Q. Do you recognize this document?
A. No.
Q. It states that it's a Commonwealth of Massachusetts Department of Correction MCI Norfolk incident report, is that correct?
A. Yes.
Q. And the date is 11-15-21?
A. Yes.
Q. And in the description it states, On November 15, 2021 at approximately 7:30, Inmate Alexander, Christine, W51335, did refuse her medical trip to LSH. Gatehouse and state transportation notified, EOR. Is that correct?

Q. And you took the ativan prior to walking out and seeing the 2014 Ford Econoline van?
A. Oh yeah. Yes.
Q. And you had seen in the incident report that you had requested a handicap van, is that correct?
A. Yes.
Q. And that there is a medical restriction dated 6/23/22 regarding a wheelchair van?
A. Yes.
Q. How did that request come about?
A. It was the only thing that I could think of that would work, because they can't take the old van out of the junkyard. They can't pick up a van and just have it for claustrophobia people, because there's not many of us in here. I think I have it the worst. So there's probably just one person that's going to be utilizing this van, so I had to think. I was thinking so I could get to this appointment. And I have another appointment I got to get to -- I can't get to because of these vans. So I'm thinking, what can I do? And a handicap van is the only thing I could

think of.

I asked one of the patients, hey, is there a seat in a handicap van? He's like, yes. There's a seat in there that a person could be sitting in, and then there's a place where the wheelchair is secured. So I was like, all right, well -- then I started talking to my therapist about the handicap van. Can we try that? Because they were saying that they don't have the old 2013 vans or 2012 or whatever year those were. They said they retired them all. And then I'm being told that there was a bunch of, like, one or two out there, but they never showed up. So I'm like, all right, let's try this, you know, because a wheelchair van's not going to go anywhere, and they don't really use it much.

When I was working in the ADL, not many patients went out on a wheelchair van, and there's one sitting right out front getting rotted wheels from not even being used, so I might as well use it. It would work. I'll go in. It'll work. I know it'll work. It's big

inside, I was told.
Q. And this was told to you by another, by one of your friends --
A. Yeah, one of the patients. There's no tint on the windows. An officer told me about the van. I don't remember which officer this was, but he told me about the van being out there and it just collects dust.
Q. Have you ever been inside the wheelchair van yourself?
A. No.
Q. So the information that you have about the wheelchair van is from another patient and an officer?
A. Yes.
Q. Okay. And do you have any issues ambulating?
A. I have no idea. What do you mean, like an ambulance?
Q. No. So I'll rephrase. Do you have any issues walking?
A. No. Well, I do have vertigo.
Q. But do you require the use of any kind of assisted device to walk?
A. No.

safely.

Q. Okay. The lawsuit that you filed in 2012, did you seek an orchiectomy in that lawsuit?

A. Well, yeah and no. It was part of the original lawsuit that I submitted, but the lawyers did not put that in. My original document into the courts was requesting an orchiectomy, but the lawyers, they didn't put it in. They didn't want to fight that. They said that's a fight for another day.

MR. GUENTHER: Christine, don't answer anything that you might have talked to your lawyer about, even in your other lawsuit.

THE WITNESS: Okay.

Q. Did you have a lawyer in that lawsuit?

THE WITNESS: Can I answer that?

MR. GUENTHER: You can answer that.

THE WITNESS: Okay.

A. Yes.

Q. Okay. So are you saying that the complaint you filed was seeking an orchiectomy?

A. Part of it, yes, among other things.

Q. Okay. And I know you testified earlier that you settled out of court, and it wasn't -- it

was that you were to receive certain things, correct?
A. Yes.
Q. Okay. But that did not, obviously, include an orchiectomy, correct?
A. It did not.
Q. Okay. Did it include any types of underwear or jeans or makeup?
A. No.
Q. Did you seek those things in that lawsuit originally?
A. No.
Q. Why not?
A. Because the lawyers -- well, I can't say.
Q. Don't tell me what your lawyers said.
A. All I can say is I have no idea. But there's things I wanted, but we didn't fight for them.
Q. When you filed the lawsuit, did you file it on your own behalf or did you have a lawyer from the get-go?
A. I filed it on my own behalf.
Q. Okay. So when you filed that lawsuit, you sought certain things in the complaint, correct?

to the GD Committee about my problems, or issues.

Q. And I think Stephanie went over this, but I just want to confirm. Do you have access to makeup currently on the Framingham commissary list?

A. Yes.

Q. And do you have access to order bras on the commissary list?

A. Yes.

Q. Were you ever able to purchase a nude bra?

A. No.

Q. And you have access to women's underwear, correct?

A. Yes.

Q. And you have access to order women's jeans, too, correct?

A. No.

Q. Because the Victory jeans aren't -- is it that they're not in stock?

A. I don't know. I have no idea what's going on with the jeans. I just know that I can't buy them from anywhere. I can't get them myself and I can't get them from the state.

extent of the pain and suffering experienced.

And in that answer, if we go to the second line, it says -- let me start with this first one. The lack of adequate treatment for my gender dysphoria, including the continued denial of my orchiectomy, as well as the lack of accommodation for my claustrophobia, has caused me great stress, pain, anxiety, and depression for the vast majority of the time I've been incarcerated. Did I read that correctly?

A. Yes.

Q. And these interrogatories, I'll represent to you were dated, your signature is August 8, 2022, but as of that date, you were approved for an orchiectomy, correct?

A. Yes.

Q. Okay. How did WellPath providers fail to accommodate you for your claustrophobia?

A. I can't answer that question.

Q. Have they failed to accommodate your claustrophobia?

A. I don't know. I don't know how to answer this question because I don't know what you guys

do. I don't know what they do. I just know that I requested, I told them I have claustrophobia, and I haven't received my van yet, and I can't get my testicles removed.
Q. So you're aware that there are medical restrictions, I believe you went through them with Stephanie. You're aware that there are medical restrictions in place that your providers have completed pursuant to your request for transportation, correct?
A. Yes.
Q. Is there something else you think that they need to do?
A. No.
Q. The next sentence or two indicates that you have attempted self-castration, is that accurate?
A. Oh yeah.
Q. Okay. How many times have you attempted it?
A. Four, five. I really, I don't know. Four or five, maybe.
Q. Have all of those times been in prison?
A. Yes.
Q. Okay. Were you injured in any way because of

it?
A. Well, yeah. I mean, it was painful, but it didn't really work out too well because the way I was doing it, it was painful. I didn't -- it had no long-lasting effects, no.
Q. Did you go see a medical provider for any injuries due to the attempted self-castration?
A. No.
Q. Do you remember the last time you attempted it?
A. No.
Q. Was it more than three years ago?
A. Yeah.
MS. VAULDING: Stephanie, if you don't mind going to page number 11, please.
Q. Ms. Alexander, can you see Interrogatory Number 15 at the top there?
A. Yes.
Q. Okay. It asks you to describe fully and in complete detail, all facts supporting your allegations that WellPath has been deliberately indifferent to a serious medical need, as stated in Count I of your amended complaint. And then the answer there says that your gender dysphoria is a disability and

serious medical need that has never been appropriately treated by my medical providers while I have been incarcerated. Did I read that correctly?
A. Yes, you did.
Q. How has your gender dysphoria never been appropriately treated?
A. Everything I asked for got denied.
Q. Okay. Which includes what?
A. Orchiectomy. All the makeup items, clothing items.
Q. Okay. The orchiectomy has been approved for at least a year now, correct?
A. Yes.
Q. Okay. Sorry, you said clothing items. And what was the other thing you said?
A. Makeup.
Q. Okay. And that included mascara?
A. Yes.
Q. Eyeliner?
A. Yes. Well, no. Not eyeliner, but mascara, the eyebrow pencil, the Oil of Olay. Just all the stuff that used to be on the canteen list that they took off. That's all I asked for.

could get an orchiectomy, but before, WellPath was denying it, so weren't the medical people before that and before that.

Q. I believe you said you have a therapist once a month, correct?

A. Yes.

Q. Okay. So they provide counseling services, correct?

A. Yes.

Q. And have you been an open mental health case since 2003?

A. Previously to that, yes, I've had -- yeah.

Q. Okay. But for at least 20 years, you've seen mental health on a regular basis and been provided counseling services, correct?

A. Yes, miss.

Q. Okay. And you're currently on hormone therapy, correct?

A. Yes.

Q. And we talked about electrolysis, correct?

A. Yes.

Q. And was it hair replacement therapy? Is that what you said, too?

A. No.

Q. Was there some medication --
A. I'm not thinking about the drug. Yes. Yes. The finasteride.
Q. Okay. So would you agree with me that you have been provided some treatment for your gender dysphoria?
A. After I won a lawsuit, yes.
Q. Okay. So since the prior lawsuit, you have received some treatment for your gender dysphoria?
A. Yes.
Q. Do you believe that WellPath has been an obstacle, or WellPath and it's providers have been an obstacle to you receiving the orchiectomy?
A. Yes.
Q. Okay. How's so?
A. Because every time I asked for something, I got denied. The GD Committee denied it, and they said it was a security issue.
Q. I'm just talking about an orchiectomy now.
A. Yeah. They denied it.
Q. Okay. And you were told it was a security issue?

A. No, the other stuff is a security issue, but the orchiectomy was denied by the -- your GD Committee, WellPath's GD Committee.

Q. But as we know, it has since been approved, right?

A. Because of this lawsuit, yes.

Q. But since it's been approved, is it your position that they've been an obstacle to you receiving it?

A. Not now.

MS. VAULDING: If we can just, Stephanie, if you don't mind going to page 14, please.

Q. Ms. Alexander, at the top of page 14, see where it says Interrogatory Number 22?

A. Yes.

Q. And asks you to please describe fully and in complete detail why the jeans currently in your possession are inadequate. Did I read that correctly?

A. Yep.

Q. Okay. And the answer has an objection there, but it says, The jeans in my possession, Levi's 515 black and 512 blue, are adequate for my needs and I was previously allowed to

order them. Did I read that correctly?
A. Yes.
Q. Okay. So you still have these 515 and 512 jeans in your possession?
A. I do. I'm wearing a pair now.
Q. Okay. Is it two blue and one black that you have?
A. I have two blue and two black.
Q. Do you recall a provider by the name of Michelle, a therapist by the name of Michelle?
A. Weiner?
Q. Correct?
A. Yes.
Q. Okay. How long did she treat you for?
A. Honestly, Lori, I can't remember that stuff. I've had so many -- I've had so many, I can't recall that. For months, a year, maybe. I don't know. A year and-a-half.
Q. Do you recall discussing with her issues regarding your gender dysphoria?
A. Yeah.
Q. Okay. Do you recall discussing transportation issues with her?
A. No, not that I can remember. Was I still

seeing her during the -- when you guys -- yeah, I think so. Hold on. Because as long as I was seeing her during these trips, yeah.

MS. VAULDING: Stephanie, if you don't mind taking that one down, and if you can pull up, it's entitled Alexander, page 34. I don't know what it is on your end.

Q. So, Ms. Alexander, I'm going to mark this as Exhibit 22, I believe. And can you see at the top where it says Mental Health Progress Notes?

A. Yes.

Q. Patient name, that's your name, Christine Alexander, correct?

A. Yes.

Q. And that's your booking number and your date of birth identified there, correct?

A. Yes.

Q. Okay. And if we look at the middle of the page where it -- see where it says D, and then it says added 6/30/22, 2:27 p.m.?

A. I can see this, yes.

Q. Okay. If we go down about four lines, you can see in the middle of the paragraph where it

says, Client reports that she will 100 percent get in the -- and that she appreciates the mental health team "bending over backwards" to accommodate her request. Did I read that correctly?
A. Yes, you did.
Q. Okay. Do you remember saying that to Michelle Weiner?
A. Yeah, because my mental health therapists, they're on my team, they try to help me, but they have no control over any of that stuff. They can only request it. Michelle's been great. And that whole 100 percent getting the -- it's the van. And that's the right van. I'll get in that van if you get the right van so I can get in there, so I get to these hospital trips I need to go on. That's what that is.
MS. VAULDING: Stephanie, if you can take that exhibit down. I'm going to pull up something else, Ms. Alexander. Stephanie, it's Extract page 1.
Q. Ms. Alexander, I'm going to mark this as Exhibit 23. And this is just one page. Feel

# EXHIBIT B

| Massachusetts Department Of Corrrection **POLICY** | Effective Date<br>2/8/2021<br>Annual Review Date<br>2/8/2021 | Responsible Division<br>Deputy Commissioner, Clinical Services and Reentry |
|---|---|---|
| Policy Name<br>103 DOC 652<br>IDENTIFICATION, TREATMENT AND CORRECTIONAL MANAGEMENT OF INMATES DIAGNOSED WITH GENDER DYSPHORIA | M.G.L. Reference:<br>M.G.L. Chapter 124, sections 1 (c) and (q)<br>DOC Policy Reference:<br>103 CMR 403; 103 DOC 630; 103 DOC 650<br>ACA/PREA Standards:<br>PREA: 115.42 | |
| Attachments: Yes ☒ No ☐<br>Inmate Library: Yes ☒ No ☐ | Applicability: Staff | |
| Public Access<br>Yes ☒ No ☐ | Location:<br>DOC Central Policy File<br>Institution Policy File<br>Health Services Division Policy File | |

**PURPOSE**:
The purpose of this policy is to establish guidelines for the identification, treatment, and institutional management of inmates diagnosed with Gender Dysphoria.

**RESPONSIBLE STAFF FOR IMPLEMENTATION AND MONITORING OF POLICY:**
Deputy Commissioner, Clinical Services and Reentry
Assistant Deputy Commissioner of Clinical Services
Director of Behavioral Health
Mental Health Regional Administrators
Superintendents
Program Directors and Staff of the Contractual Medical, Mental Health, Sex Offender Treatment and Program/Substance Abuse Providers

**CANCELLATION**:
103 DOC 652 cancels all previous department policy statements, bulletins, directives, orders, notices, rules or regulations regarding Internal Regulations/Policies which are inconsistent with this document.

**SEVERABILITY CLAUSE:**
If any part of 103 DOC 652 is for any reason, held to be in excess of the authority of the Commissioner, such decision shall not affect any other part of this policy.

## TABLE OF CONTENTS


| | | |
|---|---|---|
| 652.01 | Definitions | 3 |
| 652.02 | Policy | 5 |
| 652.03 | Responsibilities of the Gender Dysphoria Clinical Supervision Group | 5 |
| 652.04 | Responsibilities of the Gender Dysphoria Treatment Committee | 6 |
| 652.05 | Identification and Diagnosis of Inmates with Gender Dysphoria | 7 |
| 652.06 | Treatment Planning for Inmates with Gender Dysphoria | 8 |
| 652.07 | Reporting | 12 |
| 652.08 | Security Review | 12 |
| 652.09 | Management and Placement | 13 |


## ATTACHMENTS


| | | |
|---|---|---|
| Attachment #1 | Gender Dysphoria Mental Health Referral Form | 15 |
| Attachment #2 | Internal Housing Risk Assessment | 16 |

## 652.01 DEFINITIONS

Clinical Supervision Group – The Gender Dysphoria Clinical Supervision Group shall be comprised of all mental health primary care clinicians who are assigned to work with an inmate or inmates diagnosed with Gender Dysphoria, the contractual mental health provider's Psychiatric Medical Director, who may serve as Chair, or appoint a designee as Chair, the contractual Director of Clinical Programs, the contractual Gender Dysphoria Consultant, based upon identified need, and a Department of Correction Health Services representative. Other treatment disciplines (i.e. medical, sex offender treatment or substance abuse treatment) may participate on an as needed basis. The role of the DOC Health Services representative shall be to monitor the Group's activities for contract compliance and to ensure the integrity of the supervision process through direct observation.

DSM-5 – Diagnostic and Statistics Manual of Mental Disorders Fifth Edition (DSM-5). A publication of the American Psychiatric Association (APA), which lists specific criteria that enable a clinician to establish diagnosis of mental disorders. The DSM-5 defines the criteria for Gender Dysphoria listed below. In the case that the DSM-5 is revised, the latest published version of the DSM applies.

Director of Clinical Programs - The contractual mental health provider who is responsible for the administration, management, supervision, and development of mental health programs and delivery of behavioral health services at all Department correctional facilities. The Director of Clinical Programs provides and supervises mental health care services throughout the Department; evaluates patient care and assesses what is required by way of treatment; determines the condition and adequacy of treatment facilities and programs; identifies the need for appropriate equipment; acts as a consultant for physicians and behavioral health care staff; delivers emergency and ongoing direct clinical service; develops and reviews Treatment Plans; and evaluates inmates when clinically indicated.

Gender Dysphoria is defined by the DSM-5 as the following:

A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:

1. A marked incongruence between one's experiences/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).
2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's

experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

3. A strong desire for the primary and/or secondary sex characteristics of the other gender.
4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

<u>Gender Dysphoria Consultant</u> – The Gender Dysphoria Consultant is an individual who is hired by/subcontracted to the Department of Correction's contractual mental health services provider. The Gender Dysphoria Consultant is Board Certified in Psychiatry and has documented experience in working with a transgender population.

<u>Gender Dysphoria Treatment Committee</u> – The Gender Dysphoria Treatment Committee shall be appointed by the Assistant Deputy Commissioner of Clinical Services of the Department of Correction. The Gender Dysphoria Treatment Committee shall be chaired by the contractual mental health provider's Psychiatric Medical Director or designee, and other members shall include the contractual Gender Dysphoria Consultant, based on identified need, the contractual Director of Clinical Programs, and the Department of Correction's Director of Behavioral Health. The role of the Director of Behavioral Health shall be to monitor the committee activities for contract compliance and to ensure the integrity of the process through direct observation.

<u>Open/Active Mental Health Case (OMH) Inmate</u> - An inmate who is diagnosed with a mental illness or determined to be in need of mental health intervention on an ongoing basis. At any time during his or her incarceration, an inmate may become an open mental health case (OMH) based on a mental health crisis, including suicidal threats or self-injurious behavior and/or the display of signs and/or symptoms of mental illness or emotional distress. Based upon clinical indications and within the discretion of the Primary Care Clinician in consultation with the site Psychiatrist (if on medication) and/or Mental Health Director, an inmate may also be removed from the active mental health caseload. However, any inmate carrying the Gender Dysphoria diagnosis will remain an open mental health case. In the case that an inmate is suspected to no longer meet the clinical criteria for a Gender Dysphoria diagnosis, approval to change the diagnosis must be granted by the Gender Dysphoria Treatment Committee, with consultation from the contractual Gender Dysphoria Consultant as deemed necessary.

Primary Care Clinician (PCC) – a Qualified Mental Health Professional who is responsible for case management, direct treatment services and the overall mental health care of inmates assigned to his or her caseload while at a Department correctional facility. Annual training specific to diagnosis and treatment for Gender Dysphoria is required for PCCs who treat inmates with Gender Dysphoria.

Primary Care Provider (PCP) – A Qualified Medical Professional, including a medical doctor or advanced practitioner (nurse practitioner or physician assistant).

Program Medical Director – The physician in charge of the Department's medical services.

Psychiatric Medical Director – The physician in charge of the Department's mental health services provider, including Bridgewater State Hospital. The Psychiatric Medical Director is Board Certified in Psychiatry. The Psychiatric Medical Director provides and supervises psychiatric and mental health care services in the correctional setting throughout the Department; evaluates patient care and assesses what is required by way of treatment; determines the condition and adequacy of treatment facilities and programs; identifies the need for appropriate equipment; acts as a consultant for physicians and behavioral health care staff; delivers emergency and ongoing direct clinical service; reviews medical orders for mental health patients; evaluates pharmacy utilization, and develops and reviews Treatment Plans; and evaluates inmates when clinically indicated.

Qualified Mental Health Professional – includes treatment providers who are psychiatrists, psychologists, clinical social workers, licensed mental health counselors, Advanced Practice Registered Nurses, Clinical Nurse Specialists, and others, who by virtue of their education, credentials, and experience, are permitted by law to evaluate and care for the mental health needs of patients.

## 652.02 POLICY

It is the policy of the Massachusetts Department of Correction to appropriately diagnose, treat, and manage inmates with Gender Dysphoria in a humane, safe, correctional environment, sensitive to their unique adjustment issues, consistent with the core values, vision, and mission of the Department and its commitment to provide adequate medical care and mental health services to all inmates in its custody.

## 652.03 RESPONSIBILITIES OF THE GENDER DYSPHORIA CLINICAL SUPERVISION GROUP

A. Duties

The role of the Gender Dysphoria Clinical Supervision Group is to provide orientation and specialized training to mental health PCCs and other practitioners; to serve as a resource to PCCs as they develop Gender

Dysphoria-related specifications to incorporate into an inmate's individualized Treatment Plan for any inmate who has or may have Gender Dysphoria; to conduct clinical reviews of specific cases; to provide supervision to the PCCs assigned to work with inmates who have Gender Dysphoria; and to provide a forum for the discussion of challenging issues related to Gender Dysphoria. This group shall meet at least monthly or as otherwise determined by the Psychiatric Medical Director or his/her designee.

B. Supervision

1. Each Primary Care Clinician (PCC) for an inmate diagnosed with Gender Dysphoria shall meet at least monthly or as scheduled with the Gender Dysphoria Clinical Supervision Group for the purpose of receiving supervision in a group setting regarding the PCC's provision of care to those inmates diagnosed with Gender Dysphoria. Additionally, annual specialized training in the assessment and treatment of Gender Dysphoria is required for all PCCs working with Gender Dysphoria clients.

2. The Gender Dysphoria Consultant shall routinely be available for consultation to the Gender Dysphoria Clinical Supervision Group. Participation with the Gender Dysphoria Consultant may occur via conference call, in person, or by videoconference.

3. For those inmates receiving other clinical services, such as substance abuse or sex offender treatment, or who are receiving cross hormonal therapy, it may be appropriate for providers of those services to participate in the Gender Dysphoria Clinical Supervision Group process on an as needed basis, to ensure that integrated and consistent treatment is being provided to the inmate, in which case access to the inmate's relevant treatment records will be made available to them.

## 652.04 RESPONSIBILITIES OF THE GENDER DYSPHORIA TREATMENT COMMITTEE

A. Duties

1. The role of the Gender Dysphoria Treatment Committee is to review the individualized Treatment Plans developed for inmates diagnosed with Gender Dysphoria to determine if the proposed treatment recommendations related to the management of Gender Dysphoria are clinically appropriate and medically necessary.

2. The Gender Dysphoria Treatment Committee shall also be responsible for reviewing the overall treatment of all Gender Dysphoria diagnosed inmates on a quarterly basis.

## 652.05 IDENTIFICATION AND DIAGNOSIS OF INMATES WITH GENDER DYSPHORIA

A. Provisional Diagnosis

Upon admission to the Department, or at any other time during an inmate's incarceration, if the inmate either self-identifies as meeting the criteria for Gender Dysphoria or is referred secondary to possible Gender Dysphoria, a facility-based Primary Care Clinician (PCC) assigned to the inmate shall evaluate the inmate to determine whether the inmate meets the clinical criteria for a provisional diagnosis of Gender Dysphoria. This diagnosis shall be based, in part, upon a face-to-face evaluation of the inmate and a review of the medical and mental health history, as well as current medical record documentation. For persons returned to the custody of the Department of Correction with a previously confirmed diagnosis of Gender Dysphoria, a new evaluation will not be required unless clinically indicated.

1. After making this provisional diagnosis, a PCC shall seek the inmate's authorization of the appropriate Releases of Information (ROI) for access to his/her medical and mental health records prior to incarceration and shall place the inmate on the "open mental health (OMH) case" list. For a newly admitted Gender Dysphoric inmate, every effort shall be made to promptly secure medical and mental health records regarding the delivery of Gender Dysphoria services prior to incarceration, to enhance continuity of care.

2. The PCC will review the case with the site treatment team, including the Mental Health Director and psychiatric providers. If clinically indicated, the inmate will be assigned to the on-site psychiatric provider.

3. The PCC shall inform the Psychiatric Medical Director or designee, Director of Clinical Programs or designee, of the provisional diagnosis of an inmate having Gender Dysphoria, using the Gender Dysphoria Mental Health Referral Form (Attachment #1). This written referral from the PCC shall be made upon determination of the provisional Gender Dysphoria diagnosis.

4. In cases where the inmate self-identifies as Gender Dysphoric and the site treatment team does not assess the inmate as meeting the clinical criteria for Gender Dysphoria, the case will be referred to the Psychiatric Medical Director and the Director of Clinical Programs for a subsequent face to face evaluation within thirty (30) calendar days of the referral.

B. Confirmation of Diagnosis

The Psychiatric Medical Director or designee of the mental health service provider shall confirm if the inmate meets the clinical criteria for diagnosis of Gender Dysphoria. This diagnosis shall be based upon, at a minimum, a review of the inmate's medical and mental health record, the referral from the PCC, a consultation with the referring site psychiatrist who has personally assessed the patient, and a face-to-face evaluation of the patient by the Psychiatric Medical Director of the mental health service provider. If there are any concerns with the validity of the Gender Dysphoria diagnosis, the Gender Dysphoria Consultant may be contacted for further evaluation. This decision by the Psychiatric Medical Director regarding an inmate's Gender Dysphoria diagnosis shall be made within thirty (30) calendar days after the referral has been received from the PCC.

C. Confirmation of Community Diagnosis

Upon admission to the Department of Correction and verification of prescribed hormones for the treatment of Gender Dysphoria, the Psychiatric Medical Director may designate a PCC to confirm the diagnosis. This designee will be an existing member of the Gender Dysphoria Supervision Group and will have direct experience treating persons with Gender Dysphoria.

## 652.06 TREATMENT PLANNING FOR INMATES WITH GENDER DYSPHORIA

A. Development of the Gender Dysphoria Treatment Plan:

Following a confirmed Gender Dysphoria diagnosis, the inmate's PCC shall prepare an individualized, initial treatment plan, and/or review and revise an existing treatment plan, which incorporates the diagnosis, along with all other outstanding co-occurring mental health issues.

1. The PCC shall develop this Treatment Plan in whole or in part with consultation from the Gender Dysphoria Clinical Supervision Group. In addition, the PCC shall also consult with the inmate's treating psychiatrist and any other clinician or practitioner who may provide clinical services to the inmate. The treatment plan should be focused on the inmate's individualized needs based upon the provision of adequate medical care utilizing prudent, professional standards, to include the most current version of the "Standards of Care" set forth by the World Professional Association for Transgender Health (WPATH).

B. Treatment Plan Review and Approval:

Once the Treatment Plan has been developed, it shall be forwarded to the Gender Dysphoria Treatment Committee for review, to ensure that all recommendations are clinically appropriate, and taking into consideration the inmate's individualized needs based upon the provision of adequate

medical care utilizing the most current version of the standards of care referenced by WPATH. The Gender Dysphoria Treatment Committee may refer the inmate for specialty physician consultations if its members believe that such consultations are advisable.

1. If the Gender Dysphoria Treatment Committee recommends that cross-gender hormone therapy should be added as a component of the individualized Treatment Plan, then the inmate shall be referred and evaluated by the assigned institutional Primary Care Provider (PCP – physician or advanced practitioner). If the site medical PCP does not believe that hormone therapy presents a significant physiological threat or contraindication to the patient for medical reasons, then the PCP shall make a referral to the designated endocrinologist under agreement to the contractual medical services provider.

2. The endocrinologist shall conduct the inmate's assessment for consideration of cross-hormonal therapy as a clinical intervention in the inmate's Gender Dysphoria Treatment Plan and determine the appropriate course of hormonal treatment, when indicated, if no medical contraindications are present. The medical PCP referral to the endocrinologist shall be made no later than thirty (30) calendar days after the medical PCP has made the initial determination that there are no physiological threats or contraindications to cross-gender hormonal therapy.

3. The purpose of the referral to the endocrinologist is to determine the appropriate cross-gender hormone regimen or any medical contraindications to initiating or continuing treatment with cross-gender hormones. Any approved update to an inmate's Treatment Plan shall not include cross-gender hormone therapy as a formal recommendation until after an endocrinologist has evaluated the inmate and determined that cross hormonal therapy does not present with any medical contraindications.

4. In the event treatment with cross-gender hormonal therapy is medically contraindicated by the endocrinologist, the determination shall be communicated to the Program Medical Director. Any and all follow-up evaluations shall be conducted by the endocrinologist on a periodic basis as clinically indicated. Any inmate refusing to be evaluated by the site PCP and/or the endocrinologist shall not receive cross-gender hormonal therapy due to the potential for clinical ramifications; medical risks involved, and need for expert medical management from an endocrinologist.

C. Essential Elements of the Treatment Plan for Gender Dysphoria Diagnosed Inmates:

1. The goal of Gender Dysphoria-related modifications to the individualized mental health Treatment Plan is to assist the Gender Dysphoria-diagnosed inmate in exploring and managing his/her issues related to Gender Dysphoria as well as any co-occurring mental health disorders.

2. Although individualized, the Treatment Plan for all inmates diagnosed with Gender Dysphoria shall contain, at a minimum, these essential elements:

    a. The inmate is offered participation in at least monthly individual psychotherapy provided by the contractual mental health service provider;

    b. The Treatment Plan may contain recommendations regarding access to cross-gender clothing and canteen/cosmetic items approved for inmates in accordance with the 103 CMR 403, *Inmate Property* policy. Commensurate with the security level of the housing placement, Gender Dysphoria inmates housed in a male institution (Male to Female, or MTF) shall be permitted to purchase and retain clothing items and articles authorized for other male inmates housed in that institution, as well as those items authorized for females commensurate with their particular security level at the female institution. Similarly, Gender Dysphoria inmates housed in a female institution (Female to Male or FTM) shall be permitted to purchase and retain clothing items and articles authorized for other female inmates housed in that institution, as well as those items authorized for males commensurate with their particular security level at the male institutions. Inmates diagnosed with Gender Dysphoria will only be permitted to purchase and retain canteen items that are allowed within the level of security that is commensurate to their housing assignment.

3. The Treatment Plan shall become effective after the Gender Dysphoria Treatment Committee has developed clinically appropriate and medically necessary treatment recommendations. If an inmate refuses to participate in any or all aspects of the Treatment Plan as it relates to his/her treatment of Gender Dysphoria, this will be documented pursuant to 103 DOC 630, *Medical Service,* 630.19, and clinically driven modifications will be made to the Treatment Plan.

    All inmates diagnosed with Gender Dysphoria shall have their Treatment Plans updated in accordance with the 103 DOC 650, *Mental Health Services* policy. All treatment plans for inmates diagnosed with Gender Dysphoria shall be revised as necessary to

reflect changes in treatment recommendations, as appropriate. Such revisions shall be made in consultation with the Gender Dysphoria Clinical Supervision Group and must be approved by the Gender Dysphoria Treatment Committee.

D. Continuation of Cross-gender Hormonal Therapy upon Admission

Upon admission to the Department, any inmate for whom cross-gender hormonal therapy is currently, lawfully prescribed as part of an established regimen for Gender Dysphoria shall have this cross-gender hormonal therapy continued at the time of receipt into the Department unless a contractual medical services provider determines that such treatment is clinically contraindicated. Cross-gender hormonal therapy as described above shall be continued within the Department until an appropriate treatment plan has been developed by the PCC through consultation with the Gender Dysphoria Clinical Supervision Group, reviewed and approved by the Gender Dysphoria Treatment Committee.

1. All newly admitted Gender Dysphoria inmates receiving hormone therapy for the management of Gender Dysphoria shall be evaluated by the medical Primary Care Provider (PCP) on-site and then referred to the identified contractual endocrinologist for assessment and continuity of therapy. The endocrinologist determines whether there are any medical contraindications to cross-gender hormone treatment. If no such contraindications exist, the endocrinologist recommends the appropriate medication, dose and route for management with cross-gender hormone therapy. The site Medical Director reviews the endocrinologist's recommendation and either writes a corresponding medical order or documents the rationale for alternative treatment.

2. A refusal by an inmate to provide a Release of Information (ROI) so that medical and mental health records prior to incarceration may be obtained and reviewed may be cause for discontinuing cross-gender hormonal therapy and for interrupting or tapering the medication(s), within the discretion of the Psychiatric Medical Director. However, regardless of the status of cross-gender hormone therapy, the inmate shall be identified as OMH and continue to receive mental health services on an ongoing basis.

3. In those instances where the PCC may believe that the inmate is not competent to provide informed consent for treatment, the PCC shall consult with the Psychiatric Medical Director of the mental health service provider. If the inmate is under a guardianship then the PCC will consult with the inmate's attorney/guardian. If the inmate is in need of a guardianship, then the procedures set forth in 103 DOC 650, *Mental Health Services* shall be followed.

## 652.07 REPORTING

A. Gender Dysphoria Treatment Committee:

1. The Gender Dysphoria Treatment Committee shall prepare a quarterly report regarding its review of all cases of inmates diagnosed with Gender Dysphoria. The format of this report shall be approved by the Department's Director of Behavioral Health.

2. The quarterly report of the Gender Dysphoria Treatment Committee shall be submitted within thirty (30) calendar days after the end of the quarter to the Department's Director of Behavioral Health.

3. The quarterly report shall be reviewed by the Department's Director of Behavioral Health and made available to the Deputy Commissioner of Clinical Services and Re-Entry through the Assistant Deputy Commissioner of Clinical Services.

4. This quarterly report shall be available for review by Department staff and others on a need-to-know basis as determined by the Deputy Commissioner of Clinical Services and Re-Entry or Commissioner.

## 652.08 SECURITY REVIEW

1. In the event that a treatment recommendation is made that may potentially present overwhelming security, safety, or operational difficulties within the correctional environment, the Director of Behavioral Health shall refer the treatment recommendation to the Deputy Commissioner of the Prison Division and the Deputy Commissioner of Clinical Services and Re-entry for a security review. The security review shall take into account the inmate's individual history of incarceration and present circumstances.

2. In the event that the treatment recommendation is determined to present overwhelming security, safety or operational difficulties, the security review will be forwarded to the Commissioner for final review. If the Commissioner determines that the treatment recommendation presents overwhelming security, safety or operational difficulties, he shall articulate specific and justifiable reasons for the denial of the recommended treatment, based on his overwhelming security, safety and/or operational concerns, in writing. The security review shall be completed within sixty (60) calendar days of the referral from the Director of Behavioral Health.

3. If the Gender Dysphoria Treatment Committee determines that no clinical alternatives are viable, the Commissioner shall provide articulate, specific and justifiable reasons, in writing, for the denial of the recommended

treatment, based on his overwhelming security, safety and/or operational concerns.

## 652.09 MANAGEMENT AND PLACEMENT

Initial Classification and Placement:

A. At the time of commitment, adjudicated individuals are court ordered into Department of Correction custody and are transported to the reception institution based upon said court order. For all new commitments, an Internal Housing Risk Factor Assessment (Attachment #2) is completed and examines issues of risk of victimization and risk of violence/predatory behavior and/or abusiveness. Should an individual identify as Gender Dysphoric or appear to need additional clinical assessment, the process of confirmation will commence as outlined in 103 DOC 652.05. An assessment will inform housing, work, education, and program assignments and will focus on individual safety. These assessments will occur on a case by case basis and will include security level, criminal and discipline history, medical and mental health assessment of needs, vulnerability to sexual victimization and potential of perpetrating abuse based on prior history. A Gender Dysphoric inmate's own views with respect to his or her own safety shall be given serious consideration. In addition, consideration of specific cases with partial completion of sex reassignment surgery, removal or augmentation of breasts, removal of testicles, etc. shall be evaluated on a case-by-case basis by the Program Medical Director and reported to the Assistant Deputy Commissioner of Classification for consideration of any safety, security and/or operational concerns presented. Consideration of these clinical recommendations should be given by the Department of Correction when making determinations regarding such issues. Final determination as to the most appropriate housing, however, is the responsibility of the Department.

B. Bi-Annual Review

An Internal Housing Risk Factor Assessment (Attachment #2) will be completed at least every six months in collaboration with medical, mental health and correctional professionals to assess ongoing placement for each Gender Dysphoric inmate. This bi-annual review will include a review any threats to safety experienced by the inmate.

C. Internal Placements

Site mental health directors may provide clinical input as to their clinical recommendations related to housing of an inmate diagnosed with Gender Dysphoria within their respective facility. Consideration of these clinical recommendations should be given by the Department of Correction when making determinations regarding such issues; however, final determination regarding housing placement is the responsibility of the Department and site Superintendent.

D. Transportation

Inmates diagnosed with Gender Dysphoria will be transported per 103 DOC 530, *Inmate Transportation* Policy.

E. Hygiene

Inmates diagnosed with Gender Dysphoria shall be given the opportunity to shower separately from other inmates per 103 DOC 750, *Hygiene Standards*.

Attachment #1

**MASSACHUSETTS DEPARTMENT OF CORRECTION**
**MENTAL HEALTH SERVICES**
**GENDER DYSPHORIA**
**MENTAL HEALTH REFERRAL**
**(To be completed by Primary Care Clinician, PCC)**

**Inmate Name:** ______________________ **Date:** ______________
**ID Number:** ______________________ **Facility:** ______________
**Primary Care Clinician (PCC):** ______________________
**Referral Source (if other than PCC):** ______________________

**Brief Criminal History:**
**Date of State Incarceration (most recent):** ______________________
**Charge(s):** ______________________
**Sentence Structure:** ______________________
**Anticipated Release Date:** ______________________

**Brief Psychiatric History (including self-injurious behavior and suicidality):**

**DSM-5 Diagnosis:**

**Other Conditions That May Be a Focus of Clinical Attention:**

**Psychotropic Medications (current):** ______________________
______________________

**Psychiatric Hospital Admissions (include 18(a) to Bridgewater State Hospital or DMH) and Dates:** ______________
______________________

**History of Self-Injurious and/or Suicidal Behavior:** ______________________
______________________

**History of Gender Dysphoria Diagnosis by Qualified Mental Health Professional:** ______________
**Prior Cross-Gender Hormone Therapy with Dates:** ☐ **Yes** ☐ **No**

**When:** ______________________
**Duration:** ______________________
**Prescriber:** ______________________
**Medication(s) – including drug name, dosage and start date:** ______________
______________________
**Pharmacy:** ______________________
**Current Name:** ______________ **Name Change:** ______________

**Diagnostic Impressions (prompting Gender Dysphoria referral):** ______________________
______________________
______________________

**Signatures:**
**PCC:** ______________________ **Date:** ______________
**Site Psychiatrist:** ______________________ **Date:** ______________
**Site Mental Health Director:** ______________________ **Date:** ______________

Attachment #2

**Massachusetts Department of Correction**
**Internal Housing Risk Factors (Males)**

Inmate Name___________________________#_____________Institution______________

**Risk of victimization**

*To be completed by medical/mental health*

| | | |
|---|---|---|
| 1) | Victim of institutional sexual assault | yes/no |
| 2) | Mental Disability | yes/no |
| 3) | Physical Disability | yes/no |
| 4) | Developmental Disability | yes/no |
| 5) | History of sexual victimization | yes/no |
| 6) | Does offender perceive self as vulnerable | yes/no |
| 7) | Is or perceived to be transgender, intersex, Gender Dysphoria, Gay, Bi-sexual, gender non-conforming | yes/no |

*To be completed by the CO/ CPO*

| | | |
|---|---|---|
| 8) | Youthful age (21 or younger) | yes/no |
| 9) | Elderly (65 +) | yes/no |
| 10) | Physical stature (5'6" or less/ less than 140 lbs.) | yes/no |
| 11) | First incarceration ever | yes/no |
| 12) | Any convictions for sex offense against child or adult including current offense | yes/no |
| 13) | Exclusively non-violent criminal history | yes/no |
| 14) | Effeminate presentation | yes/no |
| 15) | History of Protective Custody placement | yes/no |

**Risk of Violence/Predatory Behavior**

| | | |
|---|---|---|
| 1) | History of institutional sexual abuse on others, as known | yes/no |
| 2) | History of domestic violence on others | yes/no |
| 3) | Security Threat Group Affiliation | yes/no |
| 4) | History of extortions or assault on others in prison | yes/no |
| 5) | History of violent offenses | yes/no |

Victim □ Potential Victim □ Unknown □ Aggressor □ Potential Aggressor □ Unknown □

Override to: Victim □ Potential Victim □ Unknown □ Aggressor □ Potential Aggressor □ Unknown □

Rationale if override used_____________________________________________________________

Completed by_________________________________________________Date___________________

Override approved/denied_______________________________________Date___________________

**Reference Guide**

**Vulnerable/Victim identifiers**

1. *Victim of institutional sexual assault (documented):* Check "yes" if there is any formal documentation or admission by the offender that there is a history of being the victim of a sexual assault while incarcerated in any correctional facility as either an adult or juvenile. This will be answered by medical/mental health staff. The CO/CPO should check other sources for validation (i.e. intake forms, IPS, Certified Sexual Assault Investigator/ PREA database) when the response is NO. Yes responses should result in notification to the institutional Certified Sexual Assault Investigator.
2. *Mental Disability:* a substantial disorder of thought, mood, perception, cognition or memory that grossly impairs their judgment, behavior, capacity to recognize reality or meet ordinary demands of life. This question will be answered by medical/mental health staff.
3. *Physical Disability:* any impairment which limits the physical function of limbs or fine or gross motor ability to include impairments which limit other facets of daily living. This question will be answered by medical/mental health staff.
4. *Developmental Disability:* a mental disorder described as mental retardation in the current edition of the DSM-IV which may impair the offender's ability to function in a correctional setting. This question will be answered by medical/mental health staff.
5. *History of institutional sexual abuse on others:* Check "yes" if there is any indication in any source documents that the offender has been sexually abused in any setting. Also check "yes" if the offender self-reports as being sexually abused in any setting. This will be answered by medical/mental health staff.
6. *Does inmate perceive self as vulnerable*: check "yes" if inmate self reports perception of there is any indication in source documents that inmate has self reported in the past.
7. *Is or perceived to be transgender, intersex, Gender* Dysphoria*, Gay, Bi-sexual, gender non-conforming*: as determined and confirmed by medical/mental health staff. This will be answered by medical/mental health staff.
8. *Youthful Age (21 or younger):* Check "yes" if the offender is 21 or younger at the time of the screening based on the inmate's official date of birth. This will default from IMS.
9. *Elderly (65 or older):* Check "yes" if the offender is 65 years or older at the time of the screening based on the inmate's official date of birth. This will default from IMS.
10. *Physical stature (5'6' or less and/or less than 140 lbs)* Check "yes" if the male inmate is 5'6" or less and/or is less than 140 pounds in weight based on the official record , self report or visual assessment. This will default from IMS.
11. *First Incarceration ever:* Check "yes" if the offender is serving their first incarceration of any kind, in state or out of state, adult or juvenile. This will default from IMS when possible otherwise will be answered by the CO/CPO.
12. *Any convictions for sex offense against child or adult including current offense:* Check yes if inmate has any conviction for sex offenses against an adult or a child. This will default from IMS.
13. *Exclusively Non*-Violent Criminal History – Including the current offense check "yes" if inmate's criminal history does not include any convictions for violent offenses. Violent offenses include: murder, manslaughter, vehicular homicide, assault w/I to commit murder, attempted murder, armed robbery, unarmed robbery, carjacking, assault w/DW, armed assault w/I to rob or murder, confining and putting in fear, armed assault in a dwelling, A&B (any type), A&B on a child, A&B DW, assault w/I to commit a felony, mayhem, violation of civil rights, rape adult or child (any type), assault w/i to rape, indecent A&B, unnatural acts w a child, armed burglary, B&E w/i to assault.

14. *Effeminate presentation:* Check "yes" if the offender presents in an effeminate way and by doing so may result in victimization. The "effeminate" attribute is limited to males and will be based on the staff's observation of the offender. This will be answered by the CO/CPO.
15. *History of Protective Custody Placement (adult/juvenile):* Check "yes" if there is a documented history of being placed in a protective custody unit in an adult or juvenile correctional facility. Also check yes if the offender self reports as having been classified as a protective custody offender. This will be answered by the CO/CPO

**Reference Guide**

**Violence/Predatory Identifiers**

1. *History of institutional sexual abuse on others*: Check "yes" if there is any formal documentation or admission by the offender that there is a history of involvement in institutional sexual predatory behavior. This will default from IMS when it is known otherwise will be answered by the CO/CPO. Yes responses should result in notification to the institutional Certified Sexual Assault Investigator.
2. *History of Domestic Violence on Others*: Check "yes" if inmate has or admits to any prior history for domestic violence on others. 209A violations may be used as an indicator of a domestic violence history. This will be answered by the CO/CPO.
3. *STG (Gang) affiliation: Check* "yes" if inmate has been identified as being a validated member of a security threat group; self reports being an active member of a street gang or security threat group as indicated in IMS or when documentation exists that the inmate is likely a member of a security threat group. This will default from IMS but should be validated through other source documents if needed by the CO/CPO.
4. *History of Extortion/assaults in prison:* Check "yes" if inmate has or admits to a history of extortion of other offenders or assaulting staff or other inmates. This will be default from IMS when possible but will be answered by the CO/CPO.
5. *History of Violent Offenses (adult and juvenile):* including current offense, check "yes" if inmate has any convictions for a violent felony. This will default from IMS when possible but will be answered by the CO/CPO.

**Override Rules**

Once a designation(s) has been determined, the screener should consider the accuracy of that designation. The screener, having knowledge of the inmate and/or the inmate's history should be confident in the designation. In cases where the designation is questioned, the screener may choose to have the housing risk assessment reviewed by the Deputy Superintendent of Classification and Treatment for a possible override of the designation to a different category. The rationale for that type of action needs to be documented. For example, some inmates may have the characteristics of a victim yet when observed; victimization is not likely to occur perhaps based on the offender's ability to adapt to the prison environment.

**Cell Assignment Rules**

- Staff responsible for cell/room assignments shall consult the Internal Housing Designation Risk Factor information prior to making a cell/room assignment.
- Staff shall not place known or potential victims with known or potential predators
- Inmates not identified in either category can be housed with anyone including those identified as a known victim or predator
- Staff shall also review for enemy issues prior to making any housing assignments

- Staff shall consider matching other factors such as length of sentence, age, medical and mental health issues, size and weight as matching these characteristics may result in a positive housing situation.

## FEMALE INTERNAL HOUSING RISK FACTORS

**Inmate Name**________________________________**#**_____________**Institution**_______________

### Risk of victimization

*To be completed by medical/mental health*

1. Victim of institutional sexual assault yes/no
2. Mental disability yes/no
3. Physical disability yes/no
4. Developmental disability yes/no
5. History of sexual victimization yes/no
6. Does offender perceive self as vulnerable yes/no
7. Is or perceived to be gay, lesbian, bisexual, transgender, intersex, gender nonconforming or gender dysphoria yes/no

*To be completed by the CO/ CPO*

8. Youthful age (25 or younger) yes/no
9. Elderly (60 or older) yes/no
10. Small in physical stature (less than 110lbs) yes/no
11. First incarceration/confinement ever yes/no
12. Conviction for sex offense against an adult or child yes/no
13. Exclusively non-violent criminal history yes/no

### Risk of abusiveness

1. History of institutional sexual abuse toward others, as known yes/no
2. History of institutional violence, as known yes/no
3. History of sexual abuse or sexual assault toward others yes/no
4. History of violent offense yes/no

Victim □ Potential Victim □ Unknown □ Aggressor □ Potential Aggressor □ Unknown □

Override to: Victim □ Potential Victim □ Unknown □ Aggressor □ Potential Aggressor □ Unknown □

Rationale if override used____________________________________________________________

Completed by_______________________________________________Date____________________

Override approved/denied____________________________________Date____________________

**Reference Guide**

**Risk of Victimization**

16. ***Victim of institutional sexual assault**:* Check "yes" if there is any formal documentation or admission by the offender that there is a history of being the victim of a sexual assault while incarcerated in any correctional facility as either an adult or juvenile. This will be answered by medical/mental health staff.

17. ***Mental Disability**:* A substantial disorder of thought, mood, perception, cognition or memory that grossly impairs their judgment, behavior, capacity to recognize reality or meet ordinary demands of life. This question will be answered by medical/mental health staff.

18. ***Physical Disability**:* Any impairment which limits the physical function of limbs or fine or gross motor ability to include impairments which limit other facets of daily living. This question will be answered by medical/mental health staff.

19. ***Developmental Disability**:* A mental disorder described as mental retardation in the current edition of the DSM-IV which may impair the offender's ability to function in a correctional setting. This question will be answered by medical/mental health staff.

20. ***History of Sexual victimization:*** Check "yes" if there is any indication in any source documents that the offender has been sexually abused in any setting. Also check "yes" if the offender self-reports as being sexually abused in any setting. This will be answered by medical/mental health staff.

21. ***Does offender perceive self as vulnerable***: Check "yes" if offender self reports perception of vulnerability or if there is any indication in source documents that inmate has self reported in the past. This will be answered by medical/mental health staff.

22. ***Is or is perceived to be, gay, lesbian, bisexual, transgender, intersex, gender nonconforming or gender dysphoria:*** As determined and confirmed by medical/mental health staff. This will be answered by medical/mental health staff.

23. ***Youthful Age (25 or younger**):* Check "yes" if the offender is 25 or younger based on the inmate's official date of birth. This will default from IMS.

24. ***Elderly (60 or older**):* Check "yes" if the offender is 60 years or older based on the inmate's official date of birth. This will default from IMS.

25. ***Small Physical stature:*** *(less than 110 lbs):* Check "yes" if the female offender is less than 110 pounds in weight based on the official record, self report or visual assessment. This will default from IMS

26. ***First Incarceration/confinement ever**:* Check "yes" if the offender is serving their first incarceration/confinement of any kind, in state or out of state, adult or juvenile, H/C, awaiting trial

or civil commitment. This will default from IMS when possible otherwise will be answered by the CO/CPO.

27. ***Conviction for sexual assault on adult or child***: Check "yes" if inmate has any **conviction** for sex offenses against an adult or a child. This will default from IMS when possible otherwise will be answered by the CO/CPO.

28. ***Exclusively non-violent criminal history***: Check "yes" if criminal history does not include any violent offenses (regardless of disposition). Violent offenses include: murder, manslaughter, vehicular homicide, assault w/I to commit murder, attempted murder, armed robbery, unarmed robbery, carjacking, assault w/DW, armed assault w/i to rob or murder, confining and putting in fear, armed assault in a dwelling, A&B (any type), A&B on a child, A&B DW, assault w/i to commit a felony, mayhem, violation of civil rights, rape adult or child (any type), assault w/i to rape, indecent A&B, unnatural acts w a child, armed burglary, B&E w/i to assault. This will default from IMS when it is known otherwise will be answered by the CO/CPO.

**Risk of Abusiveness**

6. ***History of institutional sexual abuse toward others***: Check "yes" if there is any formal documentation or admission by the offender that there is a history of involvement in institutional sexual aggressive behavior. This will default from IMS when it is known otherwise will be answered by the CO/CPO.

7. ***History of Institutional Violence****:* Institutional violence is normally captured in category 1 or category 2 DOC disciplinary reports or other incident or disciplinary reports if occurred in another jurisdiction. This will default from IMS when it is known otherwise will be answered by the CO/CPO.

8. ***History of sexual abuse or sexual assault toward others****:* Check "yes" if criminal history includes charges (regardless of disposition) for rape- child or adult (any type), assault w/i to commit rape, indecent assault and battery or unnatural acts with a child. Additionally, if during the interview the offender admits to sexual abuse or sexual assault on others for which no charges were sought a "yes" response is appropriate. This will be answered by the CO/CPO.

9. ***History of violent offense****:* Check "yes" if criminal history includes charges (regardless of disposition) for a violent offense. Violent offenses include murder, manslaughter, vehicular homicide, assault w/i to commit murder, attempted murder, armed robbery, unarmed robbery, carjacking, assault w/dw, armed assault w/i to rob or murder, confining and putting in fear, armed assault in a dwelling, A&B (any type), A&B on a child, A&B DW, assault w/i to commit a felony, mayhem, violation of civil rights, rape adult or child (any type), assault w/i to rape, indecent A&B, unnatural acts w a child, armed burglary, B&E w/i to assault. This will be answered by the CO/CPO.

**Override Rules**

Once a designation(s) has been determined, the screener should consider the accuracy of that designation. The screener, having knowledge of the offender and/or the offender's history should be

confident in the designation. In cases where the designation is questioned, the screener may choose to have the housing risk assessment reviewed by the Deputy Superintendent of Classification and Treatment for a possible override of the designation to a different category. The rationale for that type of action needs to be documented. For example, some offenders may have the characteristics of a victim yet when observed; victimization is not likely to occur perhaps based on the offender's ability to adapt to the prison environment.

**Cell Assignment Rules**

- Staff responsible for cell/room assignments shall consult the Internal Housing Designation Risk Factor information prior to making a cell/room assignment.
- Staff shall not place known or potential victims with known or a potential aggressor.
- Inmates not identified in either category can be housed with anyone including those identified as a known victim or aggressor.
- Staff shall also review for enemy issues prior to making any housing assignments
- Staff shall consider matching other factors such as length of sentence, age, medical and mental health issues, size and weight as matching these characteristics may result in a positive housing situation.

Victim if yes to question 1. Potential victim if yes to 4 or more victimization identifiers (2-13). Status unknown if yes to 3 or less victimization identifiers.

Aggressor if yes to question 1. Potential aggressor if yes to 2 or more abusiveness identifiers (2-4). Status unknown if yes to 1 or zero identifiers.

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - -x
CHRISTINE MARA ALEXANDER, :
Plaintiff, :
:
vs. :
: Civil Action No.
MASSACHUSETTS DEPARTMENT OF : 1:20-cv-10020-
CORRECTION, CAROL MICI, in : PBS
her official capacity, NELSON :
ALVES, in his official :
capacity, and WELLPATH, LLC, :
Defendants. :
- - - - - - - - - - - - - - - - - - - - -x

DEPOSITION OF WELLPATH, LLC, by its Designee JAMES S. THOMPSON, M.D., a witness called by counsel for the Plaintiff, appearing from his home in Massachusetts, taken pursuant to the Rule 30(b)(6) of the Federal Rules of Civil Procedure remotely before Carol H. Kusinitz, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, on Wednesday, November 9, 2022, commencing at 12:04 p.m.

(All participants attended via Zoom)

PRESENT:

Sherin and Lodgen LLP
(by Daniel S. Guenther, Esq.)
101 Federal Street, Boston, MA 02110,
617.646.2000, dguenther@sherin.com,
for the Plaintiff.

(Continued on Page 2)

feels that their internal sense of their gender is different than their natal gender, and there's an incongruence that rises to the level that it causes them distress, which impairs their functioning, then that meets the criteria for gender dysphoria.

So it has to do with their report of their gender, how they view their gender identity, and how it impacts them in their functioning.

Q. And what does the word "dysphoria" mean in the medical sense?

A. Distress, significant distress.

Q. And do you have a sense of what untreated gender dysphoria would cause in an individual?

A. It varies by person. It's difficult to say.

Q. And we can go through this and break it down deliberately, but I'll start with the question, how do you treat gender dysphoria?

A. So, generally, dysphoria can be treated with several approaches. One of them is to try to help the person transition appropriately to their gender identity. It also involves the person's psychological adjustment, which may not be just a physical transition.

So generally it's a combination of medical interventions, or could be medical interventions -- it depends on the person and what they need -- such as hormones or things like that, but also helping the person, you know, deal with how that -- having that incongruence has affected them, through psychological treatment.

Q. And you've said "psychological adjustment" or "psychological treatment." What would that mean?

A. Psychotherapy I'm talking about, supportive psychotherapy.

Q. Would that mean, like, speaking to a therapist about the issues?

A. Correct. Yes.

Q. You mentioned hormone therapy?

A. Yes. Some patients with gender dysphoria receive hormones, cross-gender hormones, to help them physically transition to their target gender.

Q. So, for instance, in a male-to-female transgender individual, what would be the purpose of providing them with hormone therapy?

A. So that would help their bodies adjust to, you know, their perceived gender identity. So for male to female, it would mean that they would grow

education.

Q. Do you know if there is currently a Gender Dysphoria Consultant?

A. There is.

Q. Do you know if there is more than one?

A. Yes. We actually have two.

Q. And who are those two individuals?

A. So Dr. Stephen Levine is an internationally known expert on gender dysphoria, who is based in Ohio, but attends all of our meetings via Zoom. And we have Dr. Patricia Raney, who is a family practice doctor who has a specialty practice in transgender health.

Q. Do you know, are these employees of Wellpath?

A. They are subcontractors.

Q. Do you know of any other individuals who have had the title of Gender Dysphoria Consultant?

A. No.

Q. Do you know how long Dr. Levine has been a Gender Dysphoria Consultant?

A. I am not exactly sure. It precedes my time on the Committee. He was on the Committee when I joined in 2017.

A. Yes.
Q. Can you explain to me the difference between the Gender Dysphoria Clinical Supervision Group and the Gender Dysphoria Treatment Committee.
A. So, the role of the Supervision Group is to provide supervision to all of the mental health clinicians who provide psychotherapy services to our gender dysphoria population.
So it provides education, supervision, consultation, you know, in a group setting, so that's why it's called the Supervision Group. Whereas the Gender Dysphoria Treatment Committee, specifically they're to provide a final review of the treatment plans and approve or disapprove any requests related to -- as a utilization management, so do certain things meet medical necessity or they don't meet medical necessity.
Q. So meeting medical necessity is under the Gender Dysphoria Treatment Committee?
A. Yes. That decision is made by the Treatment Committee.
Q. Would you please take a moment and read to yourself -- you don't need to read it out loud, but just read 652.03, "Responsibilities of the Gender

Q. Is it your understanding that Wellpath medical providers can prescribe items that would be considered personal property items that an inmate would take back to their cell? So, for instance, outside of the gender dysphoria context, if a provider felt that a certain type of shoe or an ankle brace was indicated for a patient, do you think that that Wellpath provider could prescribe such an item?

A. It's my understanding they can, within certain security parameters. So that's for the Department of Correction to decide, if there are any security issues with a particular item.

Q. Now, thinking back to the Gender Dysphoria Committee, if the Committee received a request for a personal property item to be used as part of the treatment for gender dysphoria, eyebrow pencil, eyeliner, mascara, lipstick, something of that nature, is that something that you believe the Gender Dysphoria Committee could approve?

A. I think we are able to approve things in general, but we don't get involved with the specifics.

Q. What do you mean by you don't get involved

with the specifics?

A. So, you know, if we approve them to have lipstick, we don't approve, like, a certain color of lipstick or -- for example, we approve bras for trans women, but we don't control what kind of bra they can get. There are certain kinds they can't get because it has an underwire in it and could be used as a weapon or something like that.

So we provide the general guidance to provide the items, but not the specifics of, you know, the particular clothing or makeup or those kind of things.

Q. Once it's been approved, do you know how the actual item makes its way to the inmate?

A. I think it depends on what the item is. If it's an item that's on canteen, then they can order it themselves, and they have -- and the trans women, for example, have access to the female canteen list, so that they can do that.

If it's something that's not on the canteen list, like a breast form, for example, some of the trans women have breast forms, then Wellpath orders it as a medical device, and it's cleared through the Department of Correction to make sure there are no

taken place?

A. Not yet.

Q. So breast binders, breast forms, gaffs, head covering like a do-rag, hormone therapy, electrolysis, orchiectomies and gender-affirming surgeries. Is that an accurate list of the things you can remember that the Gender Dysphoria Committee had approved as treatment for certain individuals with gender dysphoria?

A. So there are also all the things that are on the female canteen list, which, prior to the current way that we do it, where they're just given access to the female canteen list, we used to have to approve, say, female panties, female underwear for male to female, and those things.

Now we don't -- that doesn't have to come to the Committee. That's just made as a general thing available to people. And --

Q. Do you know -- I'm sorry.

A. And similarly, like, for the female-to-male patients, boxer shorts instead of female underwear.

Q. Do you know when the ability of male-to-female transgender inmates to purchase off the Framingham female commissary list policy came into

place?

A. I can't give you the exact date. I was going to say 2018, but I could be wrong about that. It could be 2019.

Q. Pretty recently, though?

A. Yeah, fairly recently, you know.

Q. Do you know, was this a Department of Correction decision?

A. Yes, it was.

Q. Do you know if Wellpath had any input that that decision?

A. I think it was us jointly working together to see what would be, you know, beneficial, you know, to the most patients. The basic items seem like they were being requested quite a bit, and so, by just making it generally available, I feel like it really helped a lot of people.

Q. How do you think it helped people?

A. We have a good number of gender dysphoric patients, but also a number of transgender patients who may not have a diagnosis of gender dysphoria. And so, you know, all of those people, I think it helps them feel more like themselves to be able to dress in their target gender.

Q. In other words, it has a psychological benefit?

A. Yes.

Q. Any other items or accommodations that you can think of the Gender Dysphoria Committee considering, other than those items we just mentioned, the surgeries we've mentioned, and the policy change to allow inmates to order off of either gender's canteen list that you can think of?

A. No, those are the ones that come to mind right now.

MR. GUENTHER: Okay. I'm going to put another exhibit up.

THE WITNESS: 33?

MR. GUENTHER: Yes.

(Document marked as Exhibit 33 for identification)

Q. Are you looking at a document marked "Exhibit 33" in the bottom right-hand corner with a yellow sticker that says, "Gender Dysphoria Treatment Committee, January 26, 2018"?

A. I don't see the yellow sticker, but I do have the document that's January 26, 2018.

Q. Let me make a note that that is 33.

Q. Do you know what "PCC" stands for?
A. That's a phrase that they use for the mental health clinician. It stands for primary care clinician, but now they tend to use the term "MHP," mental health professional.
Q. "Group discussed impact of this surgery in comparison to sex confirmation surgery. Pt has an upcoming colonoscopy, was requesting to do colon in her cell, she will be in the back cell in HSU to accommodate her single cell order."
Did I read that correctly?
A. Yes.
Q. In your role as the Chair of the GD Committee, do you recall having a discussion on any of the topics in this note?
A. Yes. Because when the issue came up about orchiectomy here, there was a discussion, because it's unusual. You know, we've had people asking for gender confirmation surgery, and by that I mean vaginoplasty and those types of surgeries. But this issue of orchiectomy, you know, was new to us as a committee, and so we had some discussion about it, how common is it, what does it accomplish, why that and not the removal of the penis as well.

So I think we did, you know, start to discuss it and deal with it at this time.

Q. If you could scroll down a bit to the notes appearing June 21, 2019. If you're able to see page numbers, it would be Page 59 in the bottom right-hand corner. It would be a note that starts, "Continues to request orchiectomy."

A. Yes.

Q. Okay. So this is a Supervision Committee note, dated June 21, 2019. The note reads, "Continues to request orchiectomy and now Erica Epsom is requesting this."

Did I read that correctly?

A. Yes.

Q. Do you know who Erica Epsom is?

A. I think she was a clinician that was filling in for, I believe it was, Michelle Weiner, who was the clinician at that time.

Q. Do you understand this note to mean that Erica Epsom had brought to the GD Committee's attention a request or continued request from Ms. Alexander concerning an orchiectomy?

A. Yes. And, you know, my thoughts at that time were that Erica wasn't her regular provider,

and it wasn't really brought up in the context of the patient's therapy.

But we did note it, and we were trying to figure out, like, so, as I mentioned before, "Why does she want that and not to have the vaginoplasty? What does that mean if she has the orchiectomy? Would she then be transferred to Framingham or not?"

She specifically did not want to leave Norfolk, and I think there was some maybe feelings that at that time she was asking only for the orchiectomy as a way to, like, stay at Norfolk but still have some surgery.

And also this is when it first started coming up that she had an idea that the only way to get her testosterone level down to zero was to have the orchiectomy, which, as I understand, is not necessarily medically true, that the medication, the testosterone blocker, would provide a similar result.

So it seemed that this was based on a misunderstanding of what the orchiectomy would do. So we were trying to continue the discussion with her and also to provide some education from our consultants.

Did I read that correctly?
A. Yes.
Q. And so it says, in accordance with your understanding, that the GD Committee was not making a recommendation of an orchiectomy at that time?
A. That's correct.
Q. For the reasons you stated?
A. Yes.
Q. When we talk about it as a recommendation, is there a further approval that needs to happen? Strike that.
If we're talking about a patient's request for an orchiectomy, and here in the notes it's being referred to as a recommendation, is that just a certain term, or does that imply a further approval would be necessary before the orchiectomy would take place?
A. It's not that a further approval would be necessary from Wellpath, but once the recommendation is made, then the person is sent out to the surgeon, right, for evaluation. The surgeon might say "No," or -- "Because you have this medical condition, you can't have that," or "I really think this other kind of surgery would be the best for you."

So we don't say, like, "Yes, they're getting it," and then they schedule the surgery suite for them. We just open it up to the further surgical evaluation by the outside -- by the Boston Medical Center, where we send people.

Q. If you could go two pages down, please, to Page 66 in the bottom right-hand corner, July 19, 2019. The section "Other Notes" start with "Pending more information from Mitzi."

A. Yes.

Q. The third bullet point under "Other Notes," it says, "Eyeliner pencil in canteen is being replaced by a pencil without metal, hopefully will be made soon."

Did I read that correctly?

A. Yes.

Q. Do you recall a discussion within the GD Committee about eyeliner pencils?

A. No, I don't remember this specific discussion, but that's the kind of thing that the Department of Correction helps us with, you know, any changes they may be making in what's available, based on security reasons.

Q. Please go to Page 90, which is notes

Q. Do you know why the note states that "Dr. Raney states orchiectomy sounds indicated for patient"?

A. So that was just based on the discussion. And, actually, I think Dr. Raney really did a good job in, you know, educating us about how orchiectomy is approached in the community, which is why we have the consultants.

And before, it had seemed that Christine Alexander wanted it for some medical reasons which may not have been exactly accurate, but many of the accommodations we give people are related to decreasing their dysphoria, right? And so now this is coming up as a separate issue about the dysphoria she has about her testicles and not just her ideas about what it will or won't do for her testosterone level.

Q. Do you know if Dr. Raney actually saw Ms. Alexander?

A. You know what? That's a good question. I'm not really sure. Dr. Raney doesn't see patients and treat them on her own. She sees patients with providers and provides consultation, you know, about their hormone dosing and things like that.

So she may have, but I'm not really sure.
MR. GUENTHER: Carol, could you please read back Dr. Thompson's answer to not the previous question, but the question before, where I believe he used the word "community."
(Answer read as follows: "So that was just based on the discussion. And, actually, I think Dr. Raney really did a good job in, you know, educating us about how orchiectomy is approached in the community, which is why we have the consultants.")
Q. Doctor, when you use the word "community," what community were you referring to?
A. Just life outside of prison.
Q. Scroll down to February 19, 2021, the bottom right-hand corner, Page 132, "Patient would like to move forward with orchiectomy."
A. Yes.
Q. "Patient would like to move forward with orchiectomy, more investigation needed to find out reasoning behind request."
Did I read that correctly?
A. Yes.
Q. Would you describe what the "more

canteen items with no exceptions."
Did I read that correctly?
A. Yes.
Q. Do you recall a discussion -- strike that.
The next column states, "DOC to look at state transit vehicles to make potential accommodations."
Did I read that correctly?
A. Yes.
Q. Do you recall a discussion at the GD Supervision Committee relating to the items in this note?
A. Yes.
Q. What do you remember being discussed?
A. Just exactly what it says, that she was having trouble with the transportation, she wanted a specific thing, the DOC was going to look into the possibilities to see if they could accommodate her, and also that she was making requests for specific variations on the things that were listed in the canteen item, but the basic accommodations were already afforded to her.
Q. Is it your sense that the GD Committee has considered these variations that she's requested?

A. Yes.
Q. And has there been a -- "decision" is the right word? What has the consideration been?
A. That it wasn't medically necessary, as you can see from all the notes from month to month, "stable," "doing well," "likes being at Norfolk," et cetera. So she was actually doing, you know, quite well.
And we don't make specific recommendations around things. Like I mentioned, we recommend bras, but not colors of bras. So it wasn't felt to be medically necessary.
Q. Do you recall if there was a conversation on whether the items would be psychologically beneficial?
A. Yes. I mean, we discussed all of that, but I feel like there is -- we realize these are things that she wants, but don't necessarily feel that it's something that's needed for her treatment of her gender dysphoria.
Q. Has the Department of Correction had any influence on that decision?
A. No.
Q. * Does the GD Committee have an opinion as

MR. GUENTHER: Can I propose about a ten-minute break, and I think I'll have maybe 10 or 15 more minutes, maximum, of questions. Is that okay with everyone?

MS. VAULDING: That works.

MR. GUENTHER: Come back at 4:10.

(Recess)

BY MR. GUENTHER:

Q. Dr. Thompson, can you tell me what requests the GD Committee, either Supervision or Treatment Committee, has considered from Ms. Alexander?

A. So all the ones that we reviewed, which -- the primary one being her orchiectomy, and also some makeup items. When I met with her, she did also discuss her blue jeans.

Q. Orchiectomy, makeup items, blue jeans.

A. Yes. And I believe a particular type of underwear that she wanted.

Q. A nude bra, I believe as well we reviewed?

A. Yes, that's right, a nude bra.

Q. And it's your understanding that the Gender Dysphoria Committee has made the recommendation for an orchiectomy?

A. Correct.

Q. However, the Gender Dysphoria Committee has considered but not approved or made a recommendation for any particular makeup items, blue jeans, underwear or nude bra?

A. No. We made sure that she had those things in general, but not necessarily a specific type.

Q. Do you have an understanding as to whether the number of what I would call cosmetic or feminizing items, such as makeup, that that number of items available on the Framingham list has, over time, increased or decreased?

A. I think sometimes it goes up and sometimes it goes down. I don't monitor it month to month.

Q. Do you know if the Gender Dysphoria Committee has ever discussed what actually is available on the Framingham commissary list?

A. Yes, we have done that at certain times.

Q. Do you remember when you most recently did?

A. No, I don't recall.

Q. Do you believe it was in the last five years?

A. Yes.

Q. Within the last year?

A. I don't know. I don't recall.

Q. You use the term she's "doing quite well and stable." I assume that's sort of a relative term. Can you explain what you mean by she's "doing quite well and stable"?

A. Well, she's -- you know, in the prison she's not getting into any trouble. She's working. She is active. She has friends. You know, that's -- my understanding is that for someone in prison, she is, you know, doing very well, who's serving a life sentence.

Q. Do you or the Gender Dysphoria Committee have an understanding of how Ms. Alexander believes she's doing presently, as it relates to her gender dysphoria care?

A. Yes. I do.

Q. And what is your understanding of her understanding?

A. I believe that she has certain things which she wants. She wants, you know, a certain color of makeup, or she wants a certain cut of her underwear.

So I do have an understanding that she has those wants. My opinion is that it doesn't rise to the level of a need of medical necessity.

Q. How does one evaluate or how would the

Q. I'm asking if you think there is a reason that a doctor would tell her she should not do so as part of treatment for her gender dysphoria.

MS. VAULDING: Objection.

You can answer.

A. So there are lots of things in prison that people do not have access to as part of being in prison. And -- so if a medical exception is made to that, it would need to rise to the level of being medically necessary, and I don't feel that this is medically necessary for her treatment.

Q. Because she's incarcerated?

A. No, because I don't -- I mean, I don't think that it's medically necessary. It may be something that she wants. There are all kinds of things that people in the community get because they want. But I don't see it as being a medical necessity.

To have a specific color or cut -- there are some items like female underwear, which are, I think, important for the treatment, but not necessarily a specific type. So we provide what's medically necessary.

Q. But if Ms. Alexander was not incarcerated,

# EXHIBIT D

# 103 CMR 403.00: INMATE PROPERTY

Section

403.01: Purpose
403.02: Cancellation
403.03: Applicability
403.04: Access to Regulation
403.05: Definitions
403.06: Property Storage Area
403.07: Appointment and Duties of the Institution Property Officer
403.08: Inmate Property Inventory and Documentation
403.09: Approved Property for Inmates Being Transported
403.10: Approved Inmate Property
403.11: Additional Property Authorized for Retention by Inmates
403.12: Responsibility for Property Retained by Inmates
403.13: Incoming Inmate Property
403.14: Inmate Identity Documents
403.15: Disposal of Inmate Property
403.16: Seized Inmate Property
403.17: Long Term Storage of Inmate Property
403.18: Transfer or Release of Inmate Property
403.19: Property of Escapees or Deceased Inmates
403.20: Disposal of Unclaimed Inmate Property
403.21: Liability for Loss, Damage or Destruction of Inmate Property
403.22: Property Transactions Involving Inmates
403.23: Training
403.24: Quarterly Meetings
403.25: Quality Assurance
403.26: Time Limits
403.27: Emergencies
403.28: Staff Responsibilities
403.29: Annual Review Date
403.30: Severability Clause

## 403.0l: Purpose

The purpose of 103 CMR 403.00 is to establish Department of Correction (Department or DOC) regulations and procedures governing the receipt, transfer, storage, maintenance, release and disposal of the property of inmates confined in state correctional institutions. 103 CMR 403.00 is not intended to confer any procedural or substantive rights or any private cause of action not otherwise granted by state or federal law.

403.02: Cancellation

103 CMR 403.00 cancels all previous Department or institution policy statements, bulletins, directives, orders, notices, rules, regulations, or standard operating procedures, regarding inmate property to the extent that they are inconsistent with 103 CMR 403.00.

403.03: Applicability

103 CMR 403.00 is applicable to all inmates, whether sentenced or awaiting trial, probation/parole detainees, or civilly committed individuals housed in state correctional institutions except individuals committed to the Bridgewater State Hospital.

403.04: Access to Regulation

103 CMR 403.00 shall be maintained within the Department Policy Manual, in each Superintendent's Central Policy File, and in each inmate library.

403.05: Definitions

Contraband. Any item(s) not approved for inmate retention at an institution.

Ditty Bag. For the purposes of 103 CMR 403.00, a bag which contains Department of Correction approved items and sent along in the same vehicle as the inmate when he or she is being transported.

Inmate Management System (IMS). The Department of Correction's automated information system that provides processing, storage and retrieval of inmate-related information needed by Department personnel and other authorized users within the criminal justice system.

Inmate Property Permission Slip. The form used by inmates to request permission to obtain items of property not sold by the institution's canteen vendor but authorized for inmate retention at the inmate's respective institution and security level.

Inventory. The record maintained by the Department in IMS of any and all property belonging to each inmate.

Living Quarters. The room, cell, dormitory or other area of any institution where an inmate is housed.

Property. Items which include the following:
(a) any and all items documented as belonging to, owned by, or otherwise approved for inmate retention in his or her living quarters;
(b) items not authorized for inmate retention but temporarily stored by the

institution as contraband;
(c) items approved for and held in long term storage;
(d) legal property in storage which may be exchanged periodically;
(e) items temporarily in the possession of a third party outside the institution/Department for repair; and/or
(f) items held as evidence by the Department or other law enforcement agency.

Property Committee. A group of Department employees, designated by the Commissioner, who review recommendations for inmate property in accordance with 103 CMR 403.00 for approval by the Commissioner.

Property Officer. The staff person responsible for the inventory, recording, storage, control, inspection, purchase and/or sale of inmate property at his or her respective institution

Property Storage Area. A designated area of an institution where inmate property is stored.

Publication. Any book, booklet, pamphlet, magazine, periodical, newsletter, newspaper, or similar document, including stationery and greetings cards, including a copy or printout of same, published by any individual organization, company, or corporation, which is distributed or made available through any means or media for a commercial purpose. Publication includes any portion extracted, photocopied, or clipped from such items, provided, however, that an inmate may receive a maximum of five pages per day, except Sundays and postal holidays, of a portion extracted, photocopied, or clipped from such items as an attachment to personal correspondence as long as the material is not otherwise prohibited by 103 CMR 481.00: *Inmate Mail*.

Security Levels. A degree of security afforded by the architectural and staffing attributes of the correctional institution and housing units within that correctional institution. Security levels are related to custody levels, and the traditional security levels are maximum, medium, minimum, and pre-release/contracted residential placement, as defined in 103 DOC 101: *Correctional Institution/Security Levels*, available at each inmate library and at http://www.mass.gov/eopss/law-enforce-and-cj/prisons/doc-policies/policy-list.

State Issued Property. Property permitted pursuant to 103 DOC 750, *Hygiene Standards* and 103 DOC 755, *Clothing, Linen and Laundry*, both available at each inmate library and at http://www.mass.gov/eopss/law-enforce-and-cj/prisons/doc-policies/policy-list,which property is provided to the inmate by the institution.

Transient Inmate. Any inmate whose security classification has yet to be determined or who has not been assigned to a permanent housing location.

403.06: Property Storage Area

Each institution shall maintain a secure inmate property storage area. Only the Superintendent or a designee and the property officer shall have access to this area unless additional personnel are specifically authorized by the Superintendent or a designee.

403.07: Appointment and Duties of the Institution Property Officer

The Superintendent at each institution shall appoint a Property Officer who is responsible for the inventory, recording, storage, control, inspection, purchase and/or sale of all inmate property.

403.08: Inmate Property Inventory and Documentation

(1) The Property Officer at each institution shall maintain a current, accurate, individual property inventory for each inmate housed or assigned to the institution, which shall be maintained in IMS.

(2) The Superintendent or designee shall ensure that the institution conducts a property inventory for each inmate housed or assigned to the institution on an annual basis. The officer conducting the inventory search shall provide the inmate with a copy of the IMS master list detailing the property that was accounted for during the inventory. The inmate shall then acknowledge that the inventory list on IMS accurately reflects his or her property. Refusals to acknowledge shall be documented by the Property Officer.

(3) The use of, format, required content, and/or specific procedures regarding all forms, reports, *etc*., either paper or electronic, or changes thereto, shall be initially forwarded to the Property Committee for review, then to the Commissioner for approval.

403.09: Approved Property for Inmates Being Transported

Inmates transferring from one institution to another, or to the Department Disciplinary Unit (DDU), shall transfer with a limited amount of property on their person and included within a ditty bag. The property allowed for inclusion in the ditty bag shall be in accordance with the Inmate Property Standard Operating Procedures, which is available at each inmate library and at http://www.mass.gov/eopss/law-enforce-and-cj/prisons/doc-policies/policy-list.

403.10: Approved Inmate Property

(1) Inmates shall be allowed to retain a limited amount of property at each Department institution. A master list of items approved for retention by general population inmates in accordance with their security level shall be posted and available in each inmate library. Items contained in this list do not denote required

403.10: continued

issue. The list is for property limitation purposes only. Please refer to 103 DOC 755: *Clothing, Linen and Laundry*, for minimum institutional clothing issue. Unless an inmate is transient, his or her security level is the same as the institution in which the inmate is housed.

(2) Notwithstanding the master list in 103 CMR 403.10(1), the following items are allowed as follows:

(a) Appliances/Accessories. Inmates may obtain televisions, radios, typewriters, fans, non-boiling hot pots, headphones and walkman-style radios *via* institutional canteen purchases in accordance with the designated security level. The utilization of these items may be restricted in certain living quarters by the Superintendent. Fans may also be restricted and/or prohibited by the Superintendent in climate controlled environments. Any fans used by inmates must be a table model only with a plastic stand, and only with a blade size of 12", which blades must be plastic and enclosed in a plastic frame. All other electrical appliances/accessories shall be constructed of clear plastic, to allow for visual inspection of the internal components.

(b) Books/Magazines/Newspapers. All publications must come directly from the publisher, a book club, a bookstore, or from the Prison Book Program. Inmates may possess a maximum of ten books/magazines/newspapers.

(c) Legal Documents. An inmate may possess a maximum of one cubic foot of legal documents containing legal material in his or her assigned living quarters. If a written request is approved by the Superintendent, authorization to store legal material exceeding the one cubic foot limit may be obtained. Any authorized excess documents shall be stored in a pre-determined storage area accessible to the inmate, not in the inmate living quarters. Inmates shall not possess audio-visual media in their cells, such as compact discs or videotapes. Each Superintendent shall develop procedures to ensure that this material is accessible for inmate use.

(d) Personal Letters/Photographs/News Clippings. An inmate may possess one cubic foot of personal letters, photos, and clippings;

(e) Religious Articles. Inmates may retain certain authorized religious articles. A list of approved religious articles shall be posted quarterly in the inmate libraries. If an inmate seeks to retain religious articles which are not on the approved list or authorized for retention pursuant to 103 CMR 403.00, he or she must submit an Inmate Religious Services Request Form to the Institution Director of Treatment, for processing, pursuant to 103 CMR 471.00: *Religious Programs and Services*.

(3) Any transient inmate housed in a Department of Correction institution for 30 consecutive days or longer, who remains disciplinary report free, may be allowed to purchase a walkman-style radio at the discretion of the Superintendent of the institution.

(4) Inmates housed in the DDU may possess items of personal property as deemed

403.10: continued

appropriate by the institutional Superintendent.

(5) Inmates housed in an institutional Special Management Unit (SMU) may possess items of personal property pursuant to 103 CMR 423.09: *Special Management and Awaiting Action*.

403.11: Additional Property Authorized for Retention by Inmates

Additional property items may be approved at any level *via* written approval of the Property Committee and the Commissioner. The authorized property shall be consistent with the security needs of the institution and the available storage space in inmate living quarters.

403.12: Responsibility for Property Retained by Inmates

Inmates are responsible for the safekeeping of all property which they are permitted to retain in their living quarters. In addition, inmates shall:

(1) Maintain all receipts and property inventories provided by the property officer to document proof of ownership upon request of a staff member. If an inmate fails to show proof of ownership, said property shall be considered contraband unless ownership can otherwise be established.

(2) Ensure that no personal or state property is altered in any manner.

(3) Ensure that they do not dispose of any property without the approval of the Property Officer.

(4) Ensure that their clothing is not worn too large or too small, and does not contain hoods, turtlenecks, excessive holes or tears, built-in athletic supporters, quilted or removable liners, leather or suede garments, appliqués, pictures, graphics, logos, insignia, writing or other ornaments, except for institutional/state logos, lettering, or graphics, as supplied and authorized by the institution or Department.

(5) Under no circumstances shall inmates accumulate property to the point where it becomes a fire, sanitation, security or housekeeping hazard. Where excessive property has been accumulated, certain items, even though previously authorized for retention, may be removed from the inmate's living quarters and forwarded to the Property Officer, who shall proceed with the disposal procedure as outlined in l03 CMR 403.l5.

(6) Inmates shall be responsible for ensuring that at no time do they have in excess of ten books, magazines or newspapers in total. Whenever property items are not properly maintained by inmates, they may be deemed contraband and disposed of in accordance with 103 CMR 403.15.

403.13: Incoming Inmate Property

(1) All items of property entering an institution must be accompanied by a canteen order form or an approved inmate property permission slip. Any items that cannot be purchased via the inmate canteen may enter the institution, but only with the approval of the Superintendent or a designee. Exceptions to this process include books, magazines, and newspapers, as long as the quantity of such items does not exceed those requirements set forth in 103 CMR 403.10.

(2) Property which belongs to an incoming inmate shall be forwarded to the Property Officer for inventory. Items authorized for retention by the inmate shall be readied for delivery to the inmate after inventory. Upon delivery of the approved property to the inmate, the Property Officer shall provide a receipt to the inmate. Property not authorized for retention and deemed contraband shall be temporarily stored in the property storage area until its disposal in accordance with 103 CMR 403.15. Items which could be evidence in disciplinary or criminal proceedings, and are located in an inmate's personal property, shall be confiscated in accordance with the established evidence guidelines and delivered to the Superintendent or designee for safekeeping or delivery to the appropriate law enforcement agency.

(3) If any property ordered by an inmate exceeds the quantity limits allowed by 103 CMR 403.00, said inmate must exchange old property for new property.

(4) Any item which is available for purchase at the institutional inmate canteen or through approved vendors shall not otherwise be authorized to enter *via* an inmate property permission
slip.

(a) Inmates who are housed in a pre-release security level may request to purchase authorized items on an approved Program Related Activity (PRA) via the inmate property permission slip. All incoming property items are to be accompanied by the approved permission slip and a purchase receipt. The Property Officer shall inspect and inventory all items so purchased immediately upon the inmate's return to the institution.

(b) Permission slips are to be issued to inmates upon the inmate's request to the Property Officer or designee. The inmate shall be responsible for completing and returning the permission slip to the Property Officer for approval. Upon approval, the inmate shall forward the approved form to the appropriate party. Delivery of property designated by approved permission slips shall be accepted *via* mail delivery only, except as designated in 103 CMR 403.13(4)(a). Incoming parcels must include the approved property slip and contain only the items noted on the slip. If the contents of the parcel do not meet the property slip criteria or contain contraband, the entire package shall be returned to the sender by the Property Officer, who shall notify the inmate in writing of this refusal, stating the reason.

(c) Inmate Property Permission Slips shall be made available to eligible inmates

no less than on a quarterly basis.

(d) Nothing in 103 CMR 403.13 shall limit the Superintendent of an institution from developing internal procedures and time limits regarding the issuance of Inmate Property Permission Slips.

(5) Canteen clothing orders, appliance orders, or permission slips shall not be approved for inmates who have documented contraband in temporary storage at any institution, unless the Superintendent or a designee authorizes a written exception.

403.14: Inmate Identity Documents

(1) The following documents, if available, shall be held in storage for all offenders:

(a) Social Security Card;
(b) Immigration documents, including, but not limited to:
1. Resident Alien Card (green card);
2. Certificate of Naturalization;
3. Certificate of Citizenship.
(c) State issued ID;
(d) Driver's License or RMV Photo ID;
(e) Passport;
(f) Military ID/Veterans DD214;
(g) Birth Certificate;
(h) Marriage Certificate;
(i) Health Insurance Card;
(j) Release Portfolio;
(k) HS/GED/Hi-Set Certificate;
(l) Trade Licenses;
(m) Educational Transcripts.

All other identity documents shall be deemed contraband and disposed of in accordance with 103 CMR 403.15.

(2) The inmate identity documents and inmate release portfolio shall be placed in a sealed envelope, *via* Records staff, with the following information documented on the outside of the envelope:

(a) Date;
(b) Inmate's name;
(c) Commitment number;
(d) An inventory of the items contained within.

(3) The Records staff who receives the documents shall sign his or her name across the seal of the envelope.

(4) The following statement shall be printed and highlighted across the front of the envelope containing the inmate identity documents:

403.14: continued

DO NOT REMOVE FROM THE RECORDS DEPARTMENT UNLESS THE INMATE IS BEING TRANSFERRED OR RELEASED. DOCUMENTS ARE TO BE PLACED INTO INMATE'S RELEASE PORTFOLIO.

(5) Inmate identity documents and the inmate release portfolio shall be stored in the institutional Records Department.

(6) Routine access to inmate identity documents and release portfolio shall be limited to the institutional Records Manager and staff involved in the reentry process. The Superintendent of each correctional institution shall identify all other staff authorized to access inmate identity documents and release and employment portfolios. Such staff shall include, but not be limited to:

(a) Records staff;
(b) Community release coordinators;
(c) Correctional Program Officers directly involved with the transfer or release of inmates;
(d) Director of Treatment/Reentry Liaisons;
(e) Designated program staff member.

Any other individual requiring access to an inmate's identity documents or release portfolio may do so only upon the authorization of the Superintendent or a designee.

(7) Identity documents obtained during the course of an inmate's incarceration shall be secured following the same procedure for identity documents obtained during the booking and admission process.

(8) Any inmate identity documents or inmate release portfolio shall be returned to the inmate upon his or her release from custody, in accordance with 103 DOC 404, *Inmate Release Policy*. The inmate identity documents and release portfolio shall be designated on the property screen
as released to the inmate at the time of the release by the releasing institution's Property Department.

(9) In the event an inmate is released from custody without receiving his or her identity documents and inmate release portfolio (*e.g.*, direct release from court), the Records Department shall forward the stored document to the Property Department. The inmate shall contact the releasing institution's Property Department to make arrangements for pickup of the identity documents in accordance with 103 CMR 403.18: *Transfer or Release of Inmate Property*. If, after three years, the inmate has not contacted the Department about his or her identity documents, the identity documents shall be disposed of pursuant to 103 CMR 403.15(1)(b)3.

(10) The institutional Records Manager or designee shall conduct periodic auditing of release portfolios and inmate identity documents. The audit shall include a physical inspection of the storage location, release portfolios and identity documents, as well as a review of the area's access log, and IMS Inmate Property and Reentry screens.

403.15: Disposal of Inmate Property

(1) Unless otherwise noted, the process for the disposal of inmate property is as follows:

(a) Within one week of property being deemed contraband, the Property Officer at the institution temporarily storing the contraband shall initially notify the inmate of the item being stored by providing him or her with the IMS Contraband Notification and Disposal form.

(b) With the exception of money orders, certified checks, bank checks, postage stamps, and cash, which are to be disposed of in accordance with 103 CMR 403.16(2), (3) and/or (4), the inmate may elect to dispose of the items by one of the following methods:

1. have the property retrieved by a visitor;
2. have the property mailed out to a specified destination at the inmate's expense;
3. have the property disposed of as seen fit by the institution.

(c) Once the inmate has selected the method of disposal and responds to the Property Officer in writing, arrangements for disposal shall be made. The property shall be properly marked and recorded in IMS noting the date, method of disposal, and address to which the property was sent, if appropriate.

(d) If the inmate does not respond within 30 days of the initial contraband notification, a final 30 day notification for response shall be printed from IMS and sent to the inmate.

(e) If there is no response after the final notification period elapses, then the institution may dispose of the property in accordance with 103 CMR 403.15(1)(b)3.

(2) Except for money orders, certified checks, bank checks, postage stamps, and cash, any property which, after a disciplinary hearing, has been found, by a preponderance of the evidence, and upon specific written findings, to have been illicitly obtained by the inmate, shall be retained for referral to the appropriate law enforcement agency, returned to its rightful owner if known, or disposed of pursuant to 103 CMR 403.15(1)(b)3.

403.16: Seized Inmate Property

Any item of property removed by an officer from an inmate's living quarters shall be held as follows:

(1) Property which could be evidence in disciplinary or criminal proceedings shall, by the end of the seizing officer's tour of duty, be delivered to the Superintendent or his or her designee for safekeeping or be delivered to the appropriate law enforcement agency.

(2) Money orders, certified checks, and bank checks, seized as contraband, which could be evidence in disciplinary or criminal proceedings, shall be confiscated and

403.16: continued

delivered to the appropriate law enforcement agency, or delivered to the Superintendent or his or her designee for safekeeping for a period (not to exceed three years for investigative purposes). If, after a disciplinary hearing, it has been found by a preponderance of the evidence, and upon specific written findings, that the money order(s), certified check(s), or bank check(s), were illicitly obtained by the inmate, the money order(s), certified check(s), or bank check(s), shall be retained for referral to the appropriate law enforcement agency, returned to the sender if known, or disposed of pursuant to 103 CMR 403.15(1)(b)3. Under no circumstances should money orders, certified checks, or bank checks, be destroyed.

(3) All postage stamps seized in conjunction with, but not limited to, disciplinary offenses 103 CMR 430.24: *Code of Offenses* (3-8), (3-14), (3-18), (4-1), and (4-3), shall be deemed contraband and the stamps shall be immediately used for indigent inmate mail purposes upon resolution of any disciplinary proceeding where guilt is established. Under no circumstances should usable, unaltered postage stamps be destroyed.

(4) Except for money that is determined to belong to the inmate, but is in excess of what is allowed, the disposal of which is governed by 103 CMR 405.14: *Disposal of Money Seized as Contraband*, any money found in an inmate's possession shall be confiscated as contraband and shall be retained for referral to the appropriate law enforcement agency, returned to its rightful owner if known, placed in the inmate benefit fund, or otherwise disposed of pursuant to 103 CMR 403.15(1)(b)3. Under no circumstances should cash or coins be destroyed.

(5) All other property which has been removed shall be forwarded to the Property Officer, who shall inventory and store such property until such time as it is disposed of in accordance with 103 CMR 403.15.

(6) Whenever an inmate is discharged or paroled, all items of the inmate's property which have been stored by the institution shall be returned, except for those items properly seized pursuant to 103 CMR 403.15(2) and 403.16. Any such seized property items shall be returned to the inmate upon resolution of any disciplinary and/or criminal proceedings, except where items are contraband or in violation of the rules and regulations of the institution or the Department, pursuant to 103 CMR 403.15(2) and 403.16. The Property Officer shall check each item of property including property retained in the living quarters, against the inventory, noting on the inventory the date the property is released to the inmate.

(7) Whenever an inmate is transferred from one Department institution to another, the sending institution shall ensure that the property transferring with the inmate is not considered contraband for the receiving institution's security level. If property items are considered contraband for the receiving institution, then the sending institution's Property Department shall be responsible for following the procedures set forth in 103 CMR 403.15.

403.17: Long Term Storage of Inmate Property

(1) Where an inmate makes a request in writing and satisfactorily provides a compelling need for long term storage of property items of value, the Superintendent or designee may approve the request. Once a Superintendent or designee approves the long term storage request, he or she shall notify the inmate and the appropriate property department in writing. The notification shall include a detailed list of the items approved for long term storage. For those items requested, but not approved for long term storage, the Superintendent or designee shall notify the inmate and the appropriate Property Department in writing that said property was not approved for long term storage. The Property Department shall then follow the procedures set forth in 103 CMR 403.15.

(2) For those inmates who have not been moved to higher security since April 12, 1991 and are requesting long term storage of contraband items possessed prior to April 12, 1991, the Department of Correction shall approve this request provided the inmate submits proof that every member of his or her immediate family who has visited within the previous 12 months cannot accommodate the storage of the contraband property. These inmates may be allowed to retain memory typewriters or word processors only if they are willing to have the institution send out their machines and have any memory disabled and disk drive sealed at inmate expense.

403.18: Transfer or Release of Inmate Property

(1) Upon notification of transfer of an inmate, the sending institution Property Officer or designee shall prepare a ditty bag for transfer. The contents of the ditty bag shall be recorded in IMS. The Property Officer shall also search and inventory all the inmate's remaining property and transfer all property authorized for retention at the receiving facility security level to the inmate as soon as practicable thereafter. Any and all property which is considered to be contraband at the inmate's receiving facility shall be disposed of by the sending facility in accordance with 103 CMR 403.15. The Property Officer shall release the inmate's inventory to the receiving facility *via* IMS.

(2) All food items in possession of an inmate shall not be transferred between institutions. All such food items shall be considered contraband and disposed of in accordance with 103 CMR 403.15.

(3) At the receiving facility, the inmate shall sign a receipt, generated from IMS, accepting the property returned and such receipt shall be kept with the inmate's property record. In the event that an inmate refuses to sign a receipt, such refusal shall be noted on the inventory by

the Property Officer or designee, but shall not be grounds for withholding the property.

(4) Whenever an inmate is absent from his or her living quarters for an extended period of time (*e.g.*, outside hospital, disciplinary detention), the officer in charge of the area in which the inmate is housed shall securely lock the inmate's living quarters or property in accordance with Standing Operating Procedures.

403.19: Property of Escapees or Deceased Inmates

(1) Upon discovery of the escape or death of an inmate, the officer in charge of the area in which the inmate was housed shall secure the living quarters. All property within the inmate's living quarters shall be forwarded as soon as possible to the Property Officer, who shall list the items on the inmate's inventory in IMS and store them in the property storage area.

(2) Where an escapee is returned to the care and custody of the Department within one year from the date of escape, approved property shall be transferred as soon as practicable to the institution where the inmate is incarcerated. Property not authorized for retention at the institution shall be disposed of in accordance with 103 CMR 403.15. If the inmate is on escape for a period of more than one year, the Department may dispose of the inmate's property in accordance with 103 CMR 403.20.

403.20: Disposal of Unclaimed Inmate Property

Property of deceased inmates shall be released to the proven administrator or executor of the deceased inmate and can be picked up by such person from the institution where the property is stored. Such person shall sign a receipt for the property received. Except for identity documents, as defined in 103 CMR 403.14, any property belonging to a deceased inmate which remains unclaimed after one year, or to an inmate on escape for more than one year, shall be disposed of in accordance with the following procedures:

(1) The Superintendent shall notify the listed next of kin of the former inmate, in writing, that said property shall be disposed of if not claimed within 30 days of the date of the letter.

(2) If no claim is received within the specified time period, a special board, composed of the Superintendent of the institution where the property is being stored, and a representative of the Department designated by the Commissioner, shall ascertain whether the unclaimed property has any sale value.

(3) If the property is determined to have sale value, the special board shall solicit offers for purchase from three reputable dealers in like property and shall sell the property to the highest bidder. The proceeds of any such sale shall be deposited into the inmate's account.

(4) If the property is determined not to have sale value, or if no offer is received in

403.20: continued

response to solicitation for bids as described, the special board may dispose of such property in such a manner as deemed appropriate.

(5) A complete record of disposal for unclaimed property shall be completed and signed by the members of the special board and filed with the former inmate's institutional records.

403.21: Liability for Loss, Damage or Destruction of Inmate Property

Nothing in 103 CMR 403.00 is intended to create any liability on the part of the Commonwealth, the Department, or any of its employees for loss, damage or destruction of property where such liability does not already exist under established law.

403.22: Property Transactions Involving Inmates

No inmate or employee may sell, barter, exchange, lend, borrow or in any other manner transfer any item or personal property to any inmate or employee of the Department except with the written approval of the Superintendent or designee. 103 CMR 403.22 shall not be construed to prohibit transfer or exchange of legal materials, provided that one inmate does not retain another inmate's legal materials in his or her cell.

403.23: Training

The Department shall provide all employees assigned to an institution's Property Department with training in the management of inmate property. This training shall include, but not be limited to, training on the application of 103 CMR 403.00, on IMS screens related to inmate property, and on the Standard Operating Procedures pertaining to 103 CMR 403.00.

403.24: Quarterly Meetings

The Deputy Commissioner of the Prison Division or his or her designee shall ensure that Property Officer meetings are held on a quarterly basis to ensure consistency and compliance with 103 CMR 403.00 Sand its standard operating procedure.

403.25: Quality Assurance

The Assistant Deputy Commissioners of the Prison Division shall ensure agency wide compliance with 103 CMR 403.00 by directing each Superintendent to conduct quality assurance audits of his or her facility at least on an annual basis.

403.26: Time Limits

Unless otherwise required by law, time limits set forth in 103 CMR 403.00 are directory and may be modified by the Superintendent or the Commissioner under appropriate circumstances.

403.27: Emergencies

Whenever, in the opinion of the Commissioner, Deputy Commissioner, or any Superintendent of a state correctional institution, an emergency exists which requires suspension of all or part of 103 CMR 403.00, he or she may order such suspension, provided that any such suspension ordered by the Superintendent lasting beyond 48 hours is authorized by the Commissioner.

403.28: Staff Responsibilities

The Property Committee shall perform an annual review of 103 CMR 403.00 and review suggestions or recommended changes to the policy from Superintendents. Each Superintendent shall be responsible for implementing and monitoring compliance with 103 CMR 403.00 at his or her institution. The Assistant Deputy Commissioners of the Prison Division shall ensure compliance throughout the Department.

403.29: Annual Review Date

103 CMR 403.00 shall be reviewed at least annually from the effective date by the Commissioner or designee. The party or parties conducting the review shall develop a memorandum to the Commissioner with a copy to the Central Policy File indicating revisions, additions, or deletions that shall be included for the Commissioner's approval and shall become effective pursuant to applicable law.

403.30: Severability Clause

If any article, section, subsection, sentence, clause or phrase of 103 CMR 403.00 is for any reason held to be unconstitutional, contrary to statute, in excess of the authority of the Commissioner or otherwise inoperative, such decision shall not affect the validity of any other section, subsection, sentence, clause or phrase of 103 CMR 403.00.

REGULATORY AUTHORITY

103 CMR 403.00: M.G.L. c. 124, §§ 1(b), (c) and (q); c. 127, §§ 3, 96A and 96B.

# EXHIBIT E

NAME ______________________________ INMATE ID ____________________________

INSTITUTION UNIT DATE

| QTY | CODE | UNDERWEAR | COST |
|---|---|---|---|
| | 1504 | CREW NECK T-SHIRT S | $2.60 |
| | 1505 | CREW NECK T-SHIRT M | $2.60 |
| | 1506 | CREW NECK T-SHIRT L | $2.60 |
| | 1507 | CREW NECK T-SHIRT XL | $2.60 |
| | 1508 | CREW NECK T-SHIRT 2XL | $3.96 |
| | 1509 | CREW NECK T-SHIRT 3XL | $3.96 |
| | 5727 | CREW NECK T-SHIRT 4XL | $6.50 |
| | 3652 | CREW NECK T-SHIRT 5XL | $6.50 |
| | 3669 | CREW NECK T-SHIRT 6XL | $6.50 |
| | 1529 | BOXERS WHITE S | $2.66 |
| | 1530 | BOXERS WHITE M | $2.66 |
| | 1531 | BOXERS WHITE L | $2.66 |
| | 1532 | BOXERS WHITE XL | $2.66 |
| | 1533 | BOXERS WHITE 2XL | $4.16 |
| | 1534 | BOXERS WHITE 3XL | $4.16 |
| | 8237 | BOXERS WHITE 4XL | $5.10 |
| | 8238 | BOXERS WHITE 5XL | $5.10 |
| | 8239 | BOXERS WHITE 6XL | $5.75 |
| | 1514 | BRIEFS WHITE S | $1.83 |
| | 1515 | BRIEFS WHITE M | $1.83 |
| | 1516 | BRIEFS WHITE L | $1.83 |
| | 1517 | BRIEFS WHITE XL | $1.83 |
| | 1518 | BRIEFS WHITE 2XL | $3.31 |
| | 1498 | BRIEFS WHITE 3XL | $3.31 |
| | 1499 | BRIEFS WHITE 4XL | $3.31 |
| | 1513 | BRIEFS WHITE 5XL | $3.31 |
| | 1698 | BRIEFS WHITE 6XL | $5.15 |
| | 9752 | BRIEFS WHITE 70-72" | $5.50 |
| | 1550 | THERMAL TOP S | $4.49 |
| | 1551 | THERMAL TOP M | $4.49 |
| | 1552 | THERMAL TOP L | $4.49 |
| | 1553 | THERMAL TOP XL | $4.49 |
| | 1554 | THERMAL TOP 2XL | $6.69 |
| | 1555 | THERMAL TOP 3XL | $6.69 |
| | 1556 | THERMAL TOP 4XL | $9.99 |
| | 1495 | THERMAL TOP 5XL | $12.49 |
| | 1557 | THERMAL TOP 6XL | $12.49 |
| | 1560 | THERMAL BOTTOM S | $4.49 |
| | 1561 | THERMAL BOTTOM M | $4.49 |
| | 1562 | THERMAL BOTTOM L | $4.49 |
| | 1563 | THERMAL BOTTOM XL | $4.49 |
| | 1564 | THERMAL BOTTOM 2XL | $5.99 |
| | 1565 | THERMAL BOTTOM 3XL | $5.99 |
| | 1567 | THERMAL BOTTOM 4XL | $9.99 |
| | 1494 | THERMAL BOTTOM 5XL | $12.49 |
| | 1558 | THERMAL BOTTOM 6XL | $12.49 |
| | 1540 | TUBE SOCKS WHITE | $1.30 |
| | 1541 | CREW SOCKS WHITE | $1.65 |
| | 1546 | THERMAL SOCKS | $1.50 |

| QTY | CODE | SWEAT CLOTHES | COST |
|---|---|---|---|
| | 1581 | SWEATSHIRT GRAY S | $7.69 |
| | 8377 | SWEATSHIRT NAVY S | $7.69 |
| | 7217 | SWEATSHIRT BLACK S | $7.69 |
| | 8378 | SWEATSHIRT NAVY M | $7.69 |
| | 1582 | SWEATSHIRT GRAY M | $7.69 |
| | 7218 | SWEATSHIRT BLACK M | $7.69 |
| | 8379 | SWEATSHIRT NAVY L | $7.69 |
| | 1583 | SWEATSHIRT GRAY L | $7.69 |
| | 7219 | SWEATSHIRT BLACK L | $7.69 |
| | 8380 | SWEATSHIRT NAVY XL | $7.69 |
| | 1584 | SWEATSHIRT GRAY XL | $7.69 |
| | 7238 | SWEATSHIRT BLACK XL | $7.69 |
| | 8381 | SWEATSHIRT NAVY 2XL | $12.99 |
| | 1585 | SWEATSHIRT GRAY 2XL | $12.99 |
| | 7239 | SWEATSHIRT BLACK 2XL | $12.99 |
| | 7213 | SWEATSHIRT NAVY 3XL | $12.99 |
| | 1586 | SWEATSHIRT GRAY 3XL | $12.99 |
| | 7240 | SWEATSHIRT BLACK 3XL | $12.99 |
| | 7214 | SWEATSHIRT NAVY 4XL | $12.99 |
| | 1599 | SWEATSHIRT GRAY 4XL | $12.99 |
| | 7241 | SWEATSHIRT BLACK 4XL | $12.99 |
| | 7215 | SWEATSHIRT NAVY 5XL | $15.79 |
| | 7242 | SWEATSHIRT BLACK 5XL | $15.79 |
| | 7949 | SWEATSHIRT GRAY 5XL | $15.79 |
| | 7948 | SWEATSHIRT GRAY 6XL | $21.29 |
| | 7216 | SWEATSHIRT NAVY 6XL | $21.29 |
| | 7243 | SWEATSHIRT BLACK 6XL | $21.29 |
| | 8382 | SWEATPANTS NAVY S | $7.69 |
| | 7248 | SWEATPANTS BLACK S | $7.69 |
| | 1587 | SWEATPANTS GRAY S | $7.69 |
| | 8383 | SWEATPANTS NAVY M | $7.69 |
| | 1588 | SWEATPANTS GRAY M | $7.69 |
| | 7249 | SWEATPANTS BLACK M | $7.69 |
| | 8384 | SWEATPANTS NAVY L | $7.69 |
| | 1589 | SWEATPANTS GRAY L | $7.69 |
| | 7250 | SWEATPANTS BLACK L | $7.69 |
| | 8385 | SWEATPANTS NAVY XL | $7.69 |
| | 1590 | SWEATPANTS GRAY XL | $7.69 |
| | 7251 | SWEATPANTS BLACK XL | $7.69 |
| | 8386 | SWEATPANTS NAVY 2XL | $14.79 |
| | 1591 | SWEATPANTS GRAY 2XL | $14.79 |
| | 7252 | SWEATPANTS BLACK 2XL | $14.79 |
| | 7244 | SWEATPANTS NAVY 3XL | $14.79 |
| | 1592 | SWEATPANTS GRAY 3XL | $14.79 |
| | 7253 | SWEATPANTS BLACK 3XL | $14.79 |
| | 7245 | SWEATPANTS NAVY 4XL | $14.79 |
| | 1675 | SWEATPANTS GRAY 4XL | $14.79 |
| | 7254 | SWEATPANTS BLACK 4XL | $14.79 |
| | 7246 | SWEATPANTS NAVY 5XL | $15.79 |
| | 7255 | SWEATPANTS BLACK 5XL | $15.79 |
| | 7947 | SWEATPANTS GRAY 5XL | $15.79 |
| | 7247 | SWEATPANTS NAVY 6XL | $15.79 |
| | 7946 | SWEATPANTS GRAY 6XL | $15.79 |
| | 7256 | SWEATPANTS BLACK 6XL | $15.79 |

| QTY | CODE | SHORTS | COST |
|---|---|---|---|
| | 7988 | GYM SHORTS NAVY M | $7.99 |
| | 7989 | GYM SHORTS NAVY L | $7.99 |
| | 7300 | GYM SHORTS NAVY XL | $7.99 |
| | 7991 | GYM SHORTS NAVY 2XL | $14.99 |
| | 7301 | GYM SHORTS NAVY 3XL | $14.99 |
| | 7302 | GYM SHORTS NAVY 4XL | $14.99 |
| | 7303 | GYM SHORTS NAVY 5XL | $14.99 |
| | 1524 | GYM SHORTS GRAY S | $7.99 |

| QTY | CODE | SHORTS CONT. | COST |
|---|---|---|---|
| | 1525 | GYM SHORTS GRAY M | $7.99 |
| | 1526 | GYM SHORTS GRAY L | $7.99 |
| | 1527 | GYM SHORTS GRAY XL | $7.99 |
| | 1528 | GYM SHORTS GRAY 2XL | $14.99 |
| | 1547 | GYM SHORTS GRAY 3XL | $14.99 |
| | 7304 | GYM SHORTS GRAY 4XL | $14.99 |
| | 1549 | GYM SHORTS GRAY 5XL | $14.99 |
| | 7319 | MESH SHORTS GRAY S | $10.79 |
| | 7320 | MESH SHORTS GRAY M | $10.79 |
| | 7321 | MESH SHORTS GRAY L | $10.79 |
| | 7322 | MESH SHORTS GRAY XL | $10.79 |
| | 7323 | MESH SHORTS GRAY 2XL | $12.49 |
| | 7324 | MESH SHORTS GRAY 3XL | $12.49 |
| | 7325 | MESH SHORTS GRAY 4XL | $12.49 |
| | 7326 | MESH SHORTS GRAY 5XL | $14.29 |
| | 7327 | MESH SHORTS GRAY 6XL | $14.29 |
| | 9761 | BLACK MESH SHORTS SMALL | $10.79 |
| | 9762 | BLACK MESH SHORTS MEDIUM | $10.79 |
| | 9763 | BLACK MESH SHORTS LARGE | $10.79 |
| | 9764 | BLACK MESH SHORTS XL | $10.79 |
| | 9765 | BLACK MESH SHORTS 2XL | $12.49 |
| | 9766 | BLACK MESH SHORTS 3XL | $12.49 |
| | 9767 | BLACK MESH SHORTS 4XL | $14.29 |
| | 9768 | BLACK MESH SHORTS 5XL | $14.29 |

| QTY | CODE | LEVI RELAXED FIT BLUE | COST |
|---|---|---|---|
| | 7752 | 30-30 | $27.31 |
| | 7753 | 30-32 | $27.31 |
| | 7329 | 30-34 | $27.31 |
| | 7776 | 30-36 | $27.31 |
| | 7758 | 32-30 | $27.31 |
| | 7760 | 32-32 | $27.31 |
| | 7331 | 32-34 | $27.31 |
| | 7761 | 32-36 | $27.31 |
| | 7769 | 34-30 | $27.31 |
| | 7771 | 34-32 | $27.31 |
| | 7333 | 34-34 | $27.31 |
| | 7773 | 34-36 | $27.31 |
| | 7775 | 36-30 | $27.31 |
| | 7777 | 36-32 | $27.31 |
| | 7334 | 36-34 | $27.31 |
| | 7778 | 36-36 | $27.31 |
| | 7779 | 38-30 | $27.31 |
| | 7780 | 38-32 | $27.31 |
| | 7335 | 38-34 | $27.31 |
| | 6959 | 42-36 | $27.31 |
| | 7782 | 40-30 | $27.31 |
| | 7783 | 40-32 | $27.31 |
| | 7336 | 40-34 | $27.31 |
| | 6955 | 40-36 | $27.31 |
| | 7784 | 42-30 | $27.31 |
| | 7337 | 42-32 | $27.31 |
| | 6958 | 42-34 | $27.31 |
| | 6959 | 42-36 | $27.31 |
| | 7849 | 44-30 | $33.06 |
| | 7850 | 44-32 | $33.06 |
| | 7851 | 44-34 | $33.06 |
| | 7830 | 44-36 | $33.06 |
| | 7852 | 46-30 | $33.06 |
| | 7853 | 46-32 | $33.06 |
| | 7854 | 46-34 | $33.06 |
| | 7855 | 48-30 | $33.06 |
| | 7856 | 48-30 | $33.06 |
| | 7857 | 48-32 | $33.06 |
| | 7858 | 50-30 | $33.06 |
| | 7859 | 50-32 | $33.06 |
| | 7860 | 50-34 | $33.06 |
| | 7861 | 52-30 | $33.06 |
| | 7862 | 52-32 | $33.06 |

| QTY | CODE | LEVI RELAXED FIT BLACK | COST |
|---|---|---|---|
| | 7785 | 28-30 | $32.35 |
| | 7786 | 28-32 | $32.35 |
| | 7803 | 29-30 | $32.35 |
| | 7806 | 29-32 | $32.35 |
| | 7338 | 29-34 | $32.35 |
| | 7809 | 30-30 | $32.35 |
| | 7805 | 30-32 | $32.35 |
| | 7339 | 30-34 | $32.35 |
| | 7804 | 31-30 | $32.35 |
| | 7811 | 31-32 | $32.35 |
| | 7340 | 31-34 | $32.35 |
| | 7787 | 31-36 | $32.35 |
| | 7813 | 32-30 | $32.35 |
| | 7816 | 32-32 | $32.35 |
| | 7341 | 32-34 | $32.35 |
| | 7808 | 32-36 | $32.35 |
| | 7788 | 33-30 | $32.35 |
| | 7814 | 33-32 | $32.35 |
| | 7342 | 33-34 | $32.35 |
| | 7807 | 33-36 | $32.35 |
| | 7822 | 34-30 | $32.35 |
| | 7825 | 34-32 | $32.35 |
| | 7343 | 34-34 | $32.35 |
| | 7815 | 34-36 | $32.35 |
| | 7819 | 36-30 | $32.35 |
| | 7824 | 36-32 | $32.35 |
| | 7344 | 36-34 | $32.35 |
| | 7821 | 36-36 | $32.35 |
| | 7820 | 38-30 | $32.35 |
| | 7823 | 38-32 | $32.35 |
| | 7345 | 38-34 | $32.35 |
| | 7812 | 40-30 | $32.35 |
| | 7818 | 40-32 | $32.35 |
| | 7346 | 40-34 | $32.35 |
| | 7810 | 42-30 | $32.35 |
| | 7347 | 42-32 | $32.35 |
| | 7789 | 42-36 | $32.35 |
| | 7790 | 42-38 | $32.35 |
| | 7791 | 44-30 | $38.10 |
| | 7792 | 44-32 | $38.10 |
| | 7794 | 44-36 | $38.10 |
| | 7795 | 46-30 | $38.10 |
| | 7796 | 46-32 | $38.10 |
| | 7349 | 46-34 | $38.10 |

| QTY | CODE | DRESS PANTS BLACK CONT | COST |
|---|---|---|---|
| | 7797 | 48-30 | $38.10 |
| | 7798 | 48-32 | $38.10 |
| | 7381 | 48-34 | $38.10 |
| | 7799 | 50-30 | $38.10 |
| | 7800 | 50-32 | $38.10 |
| | 7382 | 50-34 | $38.10 |
| | 7801 | 52-30 | $38.10 |
| | 7802 | 52-32 | $38.10 |
| | 7393 | 52-34 | $38.10 |

| QTY | CODE | DRESS PANTS NAVY | COST |
|---|---|---|---|
| | 7757 | 29-30 | $24.56 |
| | 7877 | 29-32 | $24.56 |
| | 7759 | 30-30 | $24.56 |
| | 7878 | 30-32 | $24.56 |
| | 7879 | 30-34 | $24.56 |
| | 7762 | 31-30 | $24.56 |
| | 7882 | 31-32 | $24.56 |
| | 7484 | 32-30 | $24.56 |
| | 7883 | 32-32 | $24.56 |
| | 7884 | 32-34 | $24.56 |
| | 7485 | 33-30 | $24.56 |
| | 7885 | 33-32 | $24.56 |
| | 7887 | 33-34 | $24.56 |
| | 7889 | 34-29 | $24.56 |
| | 7486 | 34-30 | $24.56 |
| | 7890 | 34-31 | $24.56 |
| | 7699 | 34-32 | $24.56 |
| | 7700 | 34-34 | $24.56 |
| | 7763 | 35-30 | $24.56 |
| | 7701 | 35-32 | $24.56 |
| | 7702 | 36-29 | $24.56 |
| | 7488 | 36-30 | $24.56 |
| | 7703 | 36-31 | $24.56 |
| | 7736 | 36-32 | $24.56 |
| | 7705 | 36-34 | $24.56 |
| | 7943 | 38-29 | $24.56 |
| | 7489 | 38-30 | $24.56 |
| | 7707 | 38-31 | $24.56 |
| | 7708 | 38-32 | $24.56 |
| | 7709 | 38-34 | $24.56 |
| | 7710 | 40-29 | $24.56 |
| | 7490 | 40-30 | $24.56 |
| | 7944 | 40-32 | $24.56 |
| | 7712 | 40-34 | $24.56 |
| | 7491 | 42-30 | $24.56 |
| | 7713 | 42-32 | $24.56 |
| | 7714 | 44-32 | $24.56 |
| | 7715 | 46-32 | $24.56 |
| | 7945 | 48-32 | $24.56 |
| | 7493 | 46-30 | $24.56 |
| | 7494 | 48-30 | $24.56 |
| | 7764 | 50-30 | $24.56 |

| QTY | CODE | DRESS PANTS BLACK | COST |
|---|---|---|---|
| | 7750 | 29-30 | $24.56 |
| | 7660 | 29-32 | $24.56 |
| | 7751 | 30-30 | $24.56 |
| | 7766 | 30-32 | $24.56 |
| | 7767 | 30-34 | $24.56 |
| | 7754 | 31-30 | $24.56 |
| | 7768 | 31-32 | $24.56 |
| | 7469 | 32-30 | $24.56 |
| | 7770 | 32-32 | $24.56 |
| | 7665 | 32-34 | $24.56 |
| | 7470 | 33-30 | $24.56 |
| | 7666 | 33-32 | $24.56 |
| | 7667 | 33-34 | $24.56 |
| | 7668 | 34-29 | $24.56 |
| | 7471 | 34-30 | $24.56 |
| | 7772 | 34-31 | $24.56 |
| | 7670 | 34-32 | $24.56 |
| | 7671 | 34-34 | $24.56 |
| | 7472 | 35-30 | $24.56 |
| | 7672 | 35-32 | $24.56 |
| | 7774 | 36-29 | $24.56 |
| | 7473 | 36-30 | $24.56 |
| | 7793 | 36-31 | $24.56 |
| | 7826 | 36-32 | $24.56 |
| | 7676 | 36-34 | $24.56 |
| | 7838 | 38-29 | $24.56 |
| | 7474 | 38-30 | $24.56 |
| | 7839 | 38-31 | $24.56 |
| | 7873 | 38-32 | $24.56 |
| | 7680 | 38-34 | $24.56 |
| | 7681 | 40-29 | $24.56 |
| | 7475 | 40-30 | $24.56 |
| | 7682 | 40-32 | $24.56 |
| | 7683 | 40-34 | $24.56 |
| | 7755 | 42-30 | $24.56 |
| | 7684 | 42-32 | $24.56 |
| | 7756 | 44-30 | $24.56 |
| | 7685 | 44-32 | $24.56 |
| | 7478 | 46-30 | $24.56 |
| | 7686 | 46-32 | $24.56 |
| | 7479 | 48-30 | $24.56 |
| | 7874 | 48-32 | $24.56 |
| | 7480 | 50-30 | $24.56 |

| QTY | CODE | DRESS SHIRT | COST |
|---|---|---|---|
| | 7271 | DRESS SHIRT WHITE S | $19.63 |
| | 7276 | DRESS SHIRT BLACK S | $19.62 |
| | 7281 | DRESS SHIRT NAVY S | $19.62 |
| | 7272 | DRESS SHIRT WHITE M | $19.63 |
| | 7277 | DRESS SHIRT BLACK M | $19.62 |
| | 7282 | DRESS SHIRT NAVY M | $19.62 |
| | 7273 | DRESS SHIRT WHITE L | $19.63 |
| | 7278 | DRESS SHIRT BLACK L | $19.62 |
| | 7283 | DRESS SHIRT NAVY L | $19.62 |
| | 7274 | DRESS SHIRT WHITE XL | $19.63 |
| | 7279 | DRESS SHIRT BLACK XL | $19.62 |
| | 7284 | DRESS SHIRT NAVY XL | $19.62 |
| | 7280 | DRESS SHIRT BLACK 2XL | $23.16 |
| | 7275 | DRESS SHIRT WHITE 2XL | $23.16 |
| | 7285 | DRESS SHIRT NAVY 2XL | $23.16 |

| QTY | CODE | DRESS SHIRT CONT | COST |
|---|---|---|---|
| | 9745 | DRESS SHIRT WHITE 3XL | $27.00 |

| QTY | CODE | RUNNING SNEAKERS | COST |
|---|---|---|---|
| | 1900 | REEBOK CLASSIC SZ 7 | $26.49 |

| QTY | CODE | BASKETBALL SNEAKERS CONT | COST |
|---|---|---|---|
| | 8482 | NIKE OVER PLAY SZ 8.5 | $67.19 |

| QTY | CODE | ITEM | COST |
|---|---|---|---|
| | 9739 | DRESS SHIRT BLACK 3XL | $27.00 |
| | 9743 | DRESS SHIRT NAVY 3XL | $27.00 |
| | 9740 | DRESS SHIRT BLACK 4XL | $30.00 |
| | 9746 | DRESS SHIRT WHITE 4XL | $30.00 |
| | 9744 | DRESS SHIRT NAVY 4XL | $30.00 |
| | 9741 | DRESS SHIRT BLACK 5XL | $35.00 |
| | 9742 | DRESS SHIRT BLACK 6XL | $40.00 |
| QTY | CODE | DICKIES LINED DEMIN JACKET | COST |
| | 7228 | BLUE M | $40.99 |
| | 7229 | BLUE L | $40.99 |
| | 7230 | BLUE XL | $40.99 |
| | 7231 | BLUE 2XL | $45.99 |
| | 7232 | BLUE 3XL | $45.99 |
| QTY | CODE | NEMISIS WIND BREAKER | COST |
| | 7264 | NAVY SMALL | $26.45 |
| | 7258 | BLACK MEDIUM | $26.45 |
| | 7265 | NAVY MEDIUM | $26.45 |
| | 7259 | BLACK LARGE | $26.45 |
| | 7266 | NAVY LARGE | $26.45 |
| | 7260 | BLACK XL | $26.45 |
| | 7267 | NAVY XL | $26.45 |
| | 7261 | BLACK 2XL | $26.45 |
| | 7262 | Black 3XL | $31.74 |
| | 7263 | Black 4XL | $33.50 |
| | 7268 | NAVY 2XL | $26.45 |
| | 7269 | NAVY 3XL | $31.74 |
| | 7270 | NAVY 4XL | $33.50 |
| QTY | CODE | LEVI DENIM JACKET | COST |
| | 7220 | SMALL | $39.10 |
| | 7221 | MEDIUM | $39.10 |
| | 7222 | LARGE | $39.10 |
| | 7223 | X LARGE | $39.10 |
| | 7224 | 2X LARGE | $46.00 |
| | 7225 | 3X LARGE | $46.00 |
| | 7226 | 4X LARGE | $46.00 |
| | 7227 | 5X LARGE | $46.00 |
| QTY | CODE | HATS/ GLOVES | COST |
| | 1704 | WORK GLOVE BROWN | $1.29 |
| | 8229 | BASEBALL HAT NAVY | $3.19 |
| | 8233 | STOCKING CAP BLACK | $1.99 |
| | 8235 | STOCKING CAP NAVY | $1.99 |
| | 1488 | ROTHCO WOOL GLOVE SMALL | $5.00 |
| | 1489 | ROTHCO WOOL GLOVE MED | $5.00 |
| | 6956 | ROTHCO WOOL GLOVE LARGE | $5.00 |
| | 6957 | ROTHCO WOOL GLOVE XL | $5.00 |
| QTY | CODE | PAJAMAS | COST |
| | 7500 | LONG SLEEVE S | $13.69 |
| | 7501 | LONG SLEEVE M | $13.69 |
| | 7502 | LONG SLEEVE L | $13.69 |
| | 7503 | LONG SLEEVE XL | $13.69 |
| | 7504 | LONG SLEEVE 2XL | $16.79 |
| | 7505 | LONG SLEEVE 3XL | $16.79 |
| | 7506 | LONG SLEEVE 4XL | $16.79 |
| | 7507 | LONG SLEEVE 5XL | $16.79 |
| | 7508 | LONG SLEEVE 6XL | $16.79 |
| QTY | CODE | BATHROBES | COST |
| | 7510 | NAVY ONE SIZE | $35.99 |
| QTY | CODE | GRAY SWEATER | COST |
| | 7233 | SMALL | $31.70 |
| | 7234 | MEDIUM | $31.70 |
| | 7235 | LARGE | $31.70 |
| | 7236 | X LARGE | $31.70 |
| | 7237 | 2X LARGE | $31.70 |
| | 7449 | 3X LARGE | $31.70 |
| QTY | CODE | MISCELLANEOUS | COST |
| | 755 | HANKERCHIEF | $1.23 |
| | 757 | ROTHCO WALLET | $2.30 |
| | 1072 | DOCUMENT FILE FOLDER | $1.14 |
| | 1167 | ALARM CLOCK (MINIMUM ONLY) | $8.14 |
| | 1280 | WAYARER SUNGLASSES | $3.28 |
| | 1310 | DOUBLE SIX DOMINOES | $4.61 |
| | 1315 | CHESS W/ BOARD | $4.74 |
| | 1320 | CHECKER SET W/ BOARD | $4.52 |
| | 1323 | BACKGAMMON | $5.06 |
| | 1334 | YAHTZEE | $10.49 |
| | 1335 | CRIBBAGE | $5.78 |
| | 1400 | CEREAL BOWL W/ LID | $0.80 |
| | 1411 | CUP 12 OZ. | $0.80 |
| | 1401 | 1.6 QT BOWL | $2.37 |
| | 1415 | 22 OZ CUP | $0.63 |
| | 1289 | READING GLASSES 1.00 | $10.36 |
| | 1275 | READING GLASSES 1.25 | $10.36 |
| | 1976 | READING GLASSES 1.50 | $10.36 |
| | 1281 | READING GLASSES 1.75 | $10.36 |
| | 1977 | READING GLASSES 2.00 | $10.36 |
| | 1282 | READING GLASSES 2.25 | $10.36 |
| | 1978 | READING GLASSES 2.50 | $10.36 |
| | 4779 | READING GLASSES 2.75 | $10.36 |
| | 1985 | READING GLASSES 3.00 | $10.36 |
| | 1986 | READING GLASSES 3.25 | $10.36 |
| | 4929 | REPLACEMENT WATCH BAND | $9.51 |
| | 4787 | CLEAR WATCH | $8.17 |
| | 7031 | FT 500 CASIO WATCH | $31.31 |
| | 1222 | CASIO WATCH BATTERY-SMALL | $1.74 |
| | 7156 | CASIO WATCH BATTERY-LARGE | $1.74 |
| | 4596 | WEIGHTLIFTING BELT SMALL | $20.00 |
| | 4597 | WEIGHTLIFTING BELT MEDIUM | $20.00 |
| | 4598 | WEIGHTLIFTING BELT LARGE | $20.00 |
| | 4599 | WEIGHTLIFTING BELT XT LARGE | $20.00 |
| | 8272 | SLEEK OVAL SUNGLASSES | $7.21 |
| | 1283 | CLIP ON SUNGLASSES | $4.59 |
| | 3854 | SHOWER SHOE SMALL | $3.19 |
| | 1875 | SHOWER SHOE MED | $3.19 |
| | 3856 | SHOWER SHOE LARGE | $3.19 |
| | 3857 | SHOWER SHOE XL | $3.19 |
| | 3858 | SHOWER SHOE 2XL | $3.19 |
| | 1453 | V STRAP SHOWER SHOE M | $0.90 |
| | 1454 | V STRAP SHOWER SHOE L | $0.90 |
| | 7063 | ELECTRIC RAZOR (OCC ONLY) | $16.00 |
| | 835 | DOO-RAG | $2.41 |

| QTY | CODE | ITEM | COST |
|---|---|---|---|
| | 1901 | REEBOk CLASSIC SZ 7.5 | $26.49 |
| | 1902 | REEBOK CLASSIC SZ 8 | $26.49 |
| | 1903 | REEBOK CLASSIC SZ 8.5 | $26.49 |
| | 1904 | REEBOK CLASSIC SZ 9 | $26.49 |
| | 1905 | REEBOK CLASSIC SZ 9.5 | $26.49 |
| | 1906 | REEBOK CLASSIC SZ 10 | $26.49 |
| | 1907 | REEBOK CLASSIC SZ 10.5 | $26.49 |
| | 1908 | REEBOK CLASSIC SZ 11 | $26.49 |
| | 1909 | REEBOK CLASSIC SZ 11.5 | $26.49 |
| | 1910 | REEBOK CLASSIC SZ 12 | $26.49 |
| | 1911 | REEBOK CLASSIC SZ 13 | $26.49 |
| | 1933 | REEBOK CLASSIC SZ 14 | $26.49 |
| | 1934 | REEBOK CLASSIC SZ 15 | $26.49 |
| | 7400 | NIKE DART SZ 7 | $33.86 |
| | 7401 | NIKE DART SZ 7.5 | $33.86 |
| | 7402 | NIKE DART SZ 8 | $33.86 |
| | 7403 | NIKE DART SZ 8.5 | $33.86 |
| | 7404 | NIKE DART SZ 9 | $33.86 |
| | 7405 | NIKE DART SZ 9.5 | $33.86 |
| | 7406 | NIKE DART SZ 10 | $33.86 |
| | 7407 | NIKE DART SZ 10.5 | $33.86 |
| | 7408 | NIKE DART SZ 11 | $33.86 |
| | 7409 | NIKE DART SZ 11.5 | $33.86 |
| | 7410 | NIKE DART SZ 12 | $33.86 |
| | 7411 | NIKE DART SZ 13 | $33.86 |
| | 7412 | NIKE DART SZ 14 | $33.86 |
| | 7413 | NIKE DART SZ 15 | $33.86 |
| | 3784 | NEW BALANCE CM225W 7 | $65.99 |
| | 3785 | NEW BALANCE CM225W 7.5 | $65.99 |
| | 3987 | NEW BALANCE CM225W 8 | $65.99 |
| | 3788 | NEW BALANCE CM225W 8.5 | $65.99 |
| | 3789 | NEW BALANCE CM225W 9 | $65.99 |
| | 3791 | NEW BALANCE CM225W 9.5 | $65.99 |
| | 3793 | NEW BALANCE CM225W 10 | $65.99 |
| | 3795 | NEW BALANCE CM225W 10.5 | $65.99 |
| | 3797 | NEW BALANCE CM225W 11 | $65.99 |
| | 3799 | NEW BALANCE CM225W 11.5 | $65.99 |
| | 3801 | NEW BALANCE CM225W 12 | $65.99 |
| | 3803 | NEW BALANCE CM225W 13 | $65.99 |
| | 3805 | NEW BALANCE CM225W 14 | $65.99 |
| | 3951 | ASICS GEL SZ 7 | $69.99 |
| | 3953 | ASICS GEL SZ 7.5 | $69.99 |
| | 3955 | ASICS GEL SZ 8 | $69.99 |
| | 3957 | ASICS GEL SZ 8.5 | $69.99 |
| | 3959 | ASICS GEL SZ 9 | $69.99 |
| | 3961 | ASICS GEL SZ 9.5 | $69.99 |
| | 3963 | ASICS GEL SZ 10 | $69.99 |
| | 3965 | ASICS GEL SZ 10.5 | $69.99 |
| | 3967 | ASICS GEL SZ 11 | $69.99 |
| | 3969 | ASICS GEL SZ 11.5 | $69.99 |
| | 3971 | ASICS GEL SZ 12 | $69.99 |
| | 3973 | ASICS GEL SZ 13 | $69.99 |
| | 9563 | NEW BALANCE MR1123MC SZ 7 | $105.00 |
| | 9564 | NEW BALANCE MR1123MC SZ 7.5 | $105.00 |
| | 9565 | NEW BALANCE MR1123MC SZ 8 | $105.00 |
| | 9566 | NEW BALANCE MR1123MC SZ 8.5 | $105.00 |
| | 9567 | NEW BALANCE MR1123MC SZ 9 | $105.00 |
| | 9568 | NEW BALANCE MR1123MC SZ 9.5 | $105.00 |
| | 9569 | NEW BALANCE MR1123MC SZ 10 | $105.00 |
| | 9570 | NEW BALANCE MR1123MC SZ 10.5 | $105.00 |
| | 9571 | NEW BALANCE MR1123MC SZ 11 | $105.00 |
| | 9572 | NEW BALANCE MR1123MC SZ 11.5 | $105.00 |
| | 9573 | NEW BALANCE MR1123MC SZ 12 | $105.00 |
| | 9574 | NEW BALANCE MR1123MC SZ 13 | $105.00 |
| | 9575 | NEW BALANCE MR1123MC SZ 14 | $105.00 |
| | 9576 | NEW BALANCE MR1123MC SZ 15 | $105.00 |
| QTY | CODE | BASKETBALL SNEAKERS | COST |
| | 8358 | V4ORCE PLAYMAKER SZ 7.5 | $29.99 |
| | 8359 | V4ORCE PLAYMAKER SZ 8 | $29.99 |
| | 8360 | V4ORCE PLAYMAKERSZ 8.5 | $29.99 |
| | 8361 | V4ORCE PLAYMAKER SZ 9 | $29.99 |
| | 8362 | V4ORCE PLAYMAKER SZ 9.5 | $29.99 |
| | 8363 | V4ORCE PLAYMAKER SZ 10 | $29.99 |
| | 8364 | V4ORCE PLAYMAKER SZ 10.5 | $29.99 |
| | 8365 | V4ORCE PLAYMAKER SZ 11 | $29.99 |
| | 8366 | V4ORCE PLAYMAKER SZ 11.5 | $29.99 |
| | 8367 | V4ORCE PLAYMAKERSZ 12 | $29.99 |
| | 7428 | V4ORCE PLAYMAKER SZ 13 | $29.99 |
| | 7429 | V4ORCE PLAYMAKER SZ 14 | $29.99 |
| | 7430 | V4ORCE PLAYMAKERSZ 15 | $29.99 |
| | 8048 | REEBOK HI-TOP SZ 7.5 | $43.99 |
| | 8049 | REEBOK HI-TOP SZ 8 | $43.99 |
| | 8050 | REEBOK HI-TOP SZ 8.5 | $43.99 |
| | 8051 | REEBOK HI-TOP SZ 9 | $43.99 |
| | 8052 | REEBOK HI-TOP SZ 9.5 | $43.99 |
| | 8053 | REEBOK HI-TOP SZ 10 | $43.99 |
| | 8054 | REEBOK HI-TOP SZ 10.5 | $43.99 |
| | 8055 | REEBOK HI-TOP SZ 11 | $43.99 |
| | 8056 | REEBOK HI-TOP SZ 11.5 | $43.99 |
| | 8057 | REEBOK HI-TOP SZ 12 | $43.99 |
| | 8058 | REEBOK HI-TOP SZ 13 | $43.99 |
| | 8059 | REEBOK HI-TOP SZ 14 | $43.99 |
| | 8060 | REEBOK HI-TOP SZ 15 | $43.99 |
| | 8557 | NEW BALANCE SZ 7 | $59.99 |
| | 8558 | NEW BALANCE SZ 7.5 | $59.99 |
| | 8559 | NEW BALANCE SZ 8 | $59.99 |
| | 8560 | NEW BALANCE SZ 8.5 | $59.99 |
| | 8561 | NEW BALANCE SZ 9 | $59.99 |
| | 8562 | NEW BALANCE SZ 9.5 | $59.99 |
| | 8563 | NEW BALANCE SZ 10 | $59.99 |
| | 8564 | NEW BALANCE SZ 10.5 | $59.99 |
| | 8565 | NEW BALANCE SZ 11 | $59.99 |
| | 8566 | NEW BALANCE SZ 11.5 | $59.99 |
| | 8567 | NEW BALANCE SZ 12 | $59.99 |
| | 8568 | NEW BALANCE SZ 13 | $59.99 |
| | 8569 | NEW BALANCE SZ 14 | $59.99 |
| | 8479 | NIKE OVER PLAY SZ 7 | $67.19 |
| | 8480 | NIKE OVER PLAY SZ 7.5 | $67.19 |
| | 8481 | NIKE OVER PLAY SZ 8 | $67.19 |

| QTY | CODE | ITEM | COST |
|---|---|---|---|
| | 8483 | NIKE OVER PLAY SZ 9 | $67.19 |
| | 8484 | NIKE OVER PLAY SZ 9.5 | $67.19 |
| | 8485 | NIKE OVER PLAY SZ 10 | $67.19 |
| | 8486 | NIKE OVER PLAY SZ 10.5 | $67.19 |
| | 8487 | NIKE OVER PLAY SZ 11 | $67.19 |
| | 8488 | NIKE OVER PLAY SZ 11.5 | $67.19 |
| | 8489 | NIKE OVER PLAY SZ 12 | $67.19 |
| | 8490 | NIKE OVER PLAY SZ 13 | $67.19 |
| | 8491 | NIKE OVER PLAY SZ 14 | $67.19 |
| | 8492 | NIKE OVER PLAY SZ 15 | $67.19 |
| | 9001 | NEW BALANCE MX407N SZ 7 | $68.39 |
| | 9005 | NEW BALANCE MX407N SZ 7.5 | $68.39 |
| | 9093 | NEW BALANCE MX407N SZ 8 | $68.39 |
| | 9096 | NEW BALANCE MX407N SZ 8.5 | $68.39 |
| | 9157 | NEW BALANCE MX407N SZ 9 | $68.39 |
| | 9200 | NEW BALANCE MX407N SZ 9.5 | $68.39 |
| | 9289 | NEW BALANCE MX407N SZ 10 | $68.39 |
| | 9306 | NEW BALANCE MX407N SZ 10.5 | $68.39 |
| | 9309 | NEW BALANCE MX407N SZ 11 | $68.39 |
| | 9318 | NEW BALANCE MX407N SZ 11.5 | $68.39 |
| | 9326 | NEW BALANCE MX407N SZ 12 | $68.39 |
| | 9330 | NEW BALANCE MX407N SZ 13 | $68.39 |
| | 9363 | NEW BALANCE MX407N SZ 14 | $68.39 |
| | 9366 | NEW BALANCE MX407N SZ 15 | $68.39 |
| QTY | CODE | VELCRO SNEAKER | COST |
| | 1878 | SHOE CORP VELCRO SZ 6 | $27.00 |
| | 5810 | SHOE CORP VELCRO SZ 6.5 | $27.00 |
| | 1879 | SHOE CORP VELCRO SZ 7 | $27.00 |
| | 5811 | SHOE CORP VELCRO SZ 7.5 | $27.00 |
| | 1880 | SHOE CORP VELCRO SZ 8 | $27.00 |
| | 5812 | SHOE CORP VELCRO SZ 8.5 | $27.00 |
| | 4993 | SHOE CORP VELCRO SZ 9 | $27.00 |
| | 5813 | SHOE CORP VELCRO SZ 9.5 | $27.00 |
| | 4994 | SHOE CORP VELCRO SZ 10 | $27.00 |
| | 5814 | SHOE CORP VELCRO SZ 10.5 | $27.00 |
| | 4995 | SHOE CORP VELCRO SZ 11 | $27.00 |
| QTY | CODE | BOOTS | COST |
| | 5682 | DESERT BOOT SZ 5 | $26.25 |
| | 5683 | DESERT BOOT SZ 5.5 | $26.25 |
| | 5684 | DESERT BOOT SZ 6 | $26.25 |
| | 5685 | DESERT BOOT SZ 6.5 | $26.25 |
| | 5686 | DESERT BOOT SZ 7 | $26.25 |
| | 5687 | DESERT BOOT SZ 7.5 | $26.25 |
| | 5688 | DESERT BOOT SZ 8 | $26.25 |
| | 5689 | DESERT BOOT SZ 8.5 | $26.25 |
| | 5690 | DESERT BOOT SZ 9 | $26.25 |
| | 5691 | DESERT BOOT SZ 9.5 | $26.25 |
| | 5692 | DESERT BOOT SZ 10 | $26.25 |
| | 5693 | DESERT BOOT SZ 10.5 | $26.25 |
| | 5694 | DESERT BOOT SZ 11 | $26.25 |
| | 5695 | DESERT BOOT SZ 11.5 | $26.25 |
| | 5696 | DESERT BOOT SZ 12 | $26.25 |
| | 5697 | DESERT BOOT SZ 13 | $26.25 |
| | 5698 | DESERT BOOT SZ 14 | $26.25 |
| | 5621 | PITBOSS BOOT SZ 7 | $87.40 |
| | 5622 | PITBOSS BOOT SZ 7.5 | $87.40 |
| | 5623 | PITBOSS BOOT SZ 8 | $87.40 |
| | 5624 | PITBOSS BOOT SZ 8.5 | $87.40 |
| | 5625 | PITBOSS BOOT SZ 9 | $87.40 |
| | 5626 | PITBOSS BOOT SZ 9.5 | $87.40 |
| | 5627 | PITBOSS BOOT SZ 10 | $87.40 |
| | 5628 | PITBOSS BOOT SZ 10.5 | $87.40 |
| | 5629 | PITBOSS BOOT SZ 11 | $87.40 |
| | 5630 | PITBOSS BOOT SZ 11.5 | $87.40 |
| | 5631 | PITBOSS BOOT SZ 12 | $87.40 |
| | 5632 | PITBOSS BOOT SZ 13 | $87.40 |
| QTY | CODE | LEATHER BELT | COST |
| | 7350 | SZ 32 | $8.49 |
| | 7351 | SZ 34 | $8.49 |
| | 7352 | SZ 36 | $8.49 |
| | 7353 | SZ 38 | $8.49 |
| | 7354 | SZ 40 | $8.49 |
| | 7355 | SZ 42 | $8.49 |
| | 7356 | SZ 44 | $8.49 |
| | 7357 | SZ 46 | $8.49 |
| | 7358 | SZ 48 | $8.75 |
| | 7359 | SZ 50 | $8.75 |
| QTY | CODE | DRESS SHOES | COST |
| | 7900 | ROCKY OXFORD SZ 7 | $68.90 |
| | 7901 | ROCKY OXFORD SZ 7.5 | $68.90 |
| | 7902 | ROCKY OXFORD SZ 8 | $68.90 |
| | 7903 | ROCKY OXFORD SZ 8.5 | $68.90 |
| | 7904 | ROCKY OXFORD SZ 9 | $68.90 |
| | 7905 | ROCKY OXFORD SZ 9.5 | $68.90 |
| | 7906 | ROCKY OXFORD SZ 10 | $68.90 |
| | 7907 | ROCKY OXFORD SZ 10.5 | $68.90 |
| | 7908 | ROCKY OXFORD SZ 11 | $68.90 |
| | 7909 | ROCKY OXFORD SZ 11.5 | $68.90 |
| | 7910 | ROCKY OXFORD SZ 12 | $68.90 |
| | 7911 | ROCKY OXFORD SZ 13 | $68.90 |
| | 7912 | ROCKY OXFORD SZ 14 | $68.90 |
| | 7913 | ROCKY OXFORD SZ 15 | $68.90 |

ORDER TOTAL ___________________

SIGNATURE ______________________

DATE ______________________

** 3 WEEK GUARANTEE ON ALL PRODUCTS

** ALL WIDE WIDTH FOOTWEAR IS A SPECIAL ORDER

** THE FOLLOWING ARE AVAILABLE IN WIDE WIDTHS - NB CM225W 2E AND 4E, ASICS 2E, NB MX407N 2E AND 4E DESERT BOOT WIDE PITBOSS BOOT WIDE

# EXHIBIT F

| Code | Qty | Item | Price |
|---|---|---|---|
| PERSONAL CARE PRODUCTS | | | |
| 0011 | ____ | ALBERTO VO5_CONDITIO | 1.38 |
| 0028 | ____ | GEN NEUTROGENA(TAR S | 3.15 |
| 0036 | ____ | D&L PERM CREAM RLXR | 6.95 |
| 0039 | ____ | D&L PLUS RELAXER SYS | 6.95 |
| 0046 | ____ | PROTEIN 29_GEL_HAIR | 2.10 |
| 0051 | ____ | HAIRDRESS & PRESS OI | 1.29 |
| 0054 | ____ | ELEMENTZ_GEL_FIRM HO | 2.28 |
| 0055 | ____ | PRO GLO GEL POMADE | 1.43 |
| 0082 | ____ | PERM HAIR COLOR-LT B | 3.38 |
| 0083 | ____ | HAIR COLOR-MED ASH B | 3.38 |
| 0084 | ____ | PERM HAIR COLOR-BLAC | 3.38 |
| 0088 | ____ | HAIR COLOR LT. ASH B | 3.38 |
| 0089 | ____ | HAIR COLOR DARK BROW | 3.38 |
| 0094 | ____ | HAIRSPRAY_ALCOHOL FR | 1.65 |
| 0106 | ____ | ANTIPERSPIRANT/DEODO | 1.65 |
| 0116 | ____ | SUAVE ANTIPERSPIRANT | 2.35 |
| 0118 | ____ | FORCE A/P DEOD ROLL- | 1.20 |
| 0139 | ____ | HAND SANITIZER 1.75 | 4.80 |
| 0147 | ____ | P-UP A/P DEOD DRIVE | 1.71 |
| 0196 | ____ | GS ALL DAY ALLERGY T | 7.00 |
| 0201 | ____ | BABY POWDER 15OZ | 1.45 |
| 0203 | ____ | DIAL ADV THRPY LOTIO | 3.25 |
| 0214 | ____ | COCOA & SHEA COND LO | 1.70 |
| 0216 | ____ | COCOA BUTTER STICK 1 | 1.10 |
| 0242 | ____ | NATUREPLEX ZIT FREE | 2.05 |
| 0247 | ____ | GEN COLACE(STOOL SOF | 3.03 |
| 0250 | ____ | HYDROCORTISONE CREAM | 3.15 |
| 0251 | ____ | GEN TINACTIN(TOLNAFT | 1.60 |
| 0267 | ____ | BACITRACIN OINTMENT | 4.60 |
| 0273 | ____ | LIP BALM | 1.02 |
| 0280 | ____ | SUNSCREEN LOTION SPF | 2.28 |
| 0287 | ____ | MELATONIN 60/CT | 4.50 |
| 0320 | ____ | REG MAGIC CREAM SHAV | 2.69 |
| 0331 | ____ | PRO-TECTION SHAVE CR | 1.15 |
| 0348 | ____ | MAXI PAD | 8.95 |
| 0349 | ____ | (BX) SHEER BANDAGES | 0.78 |
| 0358 | ____ | CONDITIONER-ALMOND/S | 1.75 |
| 0361 | ____ | ELEMENTZ 3-N-1 BODY | 2.00 |
| 0362 | ____ | DANDRUFF SHAMP/ALMND | 2.40 |
| 0396 | ____ | OATMEAL BAR SOAP | 1.40 |
| 0397 | ____ | NEXT1 COCOA BTTR SOA | 0.75 |
| 0424 | ____ | MOISTURIZING SOAP 5 | 0.80 |
| 0426 | ____ | SPORT BAR SOAP | 0.80 |
| 0490 | ____ | SOAP DISH | 0.35 |
| 0500 | ____ | 8-OZ MOUTHWASH_ORAL | 1.10 |
| 0510 | ____ | CAVITY TOOTHPASTE_MI | 1.80 |
| 0515 | ____ | COLGATE_TOOTHPASTE_T | 2.48 |
| 0519 | ____ | COLGATE TOOTHPASTE | 1.15 |
| 0535 | ____ | 4 OZ SENSODYNE TOOTH | 5.15 |
| 0544 | ____ | FLOSS LOOPS | 1.87 |
| 0550 | ____ | TEK SOFT TOOTHBRUSH | 0.60 |
| 0551 | ____ | TEK MED. TOOTHBRUSH | 0.60 |
| 0552 | ____ | TEK HARD TOOTHBRUSH | 0.60 |
| 0564 | ____ | FIXODENT | 5.95 |
| 0573 | ____ | ANTACID | 0.25 |
| 0577 | ____ | MEDI-SELTZER | 0.60 |
| 0580 | ____ | TOOTHBRUSH HOLDER | 0.31 |
| 0594 | ____ | DENTURE CLEANSER | 5.40 |
| 0595 | ____ | 2.5OZ EFFERGRIP | 3.25 |
| 0596 | ____ | ORAFIX DENTURE BATH | 1.51 |
| 0611 | ____ | ASPRIN - GENERIC | 0.50 |
| 0612 | ____ | 2PK ADVIL | 0.50 |
| 0615 | ____ | ASPRIN | 1.55 |
| 0620 | ____ | IBUPROFEN 50/CT | 1.85 |
| 0635 | ____ | ANTACID LIQUID | 2.68 |
| 0636 | ____ | MILK OF MAGNESIA | 2.50 |
| 0640 | ____ | (PK) ROLAIDS 3/ROLLS | 1.70 |
| 0645 | ____ | 2PK ALKA SELTZER | 0.50 |
| 0655 | ____ | BISMUTH LIQUID-STOMA | 2.93 |
| 0662 | ____ | GEN CHIFORPHEN(ALRGY | 1.50 |
| 0663 | ____ | KAOPECTATE | 4.50 |
| 0669 | ____ | SALINE NASAL SPRAY 1 | 1.76 |
| 0671 | ____ | GEN CGH DROPS-CHRY 3 | 0.80 |
| 0680 | ____ | DAILY MULTIVITAMIN | 2.25 |
| 0681 | ____ | MULTIVITAMIN W/IRON | 2.50 |
| 0691 | ____ | ARTIFICIAL TEARS | 2.15 |
| 0708 | ____ | MONISTATE ITCH RELIE | 6.85 |
| 0709 | ____ | SUPER TAMPONS | 5.25 |
| 0710 | ____ | TAMPONS 1BX | 4.75 |
| 0712 | ____ | REGULAR MAXI PAD 24C | 2.00 |
| 0713 | ____ | PANTY LINERS 22CT. | 0.98 |
| 0716 | ____ | PEPCID AC 8 CT | 7.44 |
| 0720 | ____ | FOOT POWDER | 2.00 |
| 0750 | ____ | NAIL CLIPPER NO FILE | 0.32 |
| 0751 | ____ | TRIM TOE NAIL CLIPPE | 0.66 |
| 0753 | ____ | EMERY BOARD (1) | 0.20 |
| 0754 | ____ | EMERY BOARD (10PACK) | 0.62 |
| 0760 | ____ | COTTON SWABS 100CT B | 0.80 |
| 0766 | ____ | SUPER SOFT TISSUES 8 | 1.40 |
| 0771 | ____ | TOILET TISSUE/1ROLL | 1.25 |
| 0800 | ____ | 5 INCH COMB | 0.15 |
| 0810 | ____ | MENS HAIR BRUSH | 1.08 |
| 0820 | ____ | VENTED HAIR BRUSH | 0.89 |
| 0824 | ____ | PONYTAILER_ELASTIC N | 2.80 |
| 0825 | ____ | SMALL AFRO PIK | 0.37 |
| 0854 | ____ | FOAM ROLLERS LRG. | 1.27 |
| 0855 | ____ | PONYTAIL HOLDER | 0.15 |
| 1343 | ____ | MIRROR W/O MAGNET | 1.77 |
| 3675 | ____ | PRILOSEC OTC | 16.95 |
| 3676 | ____ | MIDOL X-STRGHTH CAPL | 5.00 |
| 5240 | ____ | SN FISH OIL OMEGA 3 | 8.70 |
| **SOAP ITEMS** | | | |
| 0398 | ____ | DIAL TRANSLUCENT SOA | 1.25 |
| 0440 | ____ | DOVE SOAP - MOISTURI | 1.40 |
| MISCELLANEOUS | | | |
| 0470 | ____ | REPLACEMENT RIBBON 2 | 7.85 |
| 0471 | ____ | CORRECTION TAPES 1/P | 4.60 |
| 0788 | ____ | BLACK RADIANCE_EYELI | 2.49 |
| 0822 | ____ | CLUB BRUSH_NYLON BRI | 2.30 |
| 0999 | ____ | BLANK CARDS | 0.61 |
| 1001 | ____ | LARGE STAMPED ENVELO | 0.68 |
| 1013 | ____ | ENVELOPE #10 50/CT | 1.05 |
| 1016 | ____ | AIRMAIL STAMP | 1.20 |
| 1030 | ____ | BLUE ROUND STICK PEN | 0.18 |
| 1033 | ____ | BLACK ROUND STICK PE | 0.18 |
| 1048 | ____ | POST CARD STAMPED | 0.40 |
| 1050 | ____ | BOOK OF TEN STAMPS | 5.50 |
| 1056 | ____ | ADDRESS BOOK SMALL | 0.74 |
| 1060 | ____ | QUILL_PAPER_50 SHEET | 0.89 |
| 1062 | ____ | 8.5 X 14 LEGAL PAD Y | 1.00 |
| 1065 | ____ | TYPING PAPER | 3.50 |
| 1068 | ____ | SECURITY PEN-BLACK | 0.30 |
| 1070 | ____ | SKETCH PAD 8.5 X 11 | 0.95 |
| 1077 | ____ | #2 PENCIL | 0.15 |
| 1080 | ____ | ROSE ART COLORED PEN | 2.10 |
| 1085 | ____ | BEVELED ERASER | 0.45 |
| 1101 | ____ | JUVENILE BIRTHDAY CA | 0.80 |
| 1103 | ____ | BIRTHDAY CARD | 0.80 |
| 1109 | ____ | FRIENDSHIP CARD - PA | 0.75 |
| 1120 | ____ | THANK YOU CARD W/O S | 0.75 |
| 1121 | ____ | SEASONAL GREETING CA | 0.75 |
| 1123 | ____ | SPANISH BIRTHDAY CAR | 0.75 |
| 1124 | ____ | SPANISH FRIENDSHIP C | 0.75 |
| 1125 | ____ | PHOTO ALBUM | 2.01 |
| 1200 | ____ | AAA 4/PK ION3 BATTER | 1.80 |
| 1210 | ____ | AA 4PK ION3 BATTERIE | 1.80 |
| 1226 | ____ | COMPOSITION BOOK-RUL | 2.50 |
| 1292 | ____ | SWINTEC_TYPEWRITER R | 8.00 |
| 1293 | ____ | LIFT OFF CORRECTN TA | 10.60 |
| 1300 | ____ | AVIATOR PLAYING CARD | 1.30 |
| 1305 | ____ | PINOCHLE CARDS | 1.30 |
| 1344 | ____ | PLASTIC FORK | 0.10 |
| 1345 | ____ | SCOTCH TAPE | 0.90 |
| 1373 | ____ | BOOT LACES_BLACK | 0.90 |
| 1398 | ____ | PALMOLIVE DISH ORIG | 1.10 |
| 1417 | ____ | SPOON (PLASTIC) | 0.09 |
| 1707 | ____ | SHOE LACES_BLACK | 0.87 |
| 1709 | ____ | KIWI_SHOE LACES_FLAT | 0.87 |
| 1875 | ____ | MED DLX SHWR SHOE SA | 3.00 |
| 2078 | ____ | 10/PK SUGAR | 0.20 |
| 2212 | ____ | BUG X INSECT REPELLE | 0.60 |
| 4901 | ____ | (SS) FULLY COOKED BA | 2.10 |
| 5078 | ____ | ATG_KCN MEDIA UNITS_ | 0.01 |
| 5314 | ____ | LIPSTICK_BLACK ORCHI | 0.86 |
| 6497 | ____ | SALT SHAKER-PLASTIC | 0.75 |
| 6498 | ____ | PEPPER SHAKER-PLASTI | 1.25 |
| 7012 | ____ | TYPEWRITER RIBBON 1/ | 4.85 |
| 7013 | ____ | CORRECTION TAPE | 4.85 |
| 7136 | ____ | WATCH BATTERY - 364 | 1.59 |
| 7139 | ____ | WATCH BATTERY - 371 | 1.85 |
| 7156 | ____ | WATCH BATTERY - ECR | 1.59 |
| 7159 | ____ | WATCH BATTERY - ECR | 1.85 |
| BEVERAGES | | | |
| 2011 | ____ | KF DECAF(CLRPK W/ZIP | 2.85 |
| 2017 | ____ | MAXWELL HOUSE 4 OZ C | 4.00 |
| 2028 | ____ | (BX) KF TEA BAGS 48 | 1.60 |
| 2037 | ____ | BIGELOW *DECAF* TEA | 2.35 |
| 2041 | ____ | FRENCH VANILLA CAPPU | 1.70 |
| 2071 | ____ | 10 OZ. HOT COCOA CLR | 1.55 |
| 2134 | ____ | CHOC HEALTH SHAKE | 1.85 |
| 2136 | ____ | VANILLA HEALTH SHAKE | 1.85 |
| 2256 | ____ | V-8 VEGETABLE JUICE | 1.80 |
| 2302 | ____ | CRANBERRY JUICE | 1.75 |
| 2312 | ____ | COUNTRY TIME LEMON B | 2.00 |
| 2320 | ____ | 12OZ ORANGE DRINK | 1.75 |
| 2331 | ____ | KOOLAID-TROP PUNCH 1 | 1.95 |
| 2357 | ____ | MEAL MART BEEF GOULA | 5.41 |
| 2395 | ____ | NIAGARA_PURIFIED BOT | 0.50 |
| 2396 | ____ | PEPSI 20 OZ. | 1.35 |
| 2398 | ____ | DIET PEPSI 20 OZ. | 1.35 |
| 2488 | ____ | SIERRA MIST 20 OZ | 1.35 |
| 2490 | ____ | ROOT BEER 20OZ | 1.35 |
| 2492 | ____ | GINGER ALE 20OZ | 1.35 |
| 2493 | ____ | ORANGE SODA 20OZ | 1.35 |
| 2514 | ____ | PERFORMANCE DRINK_PA | 1.95 |
| 4288 | ____ | KEEFE_COFFEE_COLOMBI | 4.40 |
| 4294 | ____ | DAYS_SODA_GRAPE_24 O | 1.10 |
| COOKIES/CRACKERS/PASTRIES | | | |
| 2594 | ____ | DOLLY MADISON CHOC C | 1.00 |
| 3020 | ____ | OREO COOKIES | 0.75 |
| 3040 | ____ | ZC ICED OATML COOKIE | 0.90 |
| 3045 | ____ | ZC DUPLEX CREMES 6OZ | 0.90 |
| 3052 | ____ | ZC VANILLA WAFERS 16 | 1.60 |
| 3107 | ____ | (BOX)SALTINE CRACKER | 1.80 |
| 3110 | ____ | CLUB CRACKERS | 1.55 |
| 3115 | ____ | CHEEZ ITS CRACKERS 1 | 0.60 |
| 3138 | ____ | KOSHER MATZAH | 4.15 |
| 3142 | ____ | HONEY GRAHAM CRACKER | 2.00 |
| 3143 | ____ | UNSALTED CRACKERS | 2.10 |
| 3175 | ____ | SMORES POPTARTS | 0.85 |
| 3192 | ____ | CREAM CHEESE COFFEE | 0.80 |
| 3193 | ____ | 2/PK FRSTD STRWBRY P | 0.80 |
| 3248 | ____ | CINNAMON ROLL | 0.80 |
| 3258 | ____ | KEEBLER TOWNHOUSE CR | 2.25 |
| 3274 | ____ | ZC MONSTER ICED BUNE | 1.00 |
| 3301 | ____ | NUTRIFT BAR CHOC CRM | 2.00 |
| 3333 | ____ | ZC(BOX) PB WAFERS 6- | 2.25 |
| 3500 | ____ | HONEY_GRADE A PURE | 2.60 |
| 4044 | ____ | DOLLY MADISON POWDER | 1.10 |
| 6263 | ____ | MUSTARD 12PK | 0.46 |
| CANDY | | | |
| 4035 | ____ | REESE PEANUT BUTTER | 1.40 |

| | | | |
|---|---|---|---|
| 4046 | ____ | M&M PEANUT PEG PACK | [illegible] |
| 4047 | ____ | M&M PLAIN PEG PACK | 2.65 |
| 4076 | ____ | GILMAN SHREDDED MOZZ | 2.50 |
| 4100 | ____ | BUTTERSCOTCH DISCS | 0.70 |
| 4121 | ____ | JELLY BEANS | 0.95 |
| 4135 | ____ | JOLLY RANCHERS ASST. | 0.99 |
| 4145 | ____ | CORNER STORE_CANDY_S | 0.70 |
| 4146 | ____ | ATOMIC FIREBALL CAND | 0.80 |
| 4151 | ____ | ASSORTED NOW & LATER | 0.98 |
| 4154 | ____ | ORANGE SLICES 5.7 OZ | 0.84 |
| 4155 | ____ | SUGAR FREE WILD FRUI | 0.67 |
| 4168 | ____ | LEMONHEADS REDRIFIC | 1.05 |
| 4310 | ____ | (EA)MILKY WAY MINI P | 1.24 |
| TOBACCO | | | |
| 4080 | ____ | (BAG)SNICKERS MINITU | 1.95 |
| 4081 | ____ | (BAG)HRSHY MINI ASSO | 2.20 |
| FOOD/SNACK ITEMS | | | |
| 0921 | ____ | HONEY TURKEY STUCK 1 | 1.50 |
| 2044 | ____ | FRENCH VANILLA CREAM | 1.40 |
| 2053 | ____ | (10/PK) FRENCH VANIL | 1.90 |
| 2216 | ____ | (BX)PINK SUGAR SUBST | 1.55 |
| 2424 | ____ | BREAD - WHEAT | 2.20 |
| 2437 | ____ | RALSTON_INST OATMEAL | 0.37 |
| 2438 | ____ | (EA) MAPLE BROWN SUG | 0.37 |
| 2550 | ____ | PDF NONFAT DRY MILK | 4.29 |
| 2596 | ____ | CREAM CHEESE W/JALAP | 1.15 |
| 2624 | ____ | TRKY HNY&BRN SGR SAU | 2.00 |
| 2630 | ____ | BC BLACK BEANS 10OZ | 1.35 |
| 2664 | ____ | MACARONI & CHEESE 3 | 0.95 |
| 2670 | ____ | SPICY REFRIED BEANS& | 1.20 |
| 2736 | ____ | CHEDDAR SOUR CREAM C | 2.00 |
| 2737 | ____ | CHILI CHEESE FRITOS | 0.71 |
| 2740 | ____ | COOL RANCH DORITOS-C | 2.00 |
| 3085 | ____ | SWEDISH FISH_RED CAN | 1.00 |
| 3343 | ____ | GVC HONEY TOASTED OA | 3.90 |
| 3359 | ____ | BERRIES BUNCH O''KRU | 3.90 |
| 3389 | ____ | BLUEBERRY NUTRI-GRAI | 0.55 |
| 3559 | ____ | SLICED PEPPERONI | 2.25 |
| 3561 | ____ | CHORIZO | 2.40 |
| 3581 | ____ | BC SUMMER SAUSAGE_HO | 1.38 |
| 3583 | ____ | BC SALAMI SUMMER SAU | 2.05 |
| 3585 | ____ | BC REG SUMMER SAUSAG | 2.05 |
| 3650 | ____ | FC MACK FILLETS/OIL | 1.65 |
| 3783 | ____ | YELLOW RICE 2 OZ | 0.80 |
| 3786 | ____ | RED BEANS & RICE 4 O | 1.20 |
| 4056 | ____ | PEANUT BUTTER SQUEEZ | 0.40 |
| 4079 | ____ | GILMAN SHREDDED CHED | 2.50 |
| 4185 | ____ | DANISH_APPLE | 0.95 |
| 4278 | ____ | SAZON | 1.00 |
| 4429 | ____ | ZC STRAWBERRY SF WAF | 0.60 |
| 4430 | ____ | CHEESE DANISH_BLUEBE | 0.95 |
| 4431 | ____ | STRAWBERRY CHEESE DA | 0.95 |
| 4472 | ____ | CHICKEN IN SPICY YOG | 1.80 |
| 4473 | ____ | SPICE MIX_MEAT & VEG | 1.80 |
| 4488 | ____ | PAKISTANI STYLE FRIE | 1.80 |
| 4900 | ____ | TUNA STK W/THAI CHIL | 2.10 |
| 6013 | ____ | CAJUN CHICKEN RAMEN | 0.41 |
| 6018 | ____ | TEXAS BEEF RAMEN SOU | 0.41 |
| 6026 | ____ | CHILI RAMEN | 0.41 |
| 6046 | ____ | CHICKEN RAMEN | 0.41 |
| 6052 | ____ | HOT & SPICY VEG RAME | 0.41 |
| 6079 | ____ | WHOLE SHABANG 1.5 OZ | 0.45 |
| 6100 | ____ | POTATO CHIPS | 0.45 |
| 6105 | ____ | BBQ POTATO CHIPS | 0.45 |
| 6108 | ____ | MOON LODGE PRETZELS | 1.10 |
| 6125 | ____ | HOT CHIPS 1.5 OZ | 0.45 |
| 6126 | ____ | SOUR CREAM ONION 1.5 | 0.45 |
| 6151 | ____ | DORITOS NACHO FLVR 8 | 1.90 |
| 6153 | ____ | CHIPS-BUFFALO WING B | 0.45 |
| 6156 | ____ | LITE BTTR MW POPCORN | 0.50 |
| 6159 | ____ | CHEETOS FLMN HOT 1.7 | 0.60 |
| 6166 | ____ | CA BBQ CORN CHIPS | 1.80 |
| 6167 | ____ | CHEETOS 2-OZ | 0.60 |
| 6173 | ____ | BC CHILI W/ BEANS | 1.90 |
| 6174 | ____ | BC HOT CHILI W/ BEAN | 1.90 |
| [illegible] | ____ | FC SARDINES IN OIL | 1.20 |
| 6183 | ____ | SMOKED CLAMS IN OIL | 2.00 |
| 6190 | ____ | FC FISHSTKS/GREEN CH | 1.20 |
| 6191 | ____ | FC SALMON FLAKES | 1.40 |
| 6195 | ____ | PREMIUM CHICKEN BREA | 2.25 |
| 6199 | ____ | BUTTER POPCORN | 1.10 |
| 6201 | ____ | MICROWAVE POPCORN - | 0.50 |
| 6241 | ____ | MIXED NUTS_W/PEANUTS | 2.75 |
| 6248 | ____ | HUNTS_KETCHUP_BEST E | 1.75 |
| 6258 | ____ | GARLIC POWDER 2.5 OZ | 1.00 |
| 6262 | ____ | MAYONNAISE 12PK | 1.04 |
| 6264 | ____ | BAGO KETCHUP 12PK | 0.55 |
| 6273 | ____ | COLONNA BROTHERS ONI | 0.94 |
| 6276 | ____ | COLONNA BROTHERS_SPI | 1.10 |
| 6308 | ____ | CHICKEN W/POTATOES | 7.85 |
| 6320 | ____ | BEEF & CHEESE STICK | 0.94 |
| 6361 | ____ | ELBOW MACARONI 1 LB | 1.35 |
| 6362 | ____ | ZITI 1 LB BAG | 1.00 |
| 6400 | ____ | (EA)CHWY CHOC CHIP G | 0.50 |
| 6402 | ____ | CLR CHC CREAMY PB | 2.45 |
| 6412 | ____ | GRAPE JELLY 1 OZ. | 0.18 |
| 6421 | ____ | KFT RANCH DRESSING P | 0.45 |
| 6426 | ____ | SALSA SQZ BOTTLE 15. | 1.60 |
| 6430 | ____ | SS FROSTED FLAKES | 0.45 |
| 6444 | ____ | JALAPENO CHS SPREAD | 1.90 |
| 6449 | ____ | JALAPENO CHEESE BAR | 1.50 |
| 6457 | ____ | PARMESAN CHEESE | 1.50 |
| 6474 | ____ | BRAN FLAKES | 2.25 |
| 6500 | ____ | PICKLE (HOT) | 0.75 |
| 6501 | ____ | PICKLE (MILD) | 0.75 |
| 6507 | ____ | SLICED JALAPENO PEPP | 0.35 |
| 6512 | ____ | 6 OZ LA HOT SAUCE | 0.75 |
| 6536 | ____ | QUAKER INSTANT GRITS | 2.55 |
| 6542 | ____ | OLIVES POUCH | 2.50 |
| 6543 | ____ | PROVOLONE CHEESE BLO | 1.50 |
| 6545 | ____ | MAYONAISE 18 OZ | 2.45 |
| 6557 | ____ | MAYAN FARMS_TORTILLA | 2.00 |
| 6600 | ____ | FLOUR TORTILLAS | 1.00 |
| 6606 | ____ | SALTED PEANUTS 1.75 | 0.70 |
| 6607 | ____ | HOT PEANUTS 1.75 OZ | 0.70 |
| 6610 | ____ | GV PLAIN BAGEL | 0.60 |
| 6644 | ____ | SOUTHWST BLACK BEANS | 2.80 |
| 6664 | ____ | 8 OZ GOYA ADOBO W/PE | 1.45 |
| 6692 | ____ | CHEESE CURLS 10OZ | 1.79 |
| 6700 | ____ | SV REFRIED BEANS | 1.65 |
| 6721 | ____ | FISH STEAKS IN HOT S | 1.00 |
| 6741 | ____ | BC WHOLE KERNEL CORN | 1.10 |
| 6826 | ____ | FRESH CATCH TUNA 4.2 | 1.85 |
| INDIGENT CARE | | | |
| 2063 | ____ | (10/PK) CARAMEL MACC | 1.90 |
| 3039 | ____ | MARIAS COOKIES | 0.55 |
| 6540 | ____ | NUTRIGRAIN_CEREAL BA | 0.55 |
| COMMISSARY ONLY ITEMS | | | |
| 0010 | ____ | ALBERTO VO5_SHAMPOO | 1.38 |
| 0035 | ____ | 3-N-1 CONDITIONING S | 2.70 |
| 0530 | ____ | COOL WAVE CLR TOOTHP | 1.20 |
| 0568 | ____ | MASON NATURALS_MULTI | 10.50 |
| 0877 | ____ | DOMESTIC STAMP | 0.50 |
| 1015 | ____ | MANILLA ENVELOPE | 0.14 |
| 1102 | ____ | SYMPATHY CARD | 0.80 |
| 2015 | ____ | 100% COLOMBIAN FREEZ | 3.00 |
| 2021 | ____ | 8 OZ CREAMER CLEARPA | 1.45 |
| 2094 | ____ | BIGELOW GREEN TEA 20 | 3.25 |
| 2304 | ____ | GA PEACH DRNK CLRPK | 2.00 |
| 3030 | ____ | ZC VNILLA CRM COOKIE | 0.90 |
| 4019 | ____ | CHICK O STICK | 0.35 |
| 4156 | ____ | VANILLA CARAMELS | 0.75 |
| 6050 | ____ | KK INSTANT RICE | 1.55 |
| 6051 | ____ | KK BROWN RICE 6.5 OZ | 1.15 |
| 6083 | ____ | WHITE CHEDDAR POPCOR | 1.10 |
| 6284 | ____ | OLIVE OIL EXTRA VIRG | 2.50 |
| 6297 | ____ | PEPPERED BEEF JERKY | 1.35 |
| 6349 | ____ | WHOLE ENCHILADA PART | 2.10 |
| 6422 | ____ | CHEDDAR CHEESE BAR | 1.50 |
| 6428 | ____ | CA SHARP CHDR CHS SQ | 0.55 |
| [illegible] | ____ | CA JALAP CHEESE SQUE | [illegible].55 |
| 6508 | ____ | SOY SAUCE 6 OZ | 0.95 |
| 9801 | ____ | PHONE TIME $1 | 1.00 |

Signature: ______________________

Date: ______________________

# EXHIBIT G

MCI Norfolk

# MCI FRAMINGHAM
# CLOTHING REQUEST FORM

NAME: C. ALEXANDER DATE: 1/10/16

UNIT: 3-2 MCI NOR. COMMITTMENT #: W51335

| State Linen | Size | Quantity | Order Period |
|---|---|---|---|
| State Pillowcase ** | | | 12 Months |
| State Sheets | | | 12 Months |
| State Blanket** | | | 12 Months |

| State Clothing | | | |
|---|---|---|---|
| Underwear | | | 4 Months |
| Socks | | | 4 Months |
| Bras | 42-C | 3 | 4 Months |
| State T-Shirt | | | 6 Months |
| State Sweatshirt | LARGE | 1 | 6 Months |
| State Jeans | | | 6 Months |
| State Sneakers | WOMEN'S SIZE 11 | 1 | 6 Months |
| State Robe | | | 6 Months |
| State Jacket ** | LARGE | 1 | 12 Months |

| | | | |
|---|---|---|---|
| State Towel ** | | | 4 Months |
| Washcloth ** | | | 4 Months |

Comments: ______________________________

Exchanges should only be made if warranted by normal wear.
Maximum quantity to exchange at any one time is 2 per item.
Maximum quantity to exchange for items marked with ** is 1

| | |
|---|---|
| Inmate Signature: | |
| Date issued: | |
| Officer Signature: | |

# EXHIBIT J

Volume I
Pages 1 to 103
Exhibits 1 to 14

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - -x
CHRISTINE MARA ALEXANDER, Plaintiff,

vs.

MASSACHUSETTS DEPARTMENT OF CORRECTION, CAROL MICI, in her official capacity, NELSON ALVES, in his official capacity, and WELLPATH, LLC, Defendants.

Civil Action No. 1:20-cv-10020-PBS
- - - - - - - - - - - - - - - - - - -x

DEPOSITION OF HERBERT BERGER-HERSHKOWITZ, M.D., a witness called by counsel for the Plaintiff, appearing remotely via Zoom from Norfolk, Massachusetts, taken pursuant to the Federal Rules of Civil Procedure, before Jane M. Werner, Registered Merit Reporter and Notary Public in and for the Commonwealth of Massachusetts, appearing remotely from Halifax, Massachusetts, on Friday, October 21, 2022, commencing at 1:03 p.m.

PRESENT:

ALL PARTICIPANTS APPEARED VIA ZOOM VIDEOCONFERENCE

Sherin and Lodgen LLP
(by Daniel S. Guenther, Esq.)
101 Federal Street, Boston, MA 02110, for the Plaintiff.
617.646.2000
dsguenther@sherin.com

for MCI-Norfolk?
A. Yes.
Q. There does not appear to be any signature either in the approval space in the top left or anywhere else from the DOC; is that correct?
A. Correct.
Q. Do you recall providing a medical restriction form for Ms. Alexander for a wheelchair van?
A. Yes.
Q. Why did you submit a medical restriction form for Ms. Alexander for a wheelchair van?
A. Ms. Alexander indicated to me that she was aware of the existence of such a van and that it would be large enough to accommodate her transportation needs, given her claustrophobia.
Q. And you thought such a request was reasonable, so you filled out this medical restriction form?
A. Yes.
Q. Did you use your clinical medical judgment to decide to issue the medical restriction form?
A. Yes.
*Q. In your clinical medical judgment,